UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LLM BAR EXAM, LLC

                    Plaintiff,

            v.

BARBRI, INC., COLUMBIA LAW
SCHOOL, NEW YORK UNIVERSITY
SCHOOL OF LAW, HARVARD LAW
SCHOOL, BENJAMIN N. CARDOZO
SCHOOL OF LAW, ST. JOHN'S
UNIVERSITY SCHOOL OF LAW, DUKE
UNIVERSITY SCHOOL OF LAW,
UNIVERSITY OF SOUTHERN
CALIFORNIA GOULD SCHOOL OF LAW,
FORDHAM UNIVERSITY SCHOOL OF
LAW, GEORGETOWN UNIVERSITY LAW
CENTER, EMORY UNIVERSITY SCHOOL
OF LAW, UNIVERSITY OF CALIFORNIA,
BERKELEY, SCHOOL OF LAW, SYLVIA
T. POLO, NITZA ESCALERA, JOHN DOES
One through Five

                    Defendants.

CIVIL ACTION NO. 1:16-cv-3770

**COMPLAINT**

**TRIAL BY JURY DEMANDED**

COMES NOW the Plaintiff, LLM BAR EXAM, LLC ("Plaintiff"), by its attorneys,

Tosolini, Lamura, Rasile & Toniutti LLP, for its complaint against Defendants BARBRI, INC.

("Barbri"), COLUMBIA LAW SCHOOL ("Columbia"), NEW YORK UNIVERSITY SCHOOL

OF LAW ("NYU"), HARVARD LAW SCHOOL ("Harvard"), BENJAMIN N. CARDOZO

SCHOOL OF LAW ("Cardozo"), ST. JOHN'S UNIVERSITY SCHOOL OF LAW ("St. John's"),

DUKE UNIVERSITY SCHOOL OF LAW ("Duke"), UNIVERSITY OF SOUTHERN

CALIFORNIA GOULD SCHOOL OF LAW ("USC"), FORDHAM UNIVERSITY SCHOOL OF

LAW ("Fordham"), GEORGETOWN UNIVERSITY LAW CENTER ("Georgetown"), EMORY

UNIVERSITY SCHOOL OF LAW ("Emory"), UNIVERSITY OF CALIFORNIA, BERKELEY,

SCHOOL OF LAW ("Berkeley"), SYLVIA T. POLO ("Dean Polo"), NITZA ESCALERA ("Dean Escalera"), and JOHN DOES One through Five ("Does") (collectively, Defendants"), individually and jointly, and alleging as follows:

## NATURE OF THE COMPLAINT

1.      This is an action to recover damages arising out of: (i) monopolization, (ii) attempted monopolization, (iii) combination and conspiracy to restrain trade, (iv) misrepresentation and fraud, (v) unfair competition, (vi) tortious interference with prospective economic advantage, (vii) tortious interference with contractual relationship, (viii) violation of section 349 of the New York General business law, (ix) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), (x) RICO conspiracy, (xi) misappropriation of ideas, (xii) copyright infringement, (xiii) trade libel/trade slander/injurious falsehood/defamation, (xiv) breach of contract/breach of implied covenant of good faith and fair, and (xv) violation of Donnelly Act New York General Business Law Section 340(1).  This is a case of blatant industrial espionage committed by a sophisticated corporate entity (Barbri, Inc.) with the intent of forcing its top competitors out of the marketplace.  Defendant Barbri, Inc. has used its dominant position in the marketplace and overall relationship with the rest of the Defendants to compete unfairly with LLM BAR EXAM, LLC in an attempt to force LLM BAR EXAM, LLC out of business and to obtain and to preserve a monopoly over the bar examination review industry pertinent to foreign LL.M. graduates sitting the bar examination in one or more states in the United States.

## JURISDICTION AND VENUE

2.      This Court has subject-matter jurisdiction over this action, pursuant to 28 U.S.C. § 1331, in that this case arises under the laws of the United States, specifically 15 U.S.C. §

15, which authorizes private actions under the Sherman and Clayton Acts and 28 U.S.C. § 1331 and 18 U.S.C. § 1961 et seq. (the "RICO Act"). This Court also has jurisdiction over Plaintiff's state law claims, pursuant to 28 U.S.C. § 1367(a), because Plaintiff's state law claims are so related to its claims under the anti-trust laws that they form part of the same case or controversy.

3.     This Court has personal jurisdiction over Defendants, pursuant to 18 U.S.C. §§ 1965(a) and (b), as Defendants reside, have agents and/or transact their affairs in New York, and because, to the extent any Defendant does not reside, have agents, or transact its affairs in New York, and cannot be served in New York, the ends of justice require that such Defendant(s) be brought before this Court. This Court, further, has personal jurisdiction over Defendants, pursuant to N.Y. C.P.L.R. 301 and 302(a), because either (a) Defendants engaged in a continuous and systematic course of doing business in the State of New York, or (b) they directly or through their agents/representatives, transacted business and engaged in the commission of tortious acts in the State of New York from which the claims alleged herein arise out and/or committed tortious acts outside of the State of New York causing injury to Plaintiff within the State, and (i) regularly do or solicit business, and derive substantial revenue from services rendered or consumed, in the State of New York, and (ii) expect or should reasonably expect their tortious actions to have consequences in the State of New York and derive substantial revenue from interstate and international commerce.

4.     Venue is proper in this Court, pursuant to 15 U.S.C. §§ 15 and 22, because Defendants transact business in this district, where one or more Defendants reside, and because this is the District Court where a substantial amount of the activities forming the basis of the Complaint occurred. Venue is, also, proper in this judicial district, pursuant to 18 U.S.C. § 1965(b), because, to the extent any Defendant may reside outside of this district, the ends of justice

require that such Defendant(s) be brought before this Court.

## PARTIES

5.    Plaintiff **LLM BAR EXAM, LLC** (herein "LBE") is a limited liability company, organized and operating under the laws of New York, with its principal place of business at 70 West 36th Street, Suite 12A, New York, New York.  LBE  offers test preparation courses for the New York State and California State bar examinations, designed and marketed exclusively for internationally trained/educated lawyers who obtain Masters of Law (LL.M.) in law schools across the U.S. (herein "Foreign LL.M. Students").  The President of LBE is Emanuele Tosolini, Esq.

6.    Defendant **Barbri, Inc.** (herein "Barbri"), is a Delaware corporation, registered to do business in New York whose primary product offering is a bar examination preparation course and a direct competitor of LBE.  Barbri offers to law school graduates – both Juris Doctor ("J.D." and LL.M. graduates – a six to seven-week review course that covers the Multistate Bar Examination ("MBE") and additional law topics relevant to the state in which the participant law graduate intends to sit for the bar, including the New York State Bar Examination (herein "NY Bar Exam").

7.    Defendant COLUMBIA LAW SCHOOL, (herein "Columbia") is a New York private educational institution accredited by the American Bar Association with its principal place of business in New York, New York.

8.    Defendant NEW YORK UNIVERSITY, SCHOOL OF LAW, (herein "NYU") is a New York private educational institution accredited by the American Bar Association with its principal place of business in New York, New York.

9.    Defendant HARVARD LAW SCHOOL, (herein "Harvard") is a

Massachusetts private educational institution accredited by the American Bar Association with its principal place of business in Cambridge, Massachusetts.

10.     Defendant BENJAMIN N. CARDOZO SCHOOL OF LAW, (herein "Cardozo") is a New York private educational institution accredited by the American Bar Association with its principal place of business in New York, New York.

11.     Defendant ST. JOHN'S UNIVERSITY, SCHOOL OF LAW, (herein "St. John's") is a New York private educational institution accredited by the American Bar Association with its principal place of business in New York, New York.

12.     Defendant DUKE UNIVERSITY SCHOOL OF LAW (herein "Duke") is a North Carolina private educational institution accredited by the American Bar Association with its principal place of business in Durham, North Carolina.

13.     Defendant UNIVERSITY OF SOUTHERN CALIFORNIA GOULD SCHOOL OF LAW (herein "USC") is a California private educational institution accredited by the American Bar Association with its principal place of business in Los Angeles, California.

14.     Defendant FORDHAM UNIVERSITY SCHOOL OF LAW (herein "Fordham") is a New York private educational institution accredited by the American Bar Association with its principal place of business in New York, New York.

15.     Defendant GEORGETOWN UNIVERSITY LAW CENTER ("Georgetown") is a private educational institution accredited by the American Bar Association with its principal place of business in Washington, District of Columbia.

16.     Defendant EMORY UNIVERSITY SCHOOL OF LAW (herein "Emory") is a Georgia private educational institution accredited by the American Bar Association with its principal place of business in Atlanta, Georgia.

17.     Defendant UNIVERSITY OF CALIFORNIA, BERKELEY, SCHOOL OF LAW (herein "Berkeley") is a California public educational institution accredited by the American Bar Association with its principal place of business in Berkeley, California.

18.     Defendant SYLVIA T. POLO is Dean of Graduate Legal Studies at Columbia, and she resides in New York, New York.

19.     Defendant NITZA ESCALERA is Assistant Dean of Student Affairs at Fordham, and she resides in New York, New York.

20.     Various other persons, firms and corporations, the identities of which are presently unknown, have participated as co-conspirators, individually and/or jointly, with the Defendants in the violations asserted herein and have performed acts and made statements in furtherance thereof.

## FACTUAL ALLEGATIONS

### *Overview of LBE's Business*

21.     LBE was created by Emanuele Tosolini.  Mr. Tosolini earned an LL.M. degree from the University of California, Los Angeles, School of Law in 2005 and passed the NY Bar Exam in 2007.  An LL.M. degree from an accredited U.S. law school is a prerequisite for internationally trained/educated lawyers with a civil law background to sit for the NY Bar Exam. Throughout his own experience and knowledge, Mr. Tosolini saw business potential for creation of a U.S. bar review course tailored specifically to the needs of internationally trained/educated lawyers.

22.     Each year, thousands of internationally trained/educated lawyers take the NY Bar Exam.  For example, according to statistics published by the New York State Board of

Law Examiners, more than 1500 candidates for the February 2009 bar examination (counting 44% of the total) and more than 2900 candidates for the July 2009 bar examination (equal to 25% of the total) were foreign-law educated candidates.  Moreover, several hundred foreign LL.M. students graduate from New York City based law schools each year; nationally, the number of foreign LL.M. graduates exceeds 2000 annually.

23.     In the spring of 2009, LBE began test marketing its bar review course to Foreign LL.M. Students at various U.S. law schools through presentations and informational tables.  LBE received a positive, and enthusiastic feedback from these marketing sessions.

24.     LBE's bar review course offered several unique features to assist Foreign LL.M. Students pass the NY Bar Exam, including:

   i.   individualized study schedules, with personal mentoring and personal assigned tutor;

   ii.   early subject matter review course, providing introduction and overview of core multi-state bar examination ("MBE") subject areas (contracts, torts, constitutional law, criminal law, evidence, property), which Foreign LL.M. Students typically would not have studied during their LL.M. programs;

   iii.   full-time review course, emphasizing essay writing skills and providing unlimited graded essays (English is not the first language for almost all the Foreign LL.M. Students);

   iv.   providing more than forty (40+) assigned and graded essays and multiple review of multistate subjects;

   v.   intensive review course and advanced test-taking techniques course

      vi.   on-line live streaming of classes for students, who cannot attend lectures in person; and

      vii.   a money-back guarantee for students who do not pass the bar exam following LBE's methodology.

25.     Since its inception, LBE has grown very attractive among Foreign LL.M. Students –due to the positive feedback from those who use LBE's services – and was successful in having a significant amount of students pass the NY Bar Exam.  Although the bar passage rates among Foreign LL.M. Students have traditionally been low, LBE has enjoyed significantly high bar passage rates compared to those of its competitors.  The ultimate goal of LBE was to pivot into a different revenue source to provide its services in the Juris Doctor ("J.D.") bar review marketplace and the general bar review market at large, once LBE became an established bar review course provider for Foreign LL.M. Students across the U.S.

### *The Foreign LL.M. Student Marketplace*

26.     Foreign LL.M. Students are heavily concentrated in New York and California, with high matriculation at Columbia, NYU, Harvard, Cardozo, St. John's, Fordham, USC, Georgetown, Duke, Emory, and Berkeley.

27.     Foreign LL.M. Students are faced with unique challenges when preparing for a bar examination within the United States.  Typically, they do not study the subject matters tested in a bar examination during their one-year LL.M. program.

28.     For a majority of Foreign LL.M. Students, English is not their native language.  Because a bar examination is a scaled exam, the Foreign LL.M. Students are in direct competition with J.D. graduates who spend three years studying American law, and who are

(mostly) native English speaking individuals.  These differences leave many Foreign LL.M. Students at a noticeable disadvantage when sitting for a bar examination.

29.     Bar examination takers are expected to perform at a certain level of performance to pass a bar examination and, historically, a large number of Foreign LL.M. Students have not reached this threshold.

30.     Historically, bar examination passage rates of Foreign LL.M. Students are approximately half that of J.D. students.

31.     Due to foregoing discrepancies in the passage rates, and as explained *supra*, LBE developed (started) a program that focuses on the needs of Foreign LL.M. Students who desired to sit for the NY Bar Exam in the spring of 2009.  Upon information and belief, LBE was the first company to offer such a service.

32.     Unlike the disclosures required regarding information on J.D. students – full-time or part-time status, employment information, bar passage rates – law schools are not required to disclose any information regarding Foreign LL.M. Students.  The lack of necessary disclosures contributes to the foreign LL.M. products marketplace sector, which is largely unregulated.

## *The Bar Examination Review Marketplace*

33.     The provision of bar review courses to individuals preparing to take a bar examination generally is a relevant product market for purposes of enforcement of antitrust laws. The provision of full-service bar review courses to such individuals, which in dollar volume accounts for the vast preponderance of sales in the overall market, is a relevant product submarket for the purposes of enforcement of the antitrust laws.

34.     Bar examination review is the business of selling products and services designed to help students prepare for the bar exam.  Because each state bar exam involves a uniform component – the Multistate Bar Exam ("MBE") – and a non-uniform state-specific portion, bar review businesses can be divided into two general categories: (1) "MBE" bar reviews, whose products and services are exclusively designed to prepare law graduates for the MBE portion of the exam, and (2) "full service" bar review courses that aim to prepare law graduates for the entire bar exam experience -including the MBE- in a particular state.  Thus, since bar examinees in every state must take the MBE, the MBE bar review's products and services are appropriate for bar examinees in any state, while full service bar review courses must tailor their offerings to each state market they intend to enter.

35.     Bar review courses, also, vary in the types and combinations of services they provide.  Some bar review courses offer package deals that include printed content, software applications and live courses. Other bar review courses may provide printed content or software applications a *la carte*.

36.     A relevant geographic territory for purposes of enforcement of the antitrust laws in the present action is the United States.  Other relevant geographic markets for antitrust law enforcement purposes may include each jurisdiction in the United States, i.e., the State of New York, in which full-service bar review courses are provided, and the venues of each national law school, i.e., ABA accredited law schools in which a substantial percentage of students attend who emanate from, or migrate to, other states.  Columbia, NYU, Harvard, St. John's, Cardozo, Fordham, Duke, Georgetown, and USC are principal examples of such schools.

37.     Presentations, informational sessions and tabling at law schools is the principal means of entering the market – i.e., having access directly with law students.  The

credibility of a bar review company is maintained and/or increased if the bar review company is actively present at law schools.  If a bar review company does not have access to a law school to table and meet with students, the bar review company will face tremendous difficulty to increase visibility and subsequent credibility to successfully enroll any student planning to take a bar examination.

### *Barbri's Use of Its Position in the Marketplace to Compete Unfairly with LBE*

38.     Barbri provides a full-service bar review course, typically about seven weeks in duration, in which substantive law is reviewed, test-taking techniques are taught, and pertinent skills honed for the grueling multi-day exam that awaits each would-be attorney.  Over the past fifty (50) years, Barbri has amassed, through mergers and an aggressive policy of marketing tactics, a monopoly within the bar review marketplace – assumed over 80% market share and $110 million revenue – with1.2 million alumni.

39.     Barbri has been a party (defendant) to numerous lawsuits **over the past few years** regarding antitrust and monopoly claims against the company.  As a result of these lawsuits, J.D. students/graduates saw an increase of new bar review companies that entered the market, with Barbri losing some of its market shares to these companies.  However, due to the LL.M. bar review market being considered its own separate marketplace – law schools are not required to disclose numbers/statistics regarding Foreign LL.M. Students/graduates and the bar passage rates related to the graduates – Barbri was able to hold on to its prominent position in the marketplace to effectively maintain a larger market share of the foreign LL.M. student marketplace, compared to the J.D. bar review marketplace.

40.     Barbri has and continues to have a long standing relationship with law

schools around the country –  particularly with NYU, Columbia, Cardozo, St. John's, Fordham, USC, Duke and Georgetown, further explained below – that has developed, in part, by collusion through direct donations by Barbri, special agreements with law schools, large contracts to law school faculty members, personal bribes and significant financial gain by law school administration, staff and personnel, which has allowed Barbri direct access to these schools to advertise on campus, use campus facilities for lecture space and utilize law school's faculty, including professors and deans.

41.     Although Barbri has been a predominant provider of bar review courses in the U.S. for decades, prior to 2012, Barbri did not have a dedicated review course specifically designed for international lawyers and Foreign LL.M. Students.

42.     Upon information and belief, Barbri first learned of LBE sometime in 2009, while conducting marketing activities in law schools located in New York City.

43.     Having successfully test marketed its new bar review course in the spring of 2009, LBE, in the fall of 2009 released its complete program to prepare foreign LL.M. graduates for the July 2010 NY Bar Exam.  The program was marketed through presentations and informational tabling at law schools that enrolled large numbers of Foreign LL.M. Students in New York – including Cardozo, Columbia, Fordham and NYU.  LBE's activities were managed on a daily basis by Executive Director Rebecca Patterson, Esq.

44.     By December 2009, LBE enrolled in its bar preparation program more than 50 students.  LBE anticipated enrolling an additional 450 students in its various courses for the July 2010 bar exam (including the early subject matter review course, the full-time review course, the intensive review course, and the advanced test-taking techniques course).  Based on these actual and projected enrollments, LBE anticipated gross revenues in excess of $1,500,000 and pre-

tax profits in excess of $900,000 from its July 2010 bar preparation program.

45.     According to LBE's company policy, enrolled students must pay a total price of $2,800.00, prior to the beginning of the course, of which, the first installment of $1,400.00 is due before or at the beginning of January 1, 2010 and the remaining balance due before May 1, 2010.  For students enrolled after January 1, 2010, payment was required either in full or in installment, at the discretion of the LBE's officers.  In addition, the same company policy provided for a non-disclosure obligation of information acquired by LBE student participants to third-parties, a standard "refundable clause" of any payment - upon request - within 7 days from the date of payment, a detailed description of the requirements of the money-back-guarantee and, a New York jurisdiction clause.

46.     From the moment it first learned about LBE and LBE's program, Barbri engaged in an aggressive campaign of harassment, disinformation, and unfair competition against LBE at any school where LBE was actively marketing.

47.     Barbri made false, misleading, and derogatory statements of the quality of LBE's bar preparation program, including LBE's methodology, materials, and professors, about the financial strength of the company, and about the business experience of the company.  These statements were intended to, and did, disparage the quality and integrity of LBE.  These statements were intended to, and did, persuade students at the foregoing schools to break their enrollment contracts and withdraw from LBE program.  These statements were intended to, and did, dissuade prospective students at the foregoing schools from enrolling in LBE.  These statements were witnessed by LBE's staff and employees, including LBE's student representatives throughout law schools.

48.     Barbri's actions and tactics – using Barbri representatives to disparage and

issue verbal defamatory statements – are well-known tactics within the bar review course industry. Due to Barbri's predominance in the bar review marketplace,  Barbri – through its disparaging remarks – is able to pursuade students to take Barbri's bar preparation program since Barbri provides bar review courses for decades and ultimately induce students to break their enrollment contracts with LBE.  With Barbri's connections with deans and faculty at the above-named law schools, Barbri representatives advise students to speak with certain faculty and administrative members at the law schools who then take actionable steps towards LBE and force LBE to issue refunds to students and/or completely deny LBE access to law school premises.

### *Development of Barbri's LL.M. Bar Review Course*

49.     On or about December 5, 2012, Mr. Tosolini was approached by Mike Sims, President of Barbri, and Stephen Fredette, CEO & Chairman of the Board of Directors at Barbri, to discuss a possible buyout of LBE from Barbri.  Mr. Tosolini was invited by, and subsequently had a lunch meeting with, Sims and Fredette, in which Sims and Ferdette relayed to Mr. Tosolini regarding Barbri's desire to move forward with the purchase of LBE's business.  Sims and Ferdette relayed that Barbri wanted to "move very quickly" and requested certain information regarding LBE, including projections, in order to put together a reasonable purchase price.  On or about December 6, 2012, per the request of Sims and Fredette, Mr. Tosolini provided to both Sims and Fredette a document that outlined LBE's income, profit, and number of student enrollment for the years 2010, 2011, and 2012 and projections for 2013.  Shortly after Mr. Tosolini provided this information to Barbri, Barbri declined to make an offer and refused all further negotiations for a buyout (Exhibit 1).

50.     On or about Spring 2013, Barbri developed and began test marketing its

own standalone bar review course focused on Foreign LL.M. Students to help prepare these students for the NY Bar Exam.

51.     On or about Fall semester 2013, Barbri formally released its bar review course focused on Foreign LL.M. Students – effectively entering the Foreign LL.M. Student marketplace.

52.     Barbri's LL.M. bar review course is almost entirely identical to LBE's course. The similarities include a personalized study plan that is tailored by the student but guided by Barbri (same as LBE's individualized study schedules); LL.M. fundamentals course that provides an overview of the multistate subjects (similar to LBE's early subject matter review course); legal writing workshops – Barbri's Essay Writing Workshop and Performance Test Skills Workshop; an MBE foundation course – Overview of the Multistate Subjects – and an MBE course – a "deeper look into each of the MBE subjects" – (similar to LBE's intensive review course and advanced test-taking techniques course); and Free Repeat Guarantee where a student "may repeat the [bar review course] by attending lectures or online for the same state the next time the [bar review course] is offered by [Barbri], without paying additional fees" (similar to LBE's money-back guarantee).

53.     After Barbri released its own course designed specifically for Foreign LL.M. Students, Barbri continued to aggressively disparage LBE's reputation at Columbia, NYU, St. John's, Cardozo, Fordham, Harvard, Duke, Georgetown, USC, Emory and Berkeley.

54.     On or about Spring 2014, Mr. Tosolini met with Sims to discuss Barbri's predatory marketing activities against LBE. Sims initially denied any disparagement. However, Sims admitted that all personnel at Barbri connected with the disparaging actions against LBE are being "let go by Barbri." After Mr Tosolini brought up specific instances and actions by Erica

Fine, former Eastern Region Vice President, Eastern Region Senior Associate Director and Eastern Region Editorial Director of Barbri, with the administration at Harvard, Sims apologized and offered to "make a phone call to Harvard" and relay that "Barbri has no issues with LBE's presence at Harvard." Sims's offer to call Harvard shocked Mr. Tosolini as to the relationship and unlimited access between Barbri and various law schools and that it is clear that Barbri controls what bar review companies have access to law schools. Regarding Sims's offer to contact Harvard directly, Mr. Tosolini stated that he was not interested in what Barbri wants to do and just wants Barbri to stop its actions in creating an unfair marketplace for LBE.

           55.     In the fall semester of 2014, coincidentally with the arrival of the new LL.M. class, Barbri drastically amended its Terms and Conditions where Barbri's requested deposits were converted into an enrollment fee, which transformed its previous non-binding agreements into binding agreements, effectively creating a substantial advantage for Barbri because, at a certain point, students were locked into these binding agreements – as early as the last week of August. At the promise of a large discount, Barbri was able to secure substantial enrollment at the detriment of LBE. With Barbri's amended Terms and Conditions, students felt such amendments were unfair, and LBE, along with other bar review companies raised this issue to various law schools but these law schools did not act against Barbri and ultimately acquiesced to Barbri's amendments. As a result of Barbri's amendments and law schools' compliance of Barbri's amendments students no longer had a choice between bar review companies once they made an initial payment, unlike in the past. As a result of Barbri's actions, in the fall of 2015, LBE was forced to adopt Barbri's Terms and Conditions regarding cancellation and deposits in order to regain its competitiveness and to effectively compete in the bar review marketplace and Foreign LL.M. Student marketplace.

56.     On or about January 25, 2016, Mr. Tosolini spoke with Sims regarding the issue of Foreign LL.M. Students who effectively enrolled and signed two binding agreements – one with LBE and one with Barbri.  Sims offered and agreed to a compromise and asked to receive LBE's Terms and Conditions (the "Jan. 25th Agreement").  On or about January 26, 2016, Mr. Tosolini sent to Sims LBE's Terms and Conditions as well as memorializing the Jan. 25th Agreement, wherein "[LBE] will present [to Barbri] with a list of students that [LBE] might think have signed up for both [companies].  [Barbri] will cross check the list with [Barbri's] database.  If those students are in effect enrolled with both [companies,] [Barbri and LBE] will give them the option to pick either [LBE] or Barbri and [LBE and Barbri] will share the [revenue] 50%" (Exhibit 2).  In this agreement, Mr. Tosolini hoped to solve the issue of students getting charged twice for two different bar review courses, show law schools that LBE and Barbri are working together to solve any issues and make students happy with the situation, and allow each company to mitigate any loss profits.

57.     On or about February 3, 2016, Mr. Tosolini communicated with Sims following-up with the agreed upon compromise (Exhibit 3).  At the time of the filing of this Complaint, Sims has refused and continues to refuse to fulfill Barbri's obligation on the Jan. 25th Agreement.

58.     LBE witnessed and received confirmation from current and prospective students that shortly after Mr. Tosolini brought issue with Sims, Barbri contacted a substantial number of students who wanted to switch or take LBE's course and offered those students substantial discounts and incentives to stay with Barbri (Exhibit 4) effectively creating and having an unfair advantage over LBE who, in good faith, attempted to resolve the issue.

***Barbri's Connections with Columbia***

59.     Upon information and belief, Barbri has had and continues to have a long-standing relationship with Columbia.   Barbri currently has three faculty members who are professors at Columbia -- Christina Ponsa, Jody Kraus, Eric Talley – with one faculty member – Jody Kraus – teaching courses at Columbia for LL.M. students.  Barbri has provided numerous donations and gifts to the school.

60.     In the fall of 2009, LBE started advertising its unique course tailored specifically for Foreign LL.M. Students at Columbia.   Within a few weeks of on-campus advertising, LBE was able to enroll about twenty (20) Foreign LL.M. Students – putting LBE in immediate competition with Barbri in the Foreign LL.M. Student marketplace.

61.     In the spring of 2010, LBE conducted a few live, interactive lectures ("Early Exposure Lectures") for New York law students, including Columbia Foreign LL.M. Students. Reaction toward the Early Exposure Lectures were mostly favorable and were generally successful.  However, rumors spread by Barbri – including the fact that LBE was a new bar review company and therefore had little experience in the bar review course marketplace – effectively making Columbia students re-evaluate their decision to choose LBE, with a substantial amount of students who originally chose to study with LBE to join the majority of the student body with Barbri.

62.     As a result of Barbri's actions, one Columbia student who was enrolled with LBE and attended the Early Exposure Lectures, shared his concerns about the quality of LBE's program – based solely on Barbri's rumors –  with LBE and subsequently requested withdrawal from LBE's course.

63.     Barbri successfully interfered with LBE's enrolled students, actively

18

advising LBE-enrolled students to meet with Sylvia Polo, Dean of Graduate Legal Studies at Columbia, to seek refunds that were not due or owing to these students and directly against LBE Terms and Conditions.

64.    Due to the rumors spread by Barbri and Barbri subsequently advising students to speak with Dean Polo, Dean Polo personally reached out to Mr. Tosolini asking him to give refunds to students who were not comfortable with taking the LBE course.  She said that she "wanted to give her students options" and that LBE should refund those students by making an exception to LBE's Terms and Conditions and in return, Columbia would allow LBE to continue marketing its product and conduct presentations on Columbia's campus.  LBE was ultimately forced in a corner by Dean Polo and, in needing to keep its goodwill and have access to Columbia, LBE was forced to comply with Dean Polo's request and issued several refunds that were not due and in direct contradiction to LBE's Terms and Conditions.  As a result of Barbri's and Dean Polo's actions, LBE ran its summer 2010 review course without any Columbia Foreign LL.M. Students.

65.    Beginning in the Fall of 2010, as per the agreement between LBE and Dean Polo, LBE would be allowed to table on-campus once a week for the entire semester.  During the first day of tabling in the Fall 2010 Semester, LBE was extremely successful with over one-hundred (100+) students stopping by the LBE table, leaving their contact information and expressing an overwhelming interest with LBE.  However, despite the agreement made by Dean Polo, and without any reason or explanation, LBE was suspended from Columbia's campus almost immediately after LBE's one and only opportunity to table at Columbia.  With LBE effectively shut out of Columbia, LBE's only means left to secure students were the initial students who showed overwhelming interest at the one and only tabling session at Columbia.  LBE eventually

prepared eight (8) Columbia students from the initial group of those interested for the July 2011 NY Bar Exam and all eight students successfully passed the New York State Bar Exam in July 2011 by using LBE's course and methodology.

66.     Upon receiving the phone call disallowing LBE from Columbia, on or about September of 2010, Mr. Tosolini and Ms. Patterson met with Dean Polo to discuss Columbia reneging on its obligation to allow LBE to market on Columbia's campus after LBE complied with Dean Polo's demand to issue refunds.  Dean Polo, while initially stating the decision was not hers to make, openly told Mr. Tosolini and Ms. Patterson that she would only recommend and endorse Barbri because Barbri is the oldest bar review course and her students are smart and do not need any other course.  Dean Polo further made disturbing discriminatory statements toward Mr. Tosolini, questioning his ability as a foreign-educated student lacking the necessary knowledge and expertise to properly prepare students for the NY Bar Exam and any other bar examination in the United States.  Dean Polo made further discriminatory statements regarding LBE's course, citing LBE's use of non-English and bilingual tutors in helping LBE's students.

67.     On or about August 2011, following the second class of LBE students taking the NY Bar Exam after studying with LBE's course, Mr. Tosolini was in communication with Dean Polo and Michelle Greenberg-Kobrin, Dean of Students at Columbia, regarding the possibility for LBE to table on campus for the upcoming 2011 to 2012 school year (Exhibit 5). Concurrently to these talks, on or about October 29 2011, Mr. Tosolini reached out to Professor Alejandro Garro, a member of the Columbia faculty and a member of the LBE faculty, regarding an offer to review LBE's course material, submit further course material and lecture for LBE for the July 2012 bar review course (Exhibit 6).  Mr. Tosolini relayed to Professor Garro that "every single [LL.M.] enrolled in [LBE's] course coming from Columbia passed the July [2011 NY Bar

Exam]" (Exhibit 7).  On or about November 12, 2011, Dean Polo communicated to Professor Garro that Columbia would "wait one more year before deciding whether to admit [LBE] [back on campus]" (Exhibit 8)  When Mr. Tosolini asked Professor Garro if he had any insight to the decision to once again refuse LBE access to Columbia, Professor Garro sensed the decision was based on a "lack of trust" from Columbia – despite the 100% pass rate provided to Columbia by LBE – and further stated "on which basis [Columbia] develop[s] this lack of trust [Prof. Garro] can never know, because trust and credibility is something impossible to measure, or count, or weigh" (Exhibit 9).

68.     On or about September 28, 2012, after another unsuccessful and tentative approach to Dean Polo and Columbia, Mr. Tosolini hand delivered a letter to Lynn Beller, Assistant Dean and Chief of Staff at Columbia to deliver to Dean David Schizer (Exhibit 10).  In the letter to Dean Schizer, Mr. Tosolini brought to light "the active and ongoing case of discrimination against Mr. Tosolini, individually, and LBE."  Mr. Tosolini highlighted that "Dean Sylvia Polo strongly advised [Mr. Tosolini] that LLM BAR EXAM refund any tuition previously paid by these students in order to maintain a working relationship with [Columbia]" despite the fact "[a] refund was in clear contradiction to [LBE's] Terms and Conditions of the Enrollment Form signed by these students with LLM BAR EXAM" (Exhibit 10).  Mr. Tosolini also brought to light the September 2010 meeting he had with Ms. Patterson and Dean Polo where Dean Polo made discriminatory statements to Mr. Tosolini stating that "he should not teach for LBE because he is neither American nor a native English speaker" as well as Dean Polo's continued favoritism toward Barbri (Exhibit 10).  Mr. Tosolini requested that "[LBE] and [Mr. Tosolini] are treated equally without any further discrimination" and that "LLM BAR EXAM and [Mr. Tosolini] have suffered and continue to suffer tremendous monetary damages due to this open discrimination"

21

(Exhibit 10) and blatant favoritism toward Barbri.

69.     In response to the letter sent to Dean Schizer, Dean Beller sent a nearly boiler plate response on October 5, 2012 that did not address any of Dean Polo's disturbing discriminatory statements (Exhibit 11).  Dean Beller simply stated that "[Dean Schizer] is not directly involved in determining which bar preparation companies are allowed to promote their programs on the Columbia Law School campus" and that "these decisions are made by a committee which is part of Student Services and includes Dean Sylvia Polo and Dean Michelle Greenberg-Kobrin" (Exhibit 11).  At the time of the filing of this Complaint, Dean Polo and Columbia refuses to comment and acknowledge the disturbing and blatantly discriminatory statements about Mr. Tosolini.

70.     On or about July 23, 2013, subsequently to the well-known excellent results obtained by LBE with Columbia students, LBE submitted a petition ("Petition") that was signed by over fifty (50) Columbia LL.M. students who graduated in May 2013 to Dean Greenberg-Kobrin (Exhibit 12).  The Petition formally requested Columbia to allow LBE on campus so as to "provide [Columbia's] students increased competition resulting in lower prices and better offers…from other bar review courses [that] will be forced to compete with an additional [bar review] company" (Exhibit 12).  Mr. Tosolini explained that "in other schools where [LBE is] permitted to market [its] course, competitors were pressured to offer an additional $1,000 discount to compete with [LBE]" and "this discount was not offered to Columbia students" (Exhibit 12).  Mr. Tosolini further stated that "as [LBE's] course expands, [LBE] will continue to develop ways to meet the unique needs of international LL.M. students, including financial assistance for those unable to afford the full price of a bar preparation course" (Exhibit 12).  The signatories of the Petition stated that they "believe that [they] should be allowed to decide for [themselves] which

bar course will best prepare [them] to take the [NY Bar Exam]" and urged that "LBE should be granted access to [Columbia] to promote its course" (Exhibit 12). Subsequently on or about December 5, 2013, Carlos Guardia, a Columbia Foreign LL.M. alumnus who graduated in May 2013, signed the Petition and successfully passed the July 2013 NY Bar Exam after taking LBE's course and using LBE's methodology, wrote directly to Dean Polo urging her to allow LBE on campus due to LBE's stellar results and stated that "the course was useful for [him] because [the course] [gave him] a very personalized treatment that…would be hard to obtain from bigger [bar review companies] and that [LBE's] methodology is what [helped him], or made [him], pass the [NY Bar Exam]" (Exhibit 13). As of the date of filing, Columbia has not responded to the Petition that was hand-delivered to the Dean of the Law School, the Dean of the Students and the Dean of the LL.M nor has Dean Polo responded to Mr. Guardia.

71.     On or about the fall of 2012 until the filing of this Complaint, Barbri organized events at Columbia to advertise and attract Foreign LL.M. Students to enroll in Barbri's bar review course. In attendance at these events included Natalia Urrea, Director of International Business Development at Barbri, and Dean Polo – Dean Polo often times stood side-by-side with Urrea. Urrea claimed that she was a Foreign LL.M. Student who is an alumna of Barbri's Foreign LL.M. Students who successfully passed the NY Bar Exam on her first try by following Barbri's course and Barbri's methodology. Such statements were wholly false and intended to misrepresent Columbia's Foreign LL.M. Students since (i) Urrea obtained a Juris Doctor from Temple University and is not a Foreign LL.M. Student and (ii) Urrea did not pass the NY Bar Exam  until July 2014. Dean Polo was well aware of Urrea's true past and Urrea's intentional false and misleading statements, accepted such misrepresentation and intentionally allowed the misrepresentation to occur.

72.     On or about February 2014, pending the Petition sent to Dean Polo and students' direct requests to Dean Polo – both through email and in-person – asking Dean Polo to allow LBE on Columbia, Mr. Tosolini met with Dean Polo but Dean Polo relayed she "needed to get the green light about inviting LBE back on campus."  On or about April 7, 2014, Mr. Tosolini reached out to Dean Polo to see if she was "able to review [LBE's] situation" and relayed that "in anticipation of [Dean Polo's review], [LBE had] to put some promotions and discounts on hold since [LBE hoped] to receive a positive response and speak with [Columbia Foreign LL.M. Students] directly on campus" and invited Dean Polo to meet with him to discuss the situation (Exhibit 15).  On or about June 12, 2014, Mr. Tosolini again reached out to Dean Polo in hopes of Columbia allowing LBE to table on campus (Exhibit 16).  On or about October 15, 2014, Mr. Tosolini reached out again to Dean Polo, inviting her to a tabling event LBE was hosting near Columbia's campus (Exhibit 10).   Due to heightened student interest and other bar review companies' fast approaching deadlines for enrollment, LBE needed to host an event off-campus to answer any questions of those students who are interested in LBE.  Mr. Tosolini sent to Dean Polo several follow-up emails regarding the Columbia's decision to allow LBE back on campus, however, Dean Polo refuses to answer and acknowledge each communication.

73.     On or about March 25, 2016, Francisco Berreta, a 2016 Columbia Foreign LL.M. Student, wrote to Mr. Tosolini regarding LBE and LBE's bar review course offered because Mr. Barreta was concerned about the "costs and the flexibility as to when to prepare and sit for the [NY Bar Exam, either 2016 or 2017]" (Exhibit 17).  Berreta was interested in switching review courses from Barbri to LBE but "already paid [for] half the course with Barbri" (Exhibit 18). Barreta stated that he had "spoken to [Barbri's representative] at Columbia, Emma Hansen, [but Barbri does] not provide a refund for [his] payment [since he] paid as part of a limited time

24

promotion" (Exhibit 18). Barreta went to Dean Polo regarding a possibility of a refund. On or about April 11, 2016. Dean Polo advised that it was "beyond her possibilities to request [a] full refund [of Barreta's money]" (Exhibit 19). Dean Polo's response to Barreta and subsequent inaction clearly shows Dean Polo's and Columbia's continued discriminatory practice against LBE and its favoritism toward Barbri considering Barreta's situation is the exact situation LBE experienced with Columbia and Dean Polo in the spring of 2010.

74.    At the time of filing this complaint, LBE is not allowed to table, advertise and rent classrooms at Columbia while Barbri continues to have access to Columbia to table, advertise, promote and rent Columbia classrooms to conduct its bar review courses.

### *Barbri's Connections with NYU*

75.    Upon information and belief, Barbri has had and continues to have a long-standing relationship with NYU. Barbri has established a predominant position at NYU, rented multiple rooms and offered multiple complimentary courses to NYU's students.

76.    Upon information and belief, ERICA B. FINE, former Eastern Region Vice President, Eastern Region Senior Associate Director and Eastern Region Editorial Director of Barbri, has had personal relationships with various Deans and faculty members at NYU and in particular with the former President of NYU, John Sexton.

77.    Upon information and belief, Fine advised NYU Foreign LL.M. Students to complain about LBE to their law school administrations in a blatant effort to undermine LBE's ability to market its course to NYU students on an equal footing with Barbri.

78.    Upon information and belief, Fine also advised various Deans, faculty members and President Sexton at NYU to bar LBE from marketing at NYU.

79.     On or about October 11, 2012, LBE – not allowed on NYU's campus due to Fine's actions – conducted a presentation off-campus at a building close to NYU.  In response to LBE's presentation, a significant amount of NYU Foreign LL.M. Students enrolled with LBE and their enthusiasm for LBE spread to other law school students and the administration at NYU. On or about October 12, 2012, exactly one day after LBE made a presentation at NYU and enrolled students, NYU's Office of Graduate Affairs sent an email/newsletter directly to NYU Foreign LL.M. Students, warning students to be careful in choosing a bar preparation course provider and advised students to "come to the [Graduate Affairs office] and talk" (Exhibit 20).  When LL.M. students approached the Graduate Affairs office regarding the email, Lourdes Marshall, an employee at the NYU Graduate Office, advised these students to drop their enrollment with LBE and choose another provider of bar review courses.  Within a week of enrolling several NYU Foreign LL.M. Students, these same students dropped their LBE enrollment.  It is clear that the email and advice of NYU were made intentionally to disparage LBE and cause damage to LBE.

80.     Upon information and belief, NYU actively warned Foreign LL.M. Students against participating with LBE and actively advised Foreign LL.M. Students already enrolled with LBE to drop the course and enroll with Barbri.  As a result of NYU's actions, LBE students and its student representatives disavowed themselves from their obligations to LBE and subsequently enrolled with Barbri.

81.     On or about January 11, 2013, LBE submitted to Barbara A. Landress, Director of the Office of Graduate Affairs at NYU, a request for tabling on campus as well as company information and statistics as well as contact information for NYU foreign LL.M. alumni who finished the LBE review course and successfully passed the NY Bar Exam (Exhibit 21).  On or about January 23, 2013, Landress communicated to LBE that "[she] reviewed [the company

information provided by LBE] carefully, including calling references that [LBE] supplied" but there was not enough information to allow LBE on campus (Exhibit 22).

82.     Upon information and belief, NYU did not in fact contact any LBE alumni nor conduct due diligence in reviewing the company information.  Furthermore, when LBE asked for "the parameters that [NYU is] looking for to establish a track record" so that "[LBE] will work hard to meet [NYU's] criteria in order to regain access to the school" (Exhibit 23), NYU refused to provide such information.

83.     On or about the summer of 2013, NYU actively harassed Foreign LL.M. Students who were already enrolled and engaged with the LBE review course regarding the Foreign LL.M. Students' decision to continue with LBE.  LBE was the only bar review course that was targeted by NYU and similarly situated LL.M. students enrolled with Barbri did not experience such adverse treatment.

84.     Hilda Alejandra Rodriguez-Rico, a July 2013 LL.M. NYU graduate, provided an affidavit in support of allowing LBE to advertise and promote its products at NYU (Exhibit 24).  Based on a recommendation from her brother, Gabriel Rodriguez Rico, who prepared with LBE for and subsequently passed the July 2012 NY Bar Exam, Ms. Rodriguez-Rico enrolled with LBE to prepare her for the July 2013 NY Bar Exam.  After Ms. Rodriguez-Rico's enrollment with LBE in November 2012, an NYU representative contacted her and asked her why she decided to enroll with LBE.  Upon explaining why she believed LBE would provide the best preparation for the NY Bar Exam, the NYU representative advised that Ms. Rodriguez-Rico "reconsider [her] options" and encouraged Ms. Rodriguez-Rico to cancel her LBE enrollment (Exhibit 24, ¶6). NYU falsely stated that LBE has ongoing litigation with students and that NYU would not be responsible should Ms. Rodriguez-Rico decide to remain with LBE.

85.     In May of 2013, Ms. Rodriguez-Rico was approached by Lourdes Marshall, an employee at the NYU Graduate Office who actively reached out to LBE students for four months prior to the July 2013 New York State Bar, who asked Ms. Rodriguez-Rico why she joined LBE and advised her to drop LBE.   When Ms. Rodriguez-Rico stated that she followed her brother's advice, who passed the NY Bar Exam while reviewing with LBE, Marshall accused Ms. Rodriguez-Rico of getting financial gain by taking LBE's course (Exhibit 24, ¶9).

86.     Throughout Ms. Rodriguez-Rico's enrollment with LBE and up until she took the NY Bar Exam in July 2013, Ms. Rodriguez-Rico was contacted "four (4) additional times by NYU representatives regarding [her] enrollment with LBE" (Exhibit 24, ¶11).  Ms. Rodriguez-Rico successfully passed the NY Bar Exam in July 2013 after preparing with LBE.

87.     LBE has received tremendous praise and recommendation from its students who are NYU alumni, including Andraz Jadek − a 2012 LL.M. graduate from NYU who passed the July 2012 NY Bar Exam after preparing with LBE, citing "the benefit of an entirely personal approach" "where many student questions were answered in real time and professors were available for consultation" (Exhibit 25  However, despite such praise and excellent track record in successfully preparing NYU Foreign LL.M. Students in taking the NY Bar Exam, NYU subsequently barred LBE from on-campus marketing at NYU, severely hampering LBE's business operations and damaging LBE financially.

88.     The combined actions of Fine and NYU were intended to, and did, dissuade prospective students at NYU from enrolling in LBE and severely damaged LBE's goodwill and business operations.

### *Barbri's Connections with Fordham*

89.     Upon information and belief, Barbri has had and continues to have a long-standing relationship with Fordham.

90.     On or about Spring of 2009, LBE reached out to several New York law schools by conducting informational events in an effort to develop a relationship and goodwill with the schools and faculty.  Toni M. Jaeger-Fine, Assistant Dean of International and Non-JD Programs at Fordham, attended LBE's informational event at Fordham and subsequently agreed to be included in LBE's faculty.

91.     Once Barbri was made aware of the Dean Jaeger-Fine's involvement with LBE – with knowledge of Dean Jaeger-Fine's respect within Fordham – and LBE possibly making a dent in Barbri's monopoly at Fordham, Barbri quickly moved to try to get Dean Jaeger-Fine terminated by drafting a letter and having a meeting with the Dean of Fordham.  Despite Babri's attempts, Dean Jaeger-Fine remained in her position and LBE had the opportunity to fairly market its course and prepare Fordham students with successful results.

92.     Due to LBE's success over the years with Fordham LL.M. students, in 2011, Mr. Tosolini was offered a position at Fordham as an Adjunct Professor to teach a course entitled Fundamental Principles of New York Law, which was based on LBE's methodology, faculty and materials.  Mr. Tosolini's course quickly became the most popular, non-mandatory course among Foreign LL.M. Students at Fordham.

93.     Due to LBE's presence at Fordham, Dean Jaeger-Fine's involvement with LBE and Mr. Tosolini's popularity among campus, LBE effectively became the first provider of bar review courses specifically designed for Foreign LL.M. Students since 2010 and as of July 2014 – after years of hard work and excellent reputation among students – LBE became the number one provider of bar review courses for Foreign LL.M. Students.

94.     At the beginning of 2015, there were substantial administrative changes at Fordham, including the appointment of Matthew Diller[1] as the Dean of Fordham.  With the changes in Fordham's administration, LBE received dramatically increased obstructions and obstacles at Fordham, which LBE was not faced with in the past.  Such obstacles resulted in LBE effectively losing a substantial amount of the market to Barbri.

95.     On or about February 11, 2015, Mr. Tosolini contacted Rebecca Gruia, Manager of Program Operations at Fordham, about summer availability of rooms at Fordham and a possibility of a discount (Exhibit 26).  On or about February 24, 2015, Gruia informed Mr. Tosolini that the rental rate for classrooms was $1,250.00 per day for up to three classrooms (Exhibit 27).  Mr. Tosolini stated that LBE only needed one classroom, as LBE needed every year, and asked whether the basic rate did not afford LBE a discount (Exhibit 28).  Up until the summer of 2015, LBE only paid $400.00 per day for one classroom rental.  There were only two bar review courses available at Fordham – Barbri and LBE, with Barbri renting three rooms and LBE renting one room.  By providing the new fee structure for renting classrooms, Fordham is clearly in favor of Barbri and actively providing an unfair disadvantage against LBE since the rental fee proposal was tailored to Barbri's needs and outside the budget of LBE – considering that the price LBE was required to pay was the same amount that Barbri was required to pay despite the fact that LBE required substantially less space than Barbri.  As a result, LBE ultimately was unable to run a class at Fordham due to the high cost of renting a classroom.  Due to Fordham's increased prices of room rentals, it is clear that Fordham tried to restrain LBE's access to Fordham's facilities by increasing the room rentals on campus, while providing Barbri access to Fordham's facilities at a

---

[1] Prior to being appointed Dean at Fordham, Dean Diller served as Dean at the Cardozo from 2009 to 2015, which was the same period that false accusations were being spread about LBE by Cardozo's administration as explained *supra*.

reduced fee.

96.     On or about August 24, 2015, Fordham's Student Bar Association ("SBA"), an on-campus organization that works closely with various departments within Fordham, communicated to third-year J.D. students and LL.M. students regarding informational sessions that discussed the bar examination (Exhibit 29).  The events were sponsored by Fordham, with guest speakers from Barbri, and were held on August 26, 2015 and August 27, 2015 during Fordham's law school orientation week (the "Early Access Events").  The Early Access Events were a blatant tactic by Fordham to bar LBE and promote Barbri for four hours over a two-day period.  Each Early Access Event was a 2-hour Barbri promotion, with Barbri enrollment forms handed out to students and special discounts available only from the days of the Early Access Events until the end of August.  The Early Access Events were designed by Fordham to intentionally mislead Foreign LL.M. Students to enroll with Barbri – Foreign LL.M. Students were told the Early Access Events were mandatory for LL.M. students since it was part of the events during orientation week.

97.     On or about September 3, 2015, Mr. Tosolini communicated to Dean Escalara and Fordham's Office of Law Student Affairs regarding the Early Access Events, how such Early Access Events caused unfair competition because it preemptively and intentionally barred LBE and other bar review companies from speaking with the students under the same conditions as Barbri, and how Barbri violated Fordham's school policies including:

"6. Bar Review Representatives *__may not__* send *__any__* emails to students who have not signed up for their course. This includes emails sent to students via Bar Review company student representatives or other departments within the University."

"7. Vendors and company representatives are to conduct their business at their reserved table in the cafeteria only. Unless they have made an appointment in advance with a faculty member or administrator in the law school, vendors may not

use the tabling day to solicit or conduct business elsewhere in the law school."
(Exhibit 30).

        98.     Mr. Tosolini further communicated his concerns to Dean Jaeger-Fine on or about September 11, 2015 (Exhibit 31).  Dean Jaeger-Fine communicated Mr. Tosolini's concerns to Dean Escalara on or about September 13, 2015 (Exhibit 32).   Although Dean Escalara communicated to Prof. Jaeger-Fine on or about September 14, 2015 that  Dean Escalara would follow up with Mr. Tosolini regarding such concerns, specifically stating "we'll write to them"(Exhibit 33), Dean Escalara and the Office of Law Student Affairs refuse to comment or respond to Mr. Tosolini regarding the Early Access Events and Barbri's clear violations of Fordham policies.

        99.     On or about February 8, 2016, several months after Mr. Tosolini raised concerns regarding the Early Access Events with no reply or comment from either Dean Escalara or the Office of Law Student Affairs and a day before the first tabling day scheduled at Fordham for the spring semester, Prof. Jaeger-Fine communicated to Mr. Tosolini Fordham's decision to tentatively disallow LBE access to Fordham due to "many complaints about LBE" and to discontinue Mr. Tosolini's for-credit class due to concerns of Mr. Tosolini allegedly "using class as a platform to distribute information about [LBE] and get students to sign up [for the course]" (Exhibit 34).  Dean Jaeger-Fine further explained that she was not party to those who made the decision to disallow LBE.  Fordham's accusations regarding Mr. Tsoolini's actions are false and unfounded – recordings of Mr. Tosolini's class show that no information of LBE were distributed nor did Mr. Tosolini attempt to enroll students during those specific class hours.  Fordham's actions caused and continue to cause damage to the reputation and goodwill of LBE and Mr. Tosolini, which have been stellar and positive up until Fordham's actions.

100.    LBE requested a meeting to discuss Fordham's decision to disavow LBE, but LBE was denied a formal meeting for several weeks.  Concurrently to waiting for Fordham to respond to LBE, rumors regarding a possible permanent removal of LBE spread across Fordham resulted in current Fordham Foreign LL.M. Students enrolled with LBE seeking cancellations of their enrollment and LBE representatives at Fordham requesting to be relieved as representatives.

101.    Finally, on February 29, 2016, Mr. Tosolini was granted a meeting with Dean Escalera.  Dean Escalera, clearly not prepared to discuss the issues previously raised by Mr. Tosolini in September of 2015, denied receiving any prior email about Barbri's conduct as early as August and subsequently discussed several inaccuracies regarding LBE's conduct.  When Mr. Tosolini requested specific information regarding student complaints, however, Dean Escalera could not provide any names of students or specific incidents of student complaints to the surprise of Mr. Tosolini because the alleged student complaints was the direct cause of Fordham's actions against LBE.  The only issue that Dean Escalera verbalized was LBE's use of an affidavit (Exhibit 35) for students who were not going to take the NY Bar Exam any longer, which is the same type of affidavit with the same exact language that Barbri uses in its affidavits (Exhibit 36).  The meeting ended with the understanding that Fordham would evaluate student complaints received by Fordham that led to Fordham's decision to disallow LBE from Fordham's campus, as referred to in the email that Dean Jaeger-Fine sent to Mr. Tosolini (Exhibit 34), and report its findings back to LBE.  It was clear to Mr. Tosolini that after his meeting with Dean Escalera that neither Fordham nor Dean Escalera knew of any student that had any complaints against LBE as cited in the email sent by Dean Jaeger-Fine.

102.    Within an hour after Dean Escalera and Mr. Tosolini ended their meeting, an email was sent from Dean Diller soliciting students to come forward regarding concerns and

complaints against LBE – specifically "[asking] that any others who have had issues with LLM Bar Exam please contact Cynthia Juco in the Office of Student Affairs" (Exhibit 37). Such an email clearly shows that Fordham's initial reasoning to suspend LBE from campus due to student complaints were baseless and false. Fordham's action to solicit students was a clear attempt to justify its baseless decision to disallow LBE from Fordham.

103.    On or about March 3, 2016, Kandice Thorn, Director of International and Non-JD Programs at Fordham, sent a follow-up email to all the Foreign LL.M. Students continuing Fordham's urgent solicitation of students for any concerns or complaints against LBE and the urgency to notify the administration immediately (Exhibit 38).

104.    On or about March 21, 2016, Dean Escalera reached out by phone to Mr. Tosolini and demanded Mr. Tosolini issue refunds to two Fordham students – neither of which contributed to Fordham's decision to disallow LBE and whose concerns only came about from Fordham's direct solicitation. In fact, one of the students asked for a cancellation for the first time in an email dated February 17, 2016, eleven days after LBE was disallowed from campus activities and the other student, while asking LBE for a refund, specifically asked LBE why LBE was "suspended from campus" clearly showing that her concerns had no contribution to Fordham's decision to disallow LBE from campus – and were not related to the way LBE conducted business or the quality of LBE's review course. As realized by Mr. Tosolini, it was clear that Fordham had no reasonable basis to disallow LBE from Fordham. In response to Mr. Tosolini's request for specific reasons why LBE was suspended from Fordham since the two previous refunds were unrelated to LBE's conduct and business practices, Dean Escalera stated the decision to disallow LBE was taken in response to LBE's use of an Affidavit – which has the same exact language as Barbri's affidavit that has been in use since at least 2015, at which time LBE was forced to use a

similar affidavit to remain competitive in the marketplace against Barbri.  Upon Mr. Tosolini's

inquiry regarding Barbri's use of a similar affidavit with the same exact language and verbiage,

Dean Escalera stated that "it was not [Mr. Tosolini's] concern" and that it was a "different project"

for Fordham's deans to handle.  Once more, it is clear from Dean Escalera's conversation with Mr.

Tosolini that Fordham is showing favoritism toward Barbri, resulting in an unfair disadvantage

against LBE.

105.    LBE was forced to issue two refunds to return to Fordham.  While the spring

2016 semester was winding down, and with serious economic damages in place, LBE agreed to

refund these specific Fordham Foreign LL.M. Students because if the refunds were not issued,

LBE would not be allowed to return to Fordham.


### *Barbri's Connections with St. John's*

106.    Upon information and belief, Barbri has had and continues to have a long-

standing relationship with St. John's.  Many St. John's faculty are also faculty of Barbri.

107.    Upon information and belief, ERICA B. FINE, former Eastern Region Vice

President, Eastern Region Senior Associate Director and Eastern Region Editorial Director of

Barbri, has had personal relationships with various Deans at St. John's.  Fine is an alumna of St.

John's and has made substantial personal donations to the school.  Fine is currently an adjunct

professor at St. John's.

108.    In 2012, due to the very poor NY Bar Exam pass rate of St. John's Foreign

LL.M. Students, former professor and Director of Transnational Programs, Luca CM Melchionna[2],

recommended St. John's Foreign LL.M. Students to LBE due to his own personal experience with

---

[2] Prof. Melchionna was a professor and Director of Transnational Programs from 2006 until his termination in 2012.

LBE – Prof. Melchionna reviewed with Barbri in 2010 but did not pass the NY Bar Exam; Prof. Melchionna subsequently reviewed with LBE in 2011 and passed the July 2011 NY Bar Exam using LBE's bar review course and LBE's methodology  There was heavy pressure put on Prof. Melchionna to advocate for Barbr,i however, Prof. Melchionna chose to continue to advocate for LBE.  As a result of his sponsorship and recommendation of LBE, Prof. Melchionna was soon after terminated by St. Johns's.  After Prof. Melchionna's departure from St. John's, LBE has not been invited back to St. John's.

109.    On or about December 2, 2014, LBE spoke with Alexis Martinez, the Assistant Dean of Students at St. John's, regarding LBE, tabling policies for bar review courses on campus and possible tabling opportunities at St. John's.

110.    On or about February 12, 2015, Mr. Tosolini provided to Dean Martinez a tabling request application (Exhibit 39).  On or about November 5, 2015, after receiving no response from Dean Martinez, Mr. Tosolini sent a follow-up email further requesting tabling time at St. John's (Exhibit 40).  At the time of filing, Dean Martinez has not responded to LBE's multiple requests.

111.    Upon information and belief, Fine's close ties with Barbri as former Eastern Region Vice President, Eastern Region Senior Associate Director and Eastern Region Editorial Director and Fine's personal relationship with various Deans and faculty members at St. John's has caused LBE to be completely shut out from St. John's campus.  At present, LBE is only able to (i) enroll those Foreign LL.M. Students who were referred to LBE by St. John's alumni and/or (ii) those Foreign LL.M. Students who will take LBE once they fail the NY Bar Exam after studying with Barbri.

### *Barbri's Connections with Cardozo*

112.    Upon information and belief, Barbri has had and continues to have a long-standing relationship with Cardozo.

113.    On or about December 13, 2011, Mr. Tosolini reached out to Amy Sugin, Assistant Dean for Graduate and International Programs at Cardozo regarding any issues from students who took the LBE review course (Exhibit 41).  Dean Sugin replied to Mr. Tosolini that the Cardozo students were "disappointed with [the] course, and had concerns about the materials and about the integrity of [LBE's] system" (Exhibit 42).  Mr. Tosolini explained that while it is not possible to please everyone, LBE has done an excellent job with Cardozo Foreign LL.M. Students and the only student that failed the exam after attending all the lectures was provided a full refund (Exhibit 43).  Mr. Tosolini also offered to provide Dean Sugin "with testimonials from [Cardozo Foreign LL.M. Students] that loved [LBE's] program" (Exhibit 43).  Dean Seguin refused to provide any further reason to deny LBE access to Cardozo and refused to discuss the situation further.

114.    On or about November 16, 2013, Gaudys Sanclemente, a 2014 Cardozo LL.M. alumnus, relayed to Mr. Tosolini that some students spoke with Dean Sugin about LBE and Dean Sugin stated that "there had been complaints from past Cardozo LL.M. students who have taken your bar preparation course, did not pass the bar exam and did not receive a full refund" (Exhibit 44).  Such statements were wholly false and intentional misrepresentations by Dean Sugin and Cardozo since there was only a singular, isolated case in which a former LBE student requested a refund and was promptly provided with said refund.

115.    Dean Sugin's false accusations regarding LBE resulted in many Cardozo Foreign LL.M. Students enrolling with Barbri.

## *Barbri's Connections with Harvard*

116.   Upon information and belief, Barbri has had and continues to have a long-standing relationship with Harvard and has regularly provided donations and gifts to the school.

117.   Upon information and belief, ERICA B. FINE, former Eastern Region Vice President, Eastern Region Senior Associate Director and Eastern Region Editorial Director of Barbri, has had personal relationships with various Deans, faculty members and administrators at Harvard, including Ellen Cosgrove, the Dean of Students at Harvard.

118.   As a result of Fine's negative comments to the various Deans at Harvard, LBE was barred from on-campus marketing at Harvard with no explanation or reason regarding Harvard's actions.

119.   On or about October 4, 2010, Ellen Cosgrove, Associate Dean and Dean of Students, revoked LBE's permission to table at Harvard because she wanted to see the results of LBE's pass rate for the July 2010 bar examination (Exhibit 45).  On or about January 19, 2011, Mr. Tosolini was "proud to communicate [to Dean Cosgrove] that [LBE has] reached an extremely high pass rate of 76.5%," and "[i]n comparison, the general [New York] state pass rate for internationally trained students was 37%" (Exhibit 46).  Mr. Tosolini asked for Harvard to reconsider its position to allow LBE to foster a relationship with Harvard's Foreign LL.M. Students and the campus as a whole.  Mr. Tosolini further provided to Dean Cosgrove a list of schools where LBE regularly tables.

120.   LBE has regularly communicated with Dean Cosgrove regarding the opportunity to table at Harvard however Dean Cosgrove refused and continues to refuse to comment or reply regarding LBE's multiple requests.

121.   On or about the spring of 2014, Mr. Tosolini met with Sims to discuss

Barbri's predatory marketing activities against LBE.  Sims initially denied any disparagement, however, Sims admitted that all personnel at Barbri connected with the disparaging actions against LBE are being "let go by Barbri."  After Mr Tosolini brought up specific instances and actions by Erica Fine with the administration at Harvard, Sims apologized and offered to "make a phone call to Harvard" and relay that "Barbri has no issues with LBE's presence at Harvard."  Sims's offer to call Harvard shocked Mr. Tosolini as to the relationship between Barbri and various law schools and that it is clear that Barbri controls what bar review companies have access to law schools.  Regarding Sims's offer to contact Harvard directly, Mr. Tosolini stated that he was not interested in what Barbri wants to do and just wants Barbri to stop its actions in creating an unfair marketplace for LBE.

122.    Upon information and belief, Fine's personal relationship with the Deans and faculty at Harvard has provided Barbri unlimited access directly with the school and Harvard students, outside of regular market channels and has caused LBE to be pushed out of the market with no reasonable basis.

### *Barbri's Connections with Georgetown*

123.    Upon information and belief, Barbri has had and continues to have a long-standing relationship with Georgetown and has regularly provided donations and gifts to the school.

124.    During the fall of 2015, LBE successfully marketed its products and services by tabling, conducting presentations and garnering enough positive testimonials from previous Georgetown Foreign LL.M. Students who studied with LBE and successfully passed the NY Bar Exam that led LBE to enroll the largest number of Georgetown Foreign LL.M. Students

in the history of LBE.

125.    On or about February 25, 2016, LBE offered to refund specific Georgetown Foreign LL.M. Students regarding those students' misunderstanding about entering a binding contract with LBE – specifically to "refund the students who have [been] automatically charged if they have already requested a refund" (Exhibit 47).  Mr. Tosolini clarified that "regular students [who] have already completed their enrollment [with LBE] by willingly paying the balance on their own are not…part of [the agreement between LBE and Georgetown]" (Exhibit 47).  Caryn Voland, Assistant Dean of Graduate Programs at Georgetown, confirmed that "[Georgetown] [is] concerned about all of the bar review companies' use of this type of binding language with students who may not be clear on what they are signing, and Dean [Mitchell] Bailin[,] [Associate Vice President, Dean of Students at Georgetown,] will be looking at this issue across the board" (Exhibit 48).

126.    Contrary to the agreement and unbeknownst to LBE, Georgetown sent a school wide email soliciting all Foreign LL.M. Students regarding the opportunity to receive a refund from LBE.  On or about March 29, 2016, Mr. Tosolini contacted Dean Voland and Dean Bailin regarding significantly more refund requests from Georgetown Foreign LL.M. Students. Mr. Tosolini confirmed there might have been a misunderstanding between LBE's Chinese speaking alumnus and Georgetown's Chinese speaking students and that LBE has subsequently received "requests [for] refunds from non-Chinese speaking students," of which Mr. Tosolini confirmed that he "personally presented [LBE's] course to [the rest of the Georgetown students] in English," and has "always been very clear" regarding LBE's Terms and Conditions and thus there "could not be any misunderstanding during [Mr. Tosolini's presentation]" (Exhibit 49).  Dean Voland replied that "the misunderstanding could easily have taken place for other students who

are non-native English speakers and had, particularly at that time, a limited understanding of U[.]S[.] contract principles and what they were signing" (Exhibit 50).  Mr. Tosolini retorted his confusion regarding Georgetown's unilateral decision to contact all Foreign LL.M. Students and Dean Voland's previous explanation since Mr. Tosolini explained "if a student attends an event where all Terms and Conditions are explained clearly and that student signs and agrees to [all Terms and Conditions,] it is hard to claim that [the student] was not familiar with a U[.]S[.] contract" (Exhibit 51).

127.   As a good faith effort to move forward from Georgetown's actions that contributed to a substantial increase in refund requests, Mr. Tosolini requested that Georgetown "waive [LBE's] fee for renting a room for [the summer of 2016]" (Exhibit 51).  In reply, Dean Voland threatened to disallow LBE from Georgetown by confirming that "[LBE's] willingness…to provide refunds to the students who contacted [LBE] by a certain deadline…contributed to [Georgetown's] willingness to have [LBE] continue to make presentations at Georgetown" (Exhibit 52).

128.   Upon information and belief, Georgetown has not taken and does not take any steps in securing refunds for Georgetown Foreign LL.M. Students who may have misunderstood Barbri's Terms and Conditions, which are identical to LBE's Terms and Conditions.

### *Barbri's Connections with Duke*

129.   Upon information and belief, Barbri has had and continues to have a long-standing relationship with Duke and has regularly provided donations and gifts to the school.

130.   During the fall of 2012, LBE successfully marketed its products and

services by tabling, conducting presentations and garnering enough positive testimonials from previous Duke Foreign LL.M. Students who studied with LBE and successfully passed the NY Bar Exam that led LBE to enroll the largest number of Duke Foreign LL.M. Students in the history of LBE.

131.    Prior to 2013, LBE tabled and promoted their products and services at Duke and helped Duke Foreign LL.M. Students successfully pass the NY Bar Exam.

132.    On or about fall of 2013, LBE was denied access to Duke.

133.    While Barbri is able to offer its course on Duke's campus using a room offered directly to Barbri free of charge by Duke, LBE was denied the same treatment and was forced to rent a room in another building off-campus at a substantial cost.  As a result of LBE's circumstances, rumors were spread that LBE did not want to pay Duke and/or LBE was too cheap to pay for a room at Duke.  In fact, such rumors were wholly false since Barbri enjoyed free rooms at Duke, Duke did not provide LBE to rent a room on-campus, and LBE was forced to pay for a room and off-campus from Duke.  Such a situation and concerted action with Duke and Barbri created an unfair advantage for Barbri and significantly hampered LBE's ability to market its products and services at Duke.

134.    On or about 2014, LBE requested to table at Duke, however Duke could not accommodate LBE's request due to a limitation of space.  As a result of LBE's absence at Duke, many Foreign LL.M. Students at Duke who were interested in LBE's products and services contacted LBE directly requesting LBE to table at Duke in order to gather further information about LBE's products and services.

135.    On or about July 29, 2015, LBE contacted Oleg Kobelev, Assistant Dean of International Studies at Duke, requesting to table during the fall 2015 semester to provide

information about their bar exam preparation course to Duke's Foreign LL.M. Students.  On or about August 28, 2015, LBE contacted Dean Kobelev again requesting a tabling opportunity since Dean Kobelev did not respond to LBE's previous request (Exhibit 53).

136.    On or about August 28, 2015, William J. Hoye, Associate Dean of Admissions & Student Affairs at Duke, contacted LBE stating "the space in [Duke's] building that is available for tabling and/or presentations is quite limited and [Duke is] unable to invite additional vendors to promote their products" and that Duke was unable to allow LBE on campus (Exhibit 54).

137.    On or about September 13, 2015, Mr. Tosolini contacted Dean Hoye directly regarding the issue about limited table space and that [LBE has] been approached by several students from [Duke] asking [LBE] to visit and introduce the LLM Bar Exam program and methodology" (Exhibit 55).  Mr. Tosolini went on to explain that he "strongly [believes] that [LBE's] presence can only bring more options to [Duke] students, who will benefit from increased competition and better prices regardless of whether [Duke students] eventually choose LLM Bar Exam or not" (Exhibit 55).  On or about September 28, 2015, Mr. Tosolini contacted Dean Hoye again regarding the same issues raised on September 13, 2015 since Dean Hoye did not respond to Mr. Tosolini (Exhibit 56).

138.    On or about September 29, 2015, Dean Hoye communicated to Mr. Tosolini that "[Duke is] not in the position to approve additional bar preparation companies at this time" and "if [LBE] receive[s] inquiries regarding [Duke's] policy from students, please feel free to refer them to [Dean Hoye]" (Exhibit 57).  When Mr. Tosolini requested further information regarding why Duke disallowed LBE from promoting its products and services, asking "[i]s it possible to know why [LBE is] not able to visit Duke Law?" and that "[LBE was] approved in the past

and able to visit [Duke] but this is not possible anymore" (Exhibit 58).  Despite multiple requests from Duke students to allow LBE to table at Duke and multiple requests from LBE, Dean Hoye refused to comment or provide further guidance.

139.    Upon information and belief, Barbri has had multiple events regarding its products and services at Duke.

140.    Upon information and belief, Foreign LL.M. Students at Duke are still requesting LBE to table at Duke since those Foreign LL.M. Students have high interest in LBE's products and services.

141.    LBE is currently and continues to be unfairly barred from Duke, LBE cannot rent any classrooms or conduct any presentations.  At present, LBE is only able to (i) enroll those Foreign LL.M. Students who were referred to LBE by Duke alumni d/or (ii) those Foreign LL.M. Students who will take LBE once they fail the NY Bar Exam after studying with Barbri – one such student, Ricardo Zuloaga, a Duke LL.M. who graduated in 2014, took Barbri's course for the July 2014 NY Bar Exam and failed, in which he received a "119 M.B.E. [score and] terrible essays" but "with [the LBE] course, [he] got a 148 M.B.E. [score] and hit 95% of the [tested essay] issues" (Exhibit 59).

### *Barbri's Connections with USC*

142.    Upon information and belief, Barbri has had and continues to have a long-standing relationship with USC and has regularly provided donations and gifts to the school.

143.    During the fall of 2015, LBE successfully marketed its products and services by tabling, conducting presentations and garnering enough positive testimonials from previous USC Foreign LL.M. Students who studied with LBE and successfully passed a bar

examination that led LBE to enroll the largest number of USC Foreign LL.M. Students in the history of LBE.

144.    Professor John Heilman, a long standing Barbri professor and faculty member of USC, offers a two for-credit classes to all LL.M. students entitled Topics in American Law and Introduction to American Legal Systems.  During these classes, Prof. Heilman actively hands out Barbri enrollment forms to his students asking them to enroll with Barbri.  All of Prof. Heilman's Barbri endorsements happened during his regular for-credit classes offered at USC. Upon information and belief, Barbri presented its products and services to Foreign LL.M. Students during one of the first LL.M. classes during the fall 2015 semester ("Early Access Presentation") at USC – several weeks prior to USC's Fall Bar Week, which is the only opportunity that bar exam preparation companies have access to USC.  At the end of the presentation, Barbri aggressively pushed Foreign LL.M. Students to enroll with Barbri for a promise of a large discount by handing out enrollment forms and collecting registrations.

145.    Upon information and belief, several Foreign LL.M. Students that enrolled and paid a deposit with Barbri during the Early Access Presentation decided to enroll instead with LBE when those students learned about LBE and compared the two providers.  These students found out that Barbri was going to charge theses students the full amount of the bar preparation course even if those students do not participate with Barbri.

146.    On or about October 15, 2015, Mr. Tosolini contacted Kyle W. Jones, Associate Dean and Dean of Students at USC, regarding Barbri's intentional unfair business practices at USC that targeted Foreign LL.M. Students – including   the specific incident that "Barbri was presented to [Foreign LL.M. Students] in one of the first [LL.M.] classes at USC " and "students were pushed to sign up on a promise of a large discount," the Early Access

Presentation and the issues that arose due to Barbri's Early Access Presentation – specifically that "several [USC Foreign LL.M. Students] that initially put down a deposit with Barbri after comparing the different providers have decided to join [LBE's] program" and that "Barbri is going to charge [those students] the full amount even if they do not take part in their main course" (Exhibit 60) – Dean Jones did not reply to Mr. Tosolini's email regarding the situation.

147.    Subsequently, and without any reason and contrary to LBE's prior accommodations , LBE was not invited to attend the yearly Spring Bar Week at USC for the Spring of 2016 ("Spring Bar Week").

148.    On or about February 12, 2016, Mr. Tosolini contacted Anne Marlenga, Director of Student Affairs, Graduate and International Programs at USC, pointing out the fact that LBE was not invited to USC for Spring Bar Week (Exhibit 61).  Many USC Foreign LL.M. Students were asking LBE why LBE promised to return in the Spring Semester to provide course books to students and to touch bases regarding LBE's program, but was not present during Spring Bar Week (Exhibit 61).

149.    On or about February 16, 2016, Deborah Call, Associate Dean of Graduate and International Programs at USC contacted Mr. Tosolini and invited LBE to attend Bar Week at USC (Exhibit 62). However, at that point, most of Spring Bar Week already started, which made it very difficult for LBE to attend and efficiently market its products and services to USC Foreign LL.M. Students.

150.    On or about February 22, 2016, Dean Call contacted Mr. Tosolini regarding issues about LBE's representative was allegedly uninformed regarding any prior issues between LBE and Foreign LL.M. Students at USC and stated "[LBE's representative] seemed surprised but assured [Dean Call] [the LBE representative] would have [information regarding USC Foreign

LL.M. Students who have issues with LBE] delivered [to LBE]" (Exhibit 63).  Mr. Tosolini explained LBE "marketing [representatives] do not get involved with cancellation or refunds" (Exhibit 64).  Mr. Tosolini further stated that LBE's "cancellation policy is the same of those of [LBE's] competitors" and assured Dean Call "that only a small number of [USC Foreign LL.M. Students] have issues compare[d] to the overwhelming majority of the enrolled students" (Exhibit 64).

151.   On or about February 23, 2016, Dean Call accused the LBE Marketing Representative was "not been informed about the problems with USC Foreign LL.M. Students nor was [LBE's Representative] prepared to assist [USC Foreign LL.M. Students]" and stated that USC will not be able to "work with LLM Bar Exam from this point forward" (Exhibit 65).  Such accusations are wholly false since Mr. Tosolini clearly stated that he would personally oversee any issues that students may have and fully clarified that the purpose of LBE tabling at USC was for the sole purpose of distributing books and explaining LBE's program.

152.   On or about March 2, 2016, Mr. Tosolini provided to Dean Call a list (Exhibit 66) of four (4) USC Foreign LL.M. Students who LBE was directly working with regarding a refund and to provide to LBE an affidavit stating that the student will not take a bar examination within the next two years – the exact language and terms in the affidavits that Barbri uses to release from students from courses and enrollment contracts (Exhibit 36) – required to obtain a refund.  Subsequently, Dean Call demanded that LBE release the USC Foreign LL.M. Students who had issues with LBE from their contracts, provide to said students full refunds, allow said students to return all the LBE materials, and to waive such students from signing any affidavit that prohibits the students from taking the bar examination in the future (Exhibit 67).

153.   In an effort to move forward from the situation, LBE has waived the

affidavit request from students requesting refunds – against the general practice in the bar examination review industry as set forth by Barbri (Exhibit 36).

### *Barbri's Connections with Emory*

154.    Upon information and belief, Barbri has had and continues to have a long-standing relationship with Emory and has regularly provided donations and gifts to the school.

155.    On or about January of 2016, Mr. Tosolini spoke with Jessica Dworkin, Assistant Dean of Graduate Programs at Emory, in which Mr. Tosolini and Dean Dworkin agreed that Emory students "who have not paid for [LBE's] course will be released from their payment obligations and students [who] have been charged will not receive a refund" (Exhibit 68).

156.    On or about March 24, 2016 – several months after Mr. Tosolini and Dean Dworkin entered into an agreement –  Robert B. Ahdieh, Vice Dean and Professor at Emory, who is/was not directly involved with the Foreign LL.M. Students at Emory nor was/is he privy to the agreement made between Dean Dworkin and Mr. Tosolini, contacted Mr. Tosolini to demand that LBE refund all Emory students immediately and stated that the situation was "above [Dean Dworkin's] paygrade, that it was "not an option [for LBE] not to refund" students and threatened to communicate with other law schools and "bring an action against LBE."  Dean Ahdieh is concurrently a distinguished faculty member at Barbri.

157.    On or about April 1, 2016 – several months after Mr. Tosolini and Dean Dworkin entered into an agreement regarding Emory Foreign LL.M. Students – Dean Ahdieh told Mr. Tosolini that Dean Dworkin "did not have the authority to reach any such agreement" and "urged [Mr. Tosolini] to proceed as [LBE] did at Georgetown" (Exhibit 69).  Dean Ahdieh further threatened "if [proceeding] as [LBE] did at [Georgetown] is not an option…[LBE] will not be able

48

to return to Emory in the future" (Exhibit 69).

158.    It is clear from Dean Adhieh's connection and employment with Barbri and subsequent actions and threats against LBE that Dean Adhieh intentionally allowed Emory to breach its agreement with Mr. Tosolini in clear favoritism for Barbri – Barbri has the same exact Terms and Conditions as LBE and Dean Adhieh and/or Emory is/are not taking any adverse actions against Barbri regarding their similar conduct.

### *Barbri's Connections with Berkeley*

159.    Upon information and belief, Barbri has had and continues to have a long-standing relationship with Berkeley and has regularly provided donations and gifts to the school.

160.    During the fall of 2015, LBE successfully marketed its products and services by tabling, conducting presentations and garnering enough positive testimonials from previous Berkeley Foreign LL.M. Students who studied with LBE and successfully passed the NY Bar Exam that led LBE to enroll the largest number of Berkeley Foreign LL.M. Students in the history of LBE.

161.    On or about March 29, 2016, LBE received a letter from Robert D. Infelise, a professor at Berkeley, in which Prof. Infelise states that several Berkeley Foreign LL.M. Students told Prof. Infelise that they "signed up for the [LBE] bar prep course based on [LBE's] representative's promise that [the students] could cancel later without incurring any penalty" (Exhibit 70).  Prof. Infelise's facts and understanding of any issues between Berkeley LL.M. students is wholly inaccurate.  Prof. Infelise further cites LBE's Terms and Conditions – despite the fact that LBE's Terms and Conditions completely reflect Barbri's Terms and Conditions – as well as LBE's practice of conditioning refunds based on a "[promise] not to take a bar exam

anywhere in the U.S. for a period of two years" (Exhibit 70). Again, Prof. Infelise's facts are wholly inaccurate – LBE's Cancellation and Refund policies are typical in the bar review course marketplace and similar to Barbri's policies – *See* Exhibit 35 and Exhibit 36.

162. Prof. Infelise further states in his communication that he does not "represent any of the students who signed up with [LBE]" and "does not speak on behalf of Berkeley…or the University of California" (Exhibit 70, pg. 3), however, Prof. Infelise clearly included Susan R. Whitman, Assistant Dean of Academic Planning and Coordination at Berkeley, in the carbon-copy of the letter.

### *LBE's Substantial Loss and Damages Due to Action by Defendants*

163. As a result of the unlawful conduct of Barbri and the other Defendants, LBE suffered significant financial and non-financial losses. LBE reasonably estimates that it suffered financial losses of at least fifty-million dollars ($50,000,000.00) caused by Defendants' actions – both individually and by and through Barbri's relationships with other-named Defendants. Because LBE has been barred from on-campus marketing at multiple campuses, these losses will continue into the future.

164. Significantly, LBE continues to be allowed to conduct on-campus marketing at several other law schools thus demonstrating the baseless nature of Barbri's and other named Defendants' attacks on the quality and integrity of LBE's program.

165. Unfortunately, the false and defamatory statements made by Barbri and other named Defendants of LBE are spreading to other law schools, jeopardizing LBE's ability to market its program and effectively compete with Barbri across the country. As a result, LBE has suffered and continues to suffer damages to its business and reputation.

### FIRST CAUSE OF ACTION -- MONOPOLIZATION, 15 U.S.C. §§ 15 and 26

166.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 165, as if fully set forth herein at length.

167.    LBE brings this claim under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for violations of Section 2 of the Sherman Act, 15 U.S.C. § 2

168.    Bar examination review courses, as provided by LBE and Barbri, represents a relevant and distinct product market within the meaning of Section 2 of the Sherman Act, 15 U.S.C. § 2.

169.    Upon information and belief, Barbri maintains an 80-90% share of the market for bar examination review courses.

170.    Barriers to entry in the market for bar examination review courses and related services are high.  A potential provider of bar examination review courses and related services must develop an extensive network of relationships with universities, law schools, and students across the county necessary to even enter the market.  It can take years to develop these types of relationships.  Moreover, it can take a long period of time to develop the method and skills necessary to provide related bar examination review services.  For example, many lecturers for bar examination review courses are law professors and attorneys with years of practice and experience in a particular area of law that is tested on the bar examination.  A potential entrant into this market must also develop software and course materials including guidebooks, outlines and test material. It would take a large capital investment and a significant amount of time to develop a successful competing product.  Barbri can raise its prices to a supracompetitive level and LBE is not aware of any other potential competitor that could successfully enter the relevant market.

171.    Due to its large market share – which includes virtually all the law schools and law students across America – and power to exclude competition, Barbri – specifically by and through its close relationships with other named Defendants – has a monopoly power in the market for bar examination review.

172.    Barbri has willfully engaged in predatory, anticompetitive and illegal conduct with the specific intent of acquiring and maintaining monopoly power in the market for bar examination review courses and related services.

173.    Barbri's false advertising and product disparagement of LBE was conducted over a prolonged period of time, was clearly false and misleading, and was intended to induce reliance by consumers – law students and international lawyers – who were not in a position to make accurate comparisons of LBE and Barbri themselves.

174.    Barbri engaged in this predatory conduct with the intent of acquiring and maintaining monopoly power and driving LBE out of business.   Barbri's tortious and anticompetitive activities have stifled competition in the relevant market, thereby allowing Barbri to exercise monopoly power unlawfully and harm competition in the relevant market in violation of Section 2 of the Sherman Act.

175.    As alleged herein, Barbri actively took LBE's identical product and identical services, with the intent to continue its monopolization of the bar examination review market.  Due to Barbri's share in the market for the general bar examination review courses that are designed for non-international lawyers, Barbri was able to easily create an identical service geared toward Foreign LL.M. Students as provided by LBE and market to directly to those students.

176.    As a direct and proximate result of Barbri's monopolization of the market

for bar examination review services, LBE has been injured in its business and property, including lost profits and damage to its reputation and goodwill in an amount of no less than 50 million dollars, which must be trebled pursuant to 15 U.S.C. § 15.  LBE is also entitled to injunctive relief sought herein pursuant to 15 U.S.C. § 26.   Finally, LBE is entitled to recover its costs incurred in prosecuting this claim, including reasonable attorney's fees as provided for in 15 U.S.C. § 15.

### SECOND CAUSE OF ACTION – ATTEMPTED MONOPOLIZATION, 15 U.S.C. §§ 15 and 26

177.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 176, as if fully set forth herein at length.

178.    LBE brings this claim under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for violations of Section 2 of the Sherman Act, 15 U.S.C. § 2.

179.    Bar examination review courses, as provided by LBE and Barbri, represents a relevant and distinct product market within the meaning of Section 2 of the Sherman Act, 15 U.S.C. § 2.

180.    Upon information and belief, Barbri maintains an 80-90% share of the market for bar examination review courses.

181.    Barriers to entry in the market for bar examination review courses and related services are high.  A potential provider of bar examination review courses and related services must develop an extensive network of relationships with universities, law schools, and students across the county necessary to even enter the market.  It can take years to develop these types of relationships.  Moreover, it can take a long period of time to develop the method and skills necessary to provide related bar examination review services.  For example, many lecturers for bar examination review courses are law professors and attorneys with years of practice and experience

in a particular area of law that is tested on the bar examination.  A potential entrant into this market must also develop software and course materials including guidebooks, outlines, and test material. It would take a large capital investment and a significant amount of time to develop a successful competing product.  Barbri can raise its prices to a supracompetitive level and LBE is not aware of any other potential competitor that could successfully enter the relevant market.

182.    Due to its large market share – which includes virtually all the law schools and law students across America – and power to exclude competition, Barbri – specifically by and through its relationships with other named Defendants – has a monopoly power in the market for bar examination review.

183.    Barbri has willfully engaged in predatory, anticompetitive and illegal conduct with the specific intent of acquiring and attempting monopoly power in the market for bar examination review courses and related services., specifically the bar review course market and the Foreign LL.M. Student market.

184.    Barbri's false advertising and product disparagement of LBE was conducted over a prolonged period of time, was clearly false and misleading, and was intended to induce reliance by consumers – law students and international lawyers – who were not in a position to make accurate comparisons of LBE and Barbri themselves.

185.    Barbri engaged in this predatory conduct with the intent of acquiring and attempting monopoly power and driving LBE out of business.  Barbri's tortious and anticompetitive activities have stifled competition in the bar review course market and the Foreign LL.M. Student market, thereby allowing Barbri to exercise monopoly power unlawfully and harm competition in the relevant market in violation of Section 2 of the Sherman Act.

186.    As alleged herein, Barbri actively took LBE's identical product and

identical services, with the intent to continue its monopolization of the bar examination review market by simultaneously monopolizing the Foreign LL.M. Student market. Due to Barbri's share in the market for the general bar examination review courses that are designed for non-international lawyers, Barbri was able to easily create an identical service geared toward Foreign LL.M. Students as provided by LBE and market directly to Foreign LL.M. Students.

187.    As a direct and proximate result of Barbri's attempted monopolization of the market for bar examination review services, LBE has been injured in its business and property, including lost profits and damage to its reputation and goodwill in an amount of no less than 50 million dollars, which must be trebled pursuant to 15 U.S.C. § 15. LBE is also entitled to injunctive relief sought herein pursuant to 15 U.S.C. § 26.    Finally, LBE is entitled to recover its costs incurred in prosecuting this claim, including reasonable attorney's fees as provided for in 15 U.S.C. § 15.


### THIRD CAUSE OF ACTION –  COMBINATION AND CONSPIRACY TO RESTRAIN TRADE

188.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 187, as if fully set forth herein at length.

189.    In violation of Section 1 of the Sherman Act (15 U.S.C. § 1) Defendants have willfully, knowingly, intentionally and with specific intent to do so, combined and conspired with each other to restrain trade in the bar exam review market and foreign LL.M. student market.

190.    The combination and conspiracy to restrain trade in the bar exam review market and foreign LL.M. student market has been effectuated by, among other things, the means and the overt acts set forth above.

191.    Defendants intended and intend by these actions to:

i.  Control the price of bar review courses in the bar exam review market and foreign LL.M. student market;

ii.  Eliminate, reduce, limit and foreclose actual and potential competition in the bar exam review market and foreign LL.M. student market;

iii.  Exclude and foreclose other persons or entities from participating in or entering the bar exam review market and foreign LL.M. student market; and

iv.  Injure and eliminate competition in the bar exam review market and foreign LL.M. student market.

192.    As a result of the conduct alleged herein, Defendants have controlled and continues to control price, has been and is able to exclude competitors and competition and has been and is able to charge supra-competitive prices in the bar exam review market and foreign LL.M. student market.

193.    The combination and conspiracy to monopolize and restrain trade has had, and is likely to have, among other things, the following effects:

i.  Actual and potential competition in the bar exam review market and foreign LL.M. student market has been restrained, suppressed and eliminated;

ii.  LBE has been excluded, and will likely continue to be excluded, from being able to sufficiently market and sell its products and services;

iii.  LBE has been injured in its business and property; and

iv.  Instead of free, open and competitive Markets a monopoly and restraint of trade in the bar exam review market and foreign LL.M. student

market has been established, maintained, furthered and enhanced.

194.    As a result of Defendants' conspiracy to monopolize and restrain trade in violation of Section 1, LBE has been injured in its business and property in an amount no less than 50 million dollars, and is entitled to recover treble damages.


**FOURTH CAUSE OF ACTION – MISREPRESENTATION & FRAUD**

195.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 194, as if fully set forth herein at length.

196.    At all times relevant herein, Dean Escalera, Dean Polo, and certain of the John Doe Defendants acted as Barbri's agents and the agents for the John Doe Defendants who were corporate officers and employees of Barbri.

197.    Barbri made one or more statements to LBE that Barbri was interested in cooperating with and/or acquiring LBE for purposes of developing and/or improving Barbri's own bar review courses for Foreign LL.M. Students.

198.     These statements were false and malicious misrepresentations of Barbri's interest and intention in dealing with LBE; Barbri never had any interest or intention to enter into a business relationship with LBE.

199.     Barbri knew that these statements were false and malicious misrepresentations.

200.    Barbri made these statements with the intent to induce LBE to rely upon these statements and to provide Barbri with LBE's trade secrets and proprietary information about LBE's educational and business operations; Barbri wanted to acquire LBE's trade secrets and proprietary information to develop and/or improve Barbri's own bar review courses for Foreign

LL.M. Students.

201.    Defendants intended for LBE to rely upon the misrepresentations made through Dean Polo, Dean Escalera  and certain of the John Doe Defendants, as alleged herein.

202.    LBE was justified in relying on Barbri's misrepresentations through Fine and Polo and the misrepresentations of the John Doe Defendants, as alleged herein.

203.    LBE in good faith relied upon Barbri's statements and provided Barbri with a written report detailing LBE's educational and business operations and containing LBE's trade secrets and proprietary information.

204.    Barbri fraudulently and improperly used the report, including LBE's trade secrets and proprietary information, to develop and/or improve Barbri's own bar review courses for foreign LL.M. students.

205.    LBE was damaged by Barbri's tortious conduct.

206.    LBE has suffered damages as a proximate result of Barbri misrepresentations through Fine and Polo and the John Doe Defendants' misrepresentations, as alleged herein, in an amount no less than 50 million dollars.


**FIFTH CAUSE OF ACTION – UNFAIR COMPETITION**

207.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 206, as if fully set forth herein at length.

208.     Upon information and belief, by willfully inducing students of LBE to breach their respective contractual obligations with LBE, by interfering with LBE's business relationships with its students, and by secretly orchestrating its activities in a way that it knew or should have known would inflict significant competitive injury upon LBE, Defendants have acted

in bad faith and have engaged and are continuing to engage in unfair competition against LBE.

209.   Upon information and belief, in addition to its actions stated in Paragraph 208, by misappropriating LBE's product, know-how and methodologies, by misappropriating LBE's confidential and proprietary information and competitive advantage, and by misappropriating the business and goodwill in LBE's operations, Barbri has acted in bad faith and has engaged and is continuing to engage in unfair competition against LBE.

210.   Upon information and belief, Defendants have also engaged and are intending to engage in unfair competition through their apparent scheme to reap the client relationships of LBE while avoiding the investment of time, money and resources that LBE has expended in order to develop and promote its products and services and client relations, in effect stealing business units from LBE rather than building or buying the business units themselves.

211.   Defendants' bad faith conduct as described herein is commercially immoral and unfair.

212.   LBE has suffered damages as a proximate result of Defendants' unfair competition in an amount no less than 50 million dollars.

213.   Barbri's unfair competition has been committed knowingly, willfully and in conscious disregard of LBE's rights.

214.   As a result of Barbri's willful, wanton, and malicious conduct, LBE is entitled to recover punitive damages against Barbri in an amount no less than 50 million dollars.


**SIXTH CAUSE OF ACTION – TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

215.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 214, as if fully set forth herein at length.

59

216.    Since at least 2009, when Barbri began misleading the market along with the other named Defendants to compete unfairly with LBE, a significant number of LBE's students have terminated their agreements with LBE to enroll instead with Barbri's products and services.

217.    LBE had a business relationship with each of their students while they were enrolled with LBE's products and services.

218.    Further, LBE had a reasonable expectancy that the students would continue their enrollment agreements for LBE upon the execution of those agreements.

219.    However, each of these customers either terminated their enrollment to enroll instead with Barbri's products and services.

220.    Upon information and belief, these customers selected Defendants because Defendants' agents and representatives presented them with false or misleading information regarding the superiority of Barbri's products as compared to LBE's products including, without limitation, misleading information about Barbri's products and the misleading information regarding LBE.  Upon information and belief, certain of these customers selected Barbri because of Barbri's unfair competition in working with schools to shut LBE from those particular campuses as well as Barbri's misrepresentations about its products.

221.    Defendants knew of LBE's relationships with these customers and intentionally interfered with them by presenting them with false and misleading information, as alleged herein.

222.    As alleged herein, Defendants used dishonest, unfair, and improper means to interfere with LBE's relationships with its customers by misappropriating LBE's confidential and trade secret information and using it to establish Barbri's own, similar LL.M. program in order to mislead and/or LBE's customers.

60

223.    Defendants' interference with LBE's relationships with its customers, as alleged herein, caused injury to LBE's relationships with those customers by misleading the customers to terminate their agreements with LBE and to instead enroll with Barbri's products and services.

224.    But for Defendants' interference and disuassion with LBE's relationships with its customers, as alleged herein, LBE would have consummated additional enrollment agreements.

225.    Upon information and belief, Barbri has intentionally interfered with LBE's relationships with customers.

226.    Further, Barbri has also interfered with LBE's relationship with certain prospective customers who did not have existing enrollment agreements with LBE.

227.    Since at least 2012, when Barbri created an identical course like LBE's course, a number of LBE's prospective customers who were actively comparing LBE's products and services with those of Barbri enrolled with Barbri instead of LBE after presentations by Barbri's sales representatives.

228.    Upon information and belief, these prospective customers selected Barbri because Barbri agents and representatives presented them with false or misleading information regarding the superiority of Barbri's products as compared to LBE's products including, without limitation, misleading information about Barbri's products and the misleading information regarding LBE.  Upon information and belief, certain of these customers selected Barbri because of Barbri's unfair competition in working with schools – specifically the other named Defendants – to shut LBE from those particular campuses as well as Barbri's misrepresentations about its products.

229. LBE had a business relationship with each of these prospective customers, many of whom had discussed with LBE representatives regarding LBE's program at the time Barbri's sales representatives presented them with the misleading information.

230. LBE had a reasonable expectancy that it would enter a contract with each of these prospective customers.

231. Barbri knew of LBE's relationships with these customers and intentionally interfered with them by presenting them with false and misleading information, as alleged herein.

232. As alleged herein, Barbri used dishonest, unfair, and improper means to interfere and/or dissuade with LBE's relationships with these prospective customers.

233. Barbri's interference and/or disuassion with LBE's relationships with these prospective customers, as alleged herein, caused injury to LBE's relationships with those customers by misleading the customers to enroll with Barbri's products and services instead of LBE's.

234. But for Barbri's interference and/or dissuasion with LBE's relationships with these prospective customers, as alleged herein, LBE would have consummated enrollment agreements with them.

235. Upon information and belief, Barbri has intentionally interfered with LBE's relationships with prospective customers.  LBE has suffered damages as a proximate result of Barbri's tortious interference with LBE's relationships with its former and prospective customers, as alleged herein, in an amount of no less than 50 million dollars.

236. LBE is entitled to recover its damages suffered as a proximate result of Defendants' tortious interference with its former and prospective customers, as alleged herein, in an amount no less than 50 million dollars.

237.    Defendants' tortious interference with LBE's relationships with its former and prospective customers has been willful, wanton and malicious.

238.    As a result of Defendants' willful, wanton, and malicious conduct, LBE is entitled to recover punitive damages against Defendants in an amount no less than 50 million dollars.

## SEVENTH CAUSE OF ACTION – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

239.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 238, as if fully set forth herein at length.

240.    LBE has established contractual relations with various students who have enrolled to participate in LBE's bar review preparation course.

241.    LBE has a reasonable expectation of ongoing contractual relations with various existing customers enrolled with LBE to complete LBE's bar review preparation course.

242.    Defendants were aware of LBE's contractual relationships with various customers.

243.    Defendants have acted purposefully and with malice in attempting to interfere with the contractual relations of LBE by and through their acts described above.

244.    As a direct result of Defendants' actions, LBE has suffered and will continue to suffer monetary losses and immediate and irreparable harm to its business and goodwill for which it has no adequate remedy at law.

245.    Defendants' actions described above constitute tortious interference with contractual relations in violation of New York common law.

246.    Upon information and belief, Defendants have intentionally interfered with

LBE's contractual relations.  LBE has suffered damages as a proximate result of Defendants' tortious interference with LBE's contractual relations, as alleged herein, in an amount of no less than 50 million dollars.

### EIGHTH CAUSE OF ACTION – VIOLATION OF SECTION 349 OF THE NEW YORK GENERAL BUSINESS LAW

247.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 246, as if fully set forth herein at length.

248.    By its acts alleged herein, Defendants deceived consumers in the bar examination review course market and the foreign LL.M. Student market in New York regarding the superiority of Barbri as compared to LBE by, among other things: creating and disseminating the misleading rumors and defamatory statements and remarks about LBE to a large number of consumers in New York (including to prospective and existing customers of LBE in New York); misleading prospective and existing customers of LBE in New York by and through its agents; and misrepresenting that Barbri is the only bar review course in the market.

249.    As a result of these deceitful acts, consumers in the bar review course market and the Foreign LL.M. Student Market in New York were misled into enrolling with Barbri rather than LBE, even though enrolling with Barbri is generally more expensive than enrolling with LBE and LBE is a superior bar review course focused on the needs of Foreign LL.M. Students to Barbri.

250.    Accordingly, consumers in the bar review course market and the Foreign LL.M. Student Market in New York were harmed as a result of Barbri's conduct, as alleged herein, by enrolling with Barbri at a higher cost than LBE on the basis of Barbri's misleading and deceitful claims regarding Barbri's superiority to LBE.

251.    Barbri's conduct constitutes deceptive acts and practices in the conduct of a business, trade, commerce, or service in New York in violation of Section 349 of the New York General Business Law.

252.    LBE has suffered damages as a proximate result of Barbri's deceptive acts and practices in an amount no less than 50 million dollars.

253.    LBE is entitled to recover its damages suffered as a proximate result of Barbri's deceptive acts and practices, as alleged herein, in an amount no less than 50 million dollars.

254.    LBE is also entitled to permanent injunctive relief as a result of Barbri's violation of Section 349 of the New York General Business Law.

255.    Barbri acted willfully and in knowing violation of Section 349 of the New York General Business Law in conducting its deceptive acts and practices, as alleged herein.

256.    As a result of Barbri's willful conduct and its knowing violation of Section 349 of the New York General Business Law, LBE is entitled to an award of exemplary damages and its attorney's fees as provided by Section 349 of the New York General Business Law.

**NINTH CAUSE OF ACTION – VIOLATION OF RICO, 18 U.S.C. § 1962(c)**

257.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 256, as if fully set forth herein at length.

258.    The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961et seq., provides that: "It shall be unlawful for (1) any person (2) employed by or associated with (3) any enterprise (4) engaged in, or the activities of which affect, interstate or foreign commerce, (5) to conduct or participate, directly or indirectly, in the conduct of such

enterprise's affairs (6) through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

259.    At all relevant times, LBE was a "person" within the meaning of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961(3) and 1964(c).

260.    At all relevant times, Barbri and its co-conspirators, Columbia, NYU, Harvard, Cardozo, St. John's, Fordham, Duke, Georgetown, Emory, USC, and Berkeley (collectively, the "Other Conspirators") were each a person within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

261.    At all relevant times, Barbri and the Other Conspirators formed an association in-fact for the purpose of defrauding LBE and obtaining unauthorized access to LBE's confidential and proprietary information.  This association-in-fact was an "enterprise" within the meaning of RICO, 18 U.S.C. §§ 1961(4) and 1962(c) (hereinafter, "the Enterprise").

262.    At all relevant times, Barbri and the Other Conspirators associated with the Enterprise conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(5), in violation of RICO, 18 U.S.C. § 1962(c).

263.    Specifically, Barbri and the Other Conspirators engaged in "racketeering activity" within the meaning of 18 U.S.C. § 1961(1) by the acts alleged herein, including without limitation the following:

    a.   Barbri sent *via* U.S. mail or interstate facsimile to some or all of the Other Conspirators agreements to obtain their services in defrauding LBE, misappropriating LBE's confidential and trade secret information, and/or creating misrepresentations regarding LBE, as alleged herein;

    b.   Barbri and the Other Conspirators communicated with one another in

furtherance of their fraudulent conspiracy via interstate telephone conversations and the internet;

c. From approximately 2009 to 2016, Barbri instructed certain of the Other Conspirators to make the misrepresentations alleged herein in communications via interstate telephone conversations and the internet; and

d. The Other Conspirators transmitted via email and the internet to its students, as well as certain of LBE's students and prospective students, misleading and false statements as well as misrepresentations regarding LBE.

264.    Barbri and the Other Conspirators knew that the above-referenced misleading, false, **misrepresentations** and the other **defamatory remarks** alleged herein which were directed towards LBE, its customers and prospective customers were false when they were made, and they intended to dissuade these customers and prospective customers from doing business with LBE.  The customers and prospective customers justifiably relied on the false, misleading misrepresentations made by Barbri and the Other Conspirators, as alleged herein, by breaching their enrollment contracts with LBE and subsequently enrolling with Barbri and/or by enrolling with Barbri rather than LBE.  As alleged herein, LBE has suffered damages as a proximate result of the customers and prospective customer's reliance upon the misrepresentations by Barbri and the Other Conspirators because LBE lost customers to Barbri that LBE would have secured but for the misrepresentations.

265.    LBE was the direct target and actual victim of the Enterprise's fraudulent scheme.

266.    Barbri and the Other Conspirators each committed and/or aided and abetted the commission of two or more of the above-referenced racketeering activity.

267.    The acts of racketeering activity set forth above constituted a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).  The acts alleged were related to each other by virtue of common participants – Barbri and the Other Conspirators, a common victim that is LBE, a common method of commission and the common purpose and common result of defrauding LBE and enriching Barbri and the Other Conspirators while concealing their activities.

268.    The fraudulent scheme continued for at least seven years and threatened to continue longer but for LBE's discovery of Barbri and the Other Conspirators' activities.

269.    LBE's business was damaged as a proximate result of Barbri and the Other Conspirators' violation of 18 U.S.C. § 1962(c).  Among other things, LBE lost prospective and existing customers, and the resultant revenues and profits associated with those customers, and has suffered a substantial loss of goodwill as a result of Barbri's and the Other Conspirators' actions for Barbri to compete unfairly against LBE.

270.    As a result of its misconduct, as alleged herein, Barbri and the Other Conspirators are liable to LBE for its losses in an amount no less than 50 million dollars.

271.    Pursuant to RICO, 18 U.S.C. § 1964(c), LBE is entitled to recover treble damages plus costs and attorney's fees from Defendants.

## TENTH CAUSE OF ACTION – RICO CONSPIRACY, 18 U.S.C. § 1962(d)

272.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 271, as if fully set forth herein at length.

273.    At all relevant times, Barbri and each of the Other Conspirators each were associated with the Enteriprise and agreed to conspire to violate 18 U.S.C. § 1962(c), that is, agreed

to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

274.    Barbri and the Other Conspirators committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth in Eighth Cause of Action and the other acts alleged herein.

275.    LBE's business and good will were damaged as a proximate result of Barbri and the Other Conspirators' violations of 18 U.S.C. § 1962(d).  Among other things, LBE lost prospective and existing customers, and the resultant revenues and profits associated with those customers, and has suffered a substantial loss of goodwill as a result of Barbri's and the Other Conspirators' actions for Barbri to compete unfairly with LBE.

276.    As a result of its participation in the conspiracy, as alleged herein, Barbri and the Other Conspirators are liable to LBE for its losses in an amount no less than 50 million dollars.

277.    Pursuant to RICO, 18 U.S.C. § 1964(c), LBE is entitled to recover treble damages plus costs and attorney's fees from Defendants.


### ELEVENTH CAUSE OF ACTION – MISAPPROPRIATION OF IDEAS

278.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 277, as if fully set forth herein at length.

279.    LBE's concept of a bar review course tailored specifically to the needs of Foreign LL.M. Students taking the NY Bar Exam was novel and original.

280.    LBE shared its educational and business ideas with Barbri in confidential business discussions and in a confidential report that was provided to Barbri solely in connection

with Barbri's potential acquisition of LBE.

281.   Barbri fraudulently and improperly misappropriated LBE's educational and business ideas for use in Barbri's own bar review course for Foreign LL.M. Students.

282.   LBE was damaged by Barbri's tortious conduct.

283.   LBE is entitled to an award of compensatory and punitive damages for Barbri's tortious conduct in an amount of no less than 50 million dollars.


## TWELFTH CAUSE OF ACTION – COPYRIGHT INFRINGEMENT

284.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 283, as if fully set forth herein at length.

285.   Defendant Barbri has infringed LBE's copyrights in violation of Copyright Act, 17 U.S.C. § 101 et seq. without authorization and consent.

286.   Defendant Barbri's act of infringement are willful, intentional, and purposeful, in disregard of LBE's legal rights.

287.   As a direct and proximate result of said infringement by Defendants, LBE is entitled to damages in an amount no less than 50 million dollars.

288.   LBE is further entitled to its reasonable and necessary attorneys' fees and full costs pursuant to Copyright Act, 17 U.S.C. § 505 and otherwise according to law.


## THIRTEENTH CAUSE OF ACTION – TRADE LIBEL/TRADE SLANDER/INJURIOUS FALSEHOOD/DEFAMATION

289.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 288, as if fully set forth herein at length.

290.   Defendants knowingly stated and published false and derogatory statements

70

about LBE, including that LBE is a disreputable business.  Defendants knew or should have known that these statements were false and that the false statements would denigrate LBE's reputation and discourage others from dealing with LBE.

291.    The false and defamatory statements concerning LBE constitute defamation and/or defamation *per se*.

292.    Defendants published these false statements of fact to third persons with the purpose of inflicting harm upon LBE; specifically, the false statements were published with the purpose of ruining LBE's business reputation, impugning the integrity of the business and causing clients to terminate their business agreements with, and potential clients to withhold future business from, LBE.

293.    Defendants stated and/or published these false statements of fact to third persons with the purpose of inflicting harm upon LBE; specifically, the false statements were stated and published with the purpose of ruining LBE's business reputation, impugning the integrity of the business and causing customers/students to terminate their business agreements with, and potential clients to withhold future business from, LBE.

294.    Defendants' false and defamatory statements concerning LBE were made maliciously, knowingly, willfully and in conscious disregard of LBE's rights, and were specifically intended to – and did – cause damage to LBE's reputation and business.

295.    Each Defendant is liable to LBE for the actions described herein, which were undertaken in furtherance of an ongoing conspiracy among all Defendants, and each Defendant took steps in furtherance of the conspiracy and each Defendant was aware that his coconspirators were taking these actions.

296.    As a direct and proximate cause of Defendants' wrongful conduct, LBE has

suffered, and continues to suffer, substantial damages as a result of Defendants' defamatory statements.

297.    By reason of the foregoing, LBE is entitled to compensatory and punitive damages in an amount to be determined at trial but not less than 50 million dollars.


**FOURTEENTH CAUSE OF ACTION – BREACH OF CONTRACT/BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

298.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 297, as if fully set forth herein at length.

299.    Defendants Barbri, Columbia, Dean Polo, Georgetown and Emory entered into contracts with LBE as alleged herein.

300.    Defendants Barbri, Columbia, Dean Polo, Georgetown and Emory have breached the terms of their contracts with LBE.

301.    LBE have been deprived of the benefits of its agreements with Defendants Barbri, Columbia, Dean Polo, Georgetown and Emory.

302.    Under New York law, Defendants Barbri, Columbia, Dean Polo, Georgetown and Emory are subject to an implied covenant of good faith and fair dealing that is part and parcel of the contracts they entered into with LBE.

303.    Under this covenant of good faith and fair dealing, Defendants Barbri, Columbia, Dean Polo, Georgetown and Emory may not deprive LBE of its benefits under the contracts entered.

304.    As a result of the breach of contract, or in the alternative, of the implied covenant of good faith and fair dealing by Defendants Barbri, Columbia, Dean Polo, Georgetown

and Emory, LBE have suffered damages.

305.   Refusal by Defendants Barbri, Columbia, Dean Polo, Georgetown and Emory to honor their obligations constitutes a breach of contract, or, in the alternative, of the implied covenant of good faith and fair dealing.

306.   Defendants Barbri, Columbia, Dean Polo, Georgetown and Emory are accordingly liable to LBE for breach of contract damages, or, in the alternative, of the implied covenant of good faith and fair dealing in an amount to be determined at trial but not less than 50 million dollars.

## FIFTEENTH CAUSE OF ACTION – VIOLATION OF DONNELLY ACT NEW YORK GENERAL BUSINESS LAW SECTION 340(1)

307.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 306, as if fully set forth herein at length.

308.   Defendants have continually engaged in an unlawful agreement, arrangement, contract, combination and conspiracy in restraint of interstate trade and commerce, in violation of Donnelly Act, New York General Business Law Section 340(1).  In so doing, Defendants restrained competition and the free exercise of activities in the conduct of business, trade and commerce, and in furnishing of services in New York.

309.   Defendants' restraints of business, trade and commerce have substantially affected business, trade and commerce in the state of New York.

310.   By reason of the foregoing, LBE has sustained an injury to their business or property.

311.   Defendants are accordingly liable for their violation of New York General Business Law Section 340(1) to LBE for damages in an amount to be determined at trial but not less than

50 million dollars.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment against Defendants as follows:

a.    Awarding compensatory damages in an amount to be determined at trial but not less than $50,000,000.00;

b.    Awarding treble damages as authorized by 15 U.S.C. § 15;

c.    Awarding treble damages as authorized by y 18 U.S.C. § 1964;

d.    Awarding punitive damages in an amount to be determined at trial but not less than $50,000,000.00;

e.    Awarding Plaintiff its cost and disbursements plus attorney's fees; and

f.    Granting such other relief as the Court deems just and proper.

## DEMAND FOR A JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), plaintiff demands a jury trial on each and every issue in the above matter.

Dated: May 19, 2016
       New York, New York

                    Respectfully submitted,

                    TOSOLINI, LAMURA, RASILE & TONIUTTI LLP
                    70 West 36th  Street, Suite 12A
                    New York, New York 10118
                    *Attorneys for Plaintiff LLM Bar Exam LLC*

          By:    */s/Rocco Lamura*
                    ROCCO LAMURA, ESQ.
                    Tel:  (212) 564-5400
                    Fax:  (646) 536-8719
                    E-mail: rocco.lamura@bltalaw.com