UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

:

LLM BAR EXAM, LLC,                                    :

:

                                    Plaintiff,        :

:

                    v.                               :               16 Civ. 3770 (KPF)

:

BARBRI, INC., COLUMBIA LAW                            :               OPINION AND ORDER
SCHOOL, NEW YORK UNIVERSITY                           :
SCHOOL OF LAW, HARVARD LAW                            :
SCHOOL, BENJAMIN N. CARDOZO                           :
SCHOOL OF LAW, ST. JOHN'S                             :
UNIVERSITY SCHOOL OF LAW, DUKE                        :
UNIVERSITY SCHOOL OF LAW,                             :
UNIVERSITY OF SOUTHERN                                :
CALIFORNIA GOULD SCHOOL OF LAW,                       :
FORDHAM UNIVERSITY SCHOOL OF                          :
LAW, GEORGETOWN UNIVERSITY LAW                        :
CENTER, EMORY UNIVERSITY SCHOOL                       :
OF LAW, THE REGENTS OF THE                            :
UNIVERSITY OF CALIFORNIA, SYLVIA                      :
T. POLO, and NITZA ESCALERA,                          :

:

                                    Defendants.       :

:

------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: September 25, 2017

16 Civ. 3770 (KPF)

KATHERINE POLK FAILLA, District Judge:

This is a dispute between two companies that prepare law school

graduates for a time-honored (and seemingly Sisyphean) rite of legal passage:

the bar examination. Each year, thousands of foreign attorneys obtain Master

of Laws ("LL.M.") degrees from American law schools. Since 2009, Plaintiff LLM

Bar Exam, LLC ("LBE") has sought to train many of these foreign LL.M.

graduates to take and pass the New York and California bars. But LBE claims

that it has been thwarted in its efforts by Defendant Barbri, Inc. ("Barbri") — a

far older, and far larger, rival. Barbri, LBE alleges, stole LBE's proprietary idea for a bar review course catered to foreign LL.M. graduates. Its representatives disparaged LBE to would-be clients. And, critically, LBE claims that Barbri has colluded with law schools nationwide in order to monopolize the bar preparation industry.

In 2016, LBE sued Barbri, several law schools located in New York (collectively, the "New York Law Schools"),[1] and several other law schools located outside of New York (collectively, the "Non-New York Law Schools").[2] The First Amended Complaint — the operative complaint in this case — seeks relief under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2; the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) ("RICO"); the Copyright Act, 17 U.S.C. §§ 101 *et seq.*; and a battery of state laws.

Barbri, the New York Law Schools, and the Non-New York Law Schools (collectively, "Defendants") have filed a combined motion to dismiss the First Amended Complaint and three supporting briefs: (i) an omnibus brief on behalf of all Defendants; (ii) a brief on behalf of Barbri; and (iii) a brief on behalf of the

---

[1] These Defendants include Columbia Law School ("Columbia") and its Dean of Graduate Legal Studies, Sylvia T. Polo; Fordham University School of Law ("Fordham") and its Assistant Dean of Student Affairs, Nitza Escalera; New York University Law School ("NYU"); Benjamin N. Cardozo School of Law ("Cardozo"); and St. John's University School of Law ("St. John's").

[2] These Defendants include Harvard Law School ("Harvard"); Duke University School of Law ("Duke"); the University of Southern California Gould School of Law ("USC"); Georgetown University Law Center ("Georgetown"); and Emory University School of Law ("Emory"). Previously, LBE sued The Regents of the University of California. (Dkt. #1, #85). On December 1, 2016 — before Defendants moved to dismiss the First Amended Complaint — LBE voluntarily dismissed the Regents from this action. (Dkt. #89, 90).

Non-New York Law Schools.  The first two of these briefs argue that LBE has failed to state a claim for relief, and urge the Court to dismiss the First Amended Complaint under Federal Rule of Civil Procedure 12(b)(6).  The third brief contends that the Court lacks personal jurisdiction over the Non-New York Law Schools, and thus that the Court should dismiss the First Amended Complaint as to these defendants pursuant to Rule 12(b)(2).

The First Amended Complaint is 78 pages long and contains 63 exhibits.  But it pleads no facts that plausibly support LBE's federal antitrust, RICO, or copyright claims.  The Court declines to exercise supplemental jurisdiction over LBE's state-law causes of action, though it shares Defendants' skepticism as to the viability of these claims.  Thus, and for the reasons set forth below, the Court grants Defendants' motion to dismiss.

## BACKGROUND[3]

### A.    Factual Background

Broadly, the First Amended Complaint alleges that Defendants have committed misconduct along two axes — one vertical, and one horizontal. First, LBE claims that Barbri has entered into agreements with the New York Law Schools and the Non-New York Law Schools (the "Law School Agreements").  (*See, e.g.*, FAC ¶ 44).  Pursuant to the Law School Agreements,

---

[3]    This Opinion draws on facts from the First Amended Complaint ("FAC" (Dkt. #85)) and the Exhibits ("Ex.") attached thereto.  For purposes of this Opinion, the Court assumes that the First Amended Complaint's allegations are true.  *E.g.*, *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).

For ease of reference, the Court will refer to LBE's opposition brief as "LBE Opp." (Dkt. #102).

LBE alleges, Barbri donates money to these schools and hires their faculty members to teach bar review courses; in exchange, the law schools ensure that Barbri remains the country's preeminent provider of bar preparation courses. (*Id.*).  Second, LBE alleges that the New York Law Schools and the Non-New York Law Schools — enticed by Barbri's financial support — have conspired with each other to prevent LBE from challenging Barbri.  (*See, e.g.*, *id.* at ¶¶ 197-99).  The result, LBE claims, is that Barbri has monopolized the market for preparing foreign LL.M. graduates to take the bar (what LBE terms the "LLM Market").  (*Id.* at ¶¶ 29-31, 196).

Understanding this case requires the Court to take stock of the relationships between and among these parties.  And given the First Amended Complaint's length, that task involves several steps.  The Court will begin by listing the parties to this suit.  Then, the Court will review LBE's allegations about the LLM Market.  The Court will next turn to LBE's allegations about Barbri.  And finally, the Court will consider LBE's allegations about the New York Law Schools and the Non-New York Law Schools.

### 1.    The Parties

LBE "is a limited liability company" based in New York City.  (FAC ¶ 9). It "offers test preparation courses for the New York State and California State bar examinations, designed for and marketed exclusively to internationally trained/educated lawyers who obtain or are in the process of obtaining [LL.M. degrees] in law schools across the United States." (*Id.*).  The bulk of the First Amended Complaint's allegations concern LBE's courses that prepare foreign

LL.M. graduates to take the New York bar. (*See, e.g.*, *id.* at ¶¶ 24, 26-27, 37, 48). LBE began marketing these courses — which "offer[] several unique features to assist [f]oreign LL.M. [s]tudents in passing the NY Bar Exam" — in spring 2009. (*Id.* at ¶¶ 25-26). And LBE enjoyed success after that point: Indeed, in a February 2016 e-mail to an administrator at USC, LBE's founder, Emanuele Tosolini, wrote that LBE "ha[d] over 500 enrolled students." (Ex. 57; *see also* FAC ¶¶ 27, 48, 64, 68, 96, 135, 144, 159)). But as a result of Defendants' "collective actions … all instigated and directed by Barbri, … LBE was forced out of business" at a time not specified in the First Amended Complaint. (FAC ¶ 61).

Barbri "is a Delaware corporation" that provides bar review classes to both LL.M. and Juris Doctor ("J.D.") graduates. (FAC ¶ 10). Barbri is "a direct competitor of LBE." (*Id.*). And by LBE's account, Barbri holds "a monopoly within the bar review marketplace": LBE "assume[s]" that Barbri has an "over 80% market share" of that marketplace and enjoys "$110 million [in] revenue." (*Id.* at ¶ 43). "1.2 million" students have taken Barbri's courses "[o]ver the past fifty [ ] years." (*Id.*).

The New York Law Schools and the Non-New York Law Schools are all law schools "accredited by the American Bar Association." (FAC ¶¶ 11-20). LBE alleges that foreign attorneys pursuing LL.M. degrees matriculate in high numbers at these ten schools. (*Id.* at ¶ 32). Polo is Columbia's Dean of Graduate Legal Studies. (*Id.* at ¶ 22). And Escalera is an Assistant Dean of Student Affairs at Fordham. (*Id.* at ¶ 23).

## 2. The LLM Market

The linchpin of LBE's antitrust claims is the existence of the LLM Market — "the U.S. market for bar examination review courses for [f]oreign LL.M. [s]tudents." (FAC ¶ 29). LBE posits that the LLM Market is one of "[t]wo markets … relating to bar examination review," with the other being the "JD Market." (*Id.*). And LBE alleges that "[t]he LLM Market is far more limited than the JD Market in part because … significantly" fewer foreign LL.M. graduates "sit for a bar examination." (*Id.* at ¶ 31). In 2015, for example, foreign LL.M. graduates comprised 44% of those who sat for the February administration of the New York bar, and 29% of those who sat for the July administration. (*Id.* at ¶ 24). Because "many jurisdictions require internationally trained/educated lawyers to obtain LL.M. degrees from law schools accredited by the American Bar Association … in order to sit for the bar examination, the relevant geographic market" for the LLM Market "is the United States." (*Id.* at ¶ 38).

For many reasons, LBE alleges, foreign LL.M. graduates fare worse on the bar exam than J.D. graduates. (FAC ¶¶ 33-34). Of note, both LL.M. graduates and J.D. graduates take the same bar exam: They "are in direct competition." (*Id.* at ¶ 34). But most LL.M. programs do not cover the subjects "tested in a bar examination." (*Id.* at ¶ 33). Moreover, most foreign LL.M. graduates are not native English speakers; most J.D. graduates are. (*Id.* at 34). "[T]raditionally," only 30-40% of foreign LL.M. graduates pass the New York bar. (*Id.* at ¶ 27). Foreign LL.M. graduates who took LBE's course, in

contrast, passed at "significantly high[er] … rates compared to those of [LBE's] competitors." (*Id.*; *see also id.* at ¶¶ 70, 75, 128).

LBE alleges that there are "exceedingly high" "[b]arriers to entry in both the JD Market and the LLM Market." (FAC ¶ 39). "A potential provider of bar examination review courses and related services must develop an extensive network of relationships with universities, law schools, and students across the country … to even enter the market." (*Id.*). Further, in order to attract law students to sign up for its courses, a bar review company must maintain an active presence on law school campuses. (*Id.* at ¶ 41). And LBE claims that the cornerstone of every bar review company's on-campus marketing is "tabling" — setting up a table to "meet with students." (*Id.*).

The First Amended Complaint's description of the LLM Market leaves two questions unanswered. First, apart from LBE and Barbri, who competes (or in LBE's case, competed) in the LLM Market? LBE alleges that "there are a very limited number of bar preparation providers in the JD Market and even [fewer] in the LLM Market." (FAC ¶ 42). But other than Barbri and LBE, the First Amended Complaint does not mention any of these companies by name. The First Amended Complaint's exhibits, in contrast, mention two other companies that appear to offer bar review courses for foreign LL.M. graduates: Pieper (Ex. 38) and Kaplan (Ex. 20-21, 37). Complicating matters, LBE alleges that after "LBE was forced out of business" due to "the collective actions of Defendants, … Barbri retained the entire LLM Market for itself." (FAC ¶ 61).

Second, how old is the LLM Market?  LBE asserts that the LLM Market comprises "the U.S. market for bar examination review courses for [f]oreign LL.M. [s]tudents." (FAC ¶ 29).  But such courses did not exist before LBE came around:  LBE alleges that it was "the first company to offer" a bar review course "that catered directly to the needs of [f]oreign LL.M." graduates.  (*Id.* at ¶ 37).  Foreign LL.M. graduates took bar examinations (at the very least, the New York bar) before LBE began operating in 2009; by LBE's account, it "developed [its] bar review course" because foreign LL.M. graduates traditionally fared poorly on the bar.  (*Id.* at ¶¶ 36-37).  And yet, according to the First Amended Complaint, the *LLM Market* did not exist until LBE began offering its courses.

### 3.     LBE's Allegations about Barbri

Barbri, LBE claims, has monopolized the LLM Market.  (*See, e.g.*, FAC ¶ 212).  And it has accomplished this goal through three means:  *First*, LBE alleges that for years before this case began, "Barbri engaged in an aggressive campaign of harassment, disinformation, defamation, and unfair competition against LBE at any school where LBE actively marketed."  (*Id.* at ¶¶ 47, 50).  *Second*, LBE claims that in 2013, Barbri developed a course for foreign LL.M. graduates that was and remains "identical to LBE's course."  (*Id.* at ¶¶ 58-60).  *Third*, LBE alleges that Barbri has maintained "long standing financial relationship[s] with" the New York Law Schools and the Non-New York Law Schools by entering into Law School Agreements with all of them.  (*Id.* at ¶ 44).

### a.    Barbri's Alleged Defamation of LBE

The First Amended Complaint alleges — repeatedly — that Barbri has spread "false, misleading, and derogatory statements ... [about] LBE's bar preparation program." (FAC ¶ 51; *see also id.* at ¶¶ 50, 52-53, 61, 64-65, 67, 192, 209, 220). Those false statements concerned "LBE's methodology, materials, and professors, ... the financial strength of the company, and ... the business experience of the company." (*Id.* at ¶ 51). And LBE claims that Barbri made these statements to "dissuade ... [f]oreign LL.M. [s]tudents from" signing up for LBE's courses, and to convince foreign LL.M. students who *had* signed up for LBE's courses "to break their enrollment contracts and withdraw from the LBE program." (*Id.*; *see also id.* at ¶¶ 192, 209, 220, 240, 249).

Here, too, the First Amended Complaint leaves an important question unanswered — what false statements did Barbri make about LBE? The First Amended Complaint identifies one statement that appears to have been an outright falsehood: During a recruiting event at Columbia, Natalie Urrea, Barbri's Director of International Business Development, "claimed that she was a [f]oreign LL.M. [s]tudent who [was] an alumna of Barbri who successfully passed the NY Bar Exam on her first try by following Barbri's LLM [c]ourse." (FAC ¶ 74). In fact, LBE claims, "Urrea obtained a [J.D.] from Temple University ... is not a [f]oreign LL.M. [s]tudent[,] and ... did not pass the NY Bar Exam until July 2014." (*Id.*). In any event, the First Amended Complaint does not allege that Urrea said anything about LBE.

Apart from this allegation, LBE principally takes issue with the fact that Barbri disparaged LBE to foreign LL.M. students (*see* FAC ¶ 61) — although it is unclear if these disparaging remarks were in fact falsehoods. For example, LBE alleges that on an unspecified date, Erica B. Fine, who has held various management positions with Barbri, "advised NYU [f]oreign LL.M. [s]tudents to complain about LBE to their law school administration in a blatant effort to undermine LBE's ability to market and sell its course to NYU [f]oreign LL.M. [s]tudents." (*Id.* at ¶¶ 80-81). LBE also alleges that Fine "advised various" NYU faculty members and administrators "to bar LBE from marketing at NYU." (*Id.* at ¶ 82). Likewise, sometime in 2016, while Barbri and LBE were attempting to settle a dispute involving students who had signed up for both companies' courses, "Barbri's representatives … stated to [some of] the students that LBE was not a reputable course, and indeed was kicked out of major law schools for poor performance and problems with students." (*Id.* at ¶¶ 54-56). As the Court will explain *infra*, it seems that some of these disparaging statements had a kernel of truth in them. (*Cf. id* at ¶ 313 ("Defendants knowingly stated and published false and derogatory statements about LBE, including that LBE is a disreputable business.")).

In any case, in the spring of 2014, Tosolini met with Barbri's President, Mike Sims, "to discuss Barbri's predatory marketing activities against LBE." (FAC ¶ 53; *see id.* at ¶ 57). At first, Sims "denied any disparagement." (*Id.* at ¶ 53). But Sims eventually conceded to Tosolini "that all personnel at Barbri connected with the disparaging actions against LBE [were] being 'let go by

Barbri.'" (*Id.*).  And when "Tosolini brought up specific instances and actions by [ ] Fine with the administration at Harvard, Sims apologized and offered to 'make a phone call to Harvard' and relay that 'Barbri ha[d] no issues with LBE's presence at Harvard.'" (*Id.*).  Tosolini declined Sims's offer.  (*Id.*).

### b.    Barbri's Course for Foreign LL.M. Graduates

In December 2012, Sims and Stephen Fredette, Barbri's Chairman and CEO, approached LBE "to discuss a possible buyout."  (FAC ¶ 57).  Tosolini "met with[ ] Sims and Fredette," and later provided them with information about LBE's business and "other proprietary information."  (*Id.*; *see* Ex. 4).  Ultimately, Barbri opted not to purchase LBE.  (FAC ¶ 57).

Instead, LBE claims, Barbri copied LBE's course.  Before 2012, "Barbri did not have a dedicated review course specifically designed for [f]oreign LL.M. [s]tudents."  (FAC ¶ 45).  Instead, Barbri sold only "one type of bar review course to both the JD Market and the LLM Market."  (*Id.* at ¶ 46).  But in the spring of 2013, Barbri started to develop and market a course targeted towards foreign LL.M. graduates.  (*Id.* at ¶ 58).  And that fall, Barbri released this course, which "is identical to LBE's course."  (*Id.* at ¶¶ 59-60).  Like LBE's course, Barbri's version offers:

> [A] personalized study plan that is tailored by the student but guided by Barbri (same as LBE's individualized study schedules); [an] LL.M. fundamentals course that provides an overview of the multistate subjects (similar to LBE's early subject matter review course); legal writing workshops … ; an MBE foundation course … and an MBE course …
> (similar to LBE's intensive review course and advanced test-taking techniques course); and Free Repeat

> Guarantee where a student may repeat the [bar review course] by attending lectures or online for the same state the next time the [bar review course] is offered by [Barbri], without paying additional fees (similar to LBE's money-back guarantee).

(*Id.* at ¶ 60 (internal quotation marks omitted)). LBE alleges that by creating a bar review course identical to LBE's, "Barbri has infringed LBE's copyrights in violation of [the] Copyright Act." (*Id.* at ¶ 304). The First Amended Complaint does not allege that LBE holds, or has applied for, a copyright of any sort.

### c. The Law School Agreements

Finally, LBE alleges that Barbri has used the Law School Agreements "to exclude and restrain competition in the JD Market and the LLM Market." (FAC ¶ 44; *see also id.* at ¶¶ 197, 200, 207). It is unclear whether the Law School Agreements are oral or written. It is also unclear when Barbri entered into the Law School Agreements.

The Law School Agreements, LBE alleges, are symbiotic. Barbri donates money to the New York Law Schools and the Non-New York Law Schools; gives "large overpaid contracts to law school faculty members"; and makes "personal bribes via gifts and significant financial gain" to these schools' "administration[s], staff[,] and personnel." (FAC ¶ 44). In return, the New York Law Schools and the Non-New York Law Schools give Barbri "direct access [to] and control of ... these schools" in order "to promote and sell [Barbri's] products on campus directly to the JD Market and LLM Market"; allow Barbri to "use campus facilities for lecture space"; and let Barbri "utilize law school faculty, including professors and deans." (*Id.*). The effect of the Law School

12

Agreements, LBE alleges, "is to exclude and restrain competition in the JD Market and the LLM Market and to maintain supracompetitive prices of bar review courses for the common benefit of" Defendants. (*Id.*).

LBE also alleges that the Law School Agreements allowed Barbri to become "the exclusive provider of bar review courses" at the New York Law Schools and the Non-New York Law Schools. (FAC ¶ 196). Other parts of the First Amended Complaint contradict this claim. For one, from 2009 through at least 2015, *LBE* provided bar review courses to foreign LL.M. graduates of the New York Law Schools and the Non-New York Law Schools. (*See, e.g.*, *id.* at ¶¶ 48, 135, 159; *see also id.* at ¶ 27 ("Since its inception, LBE has grown very attractive among [f]oreign LL.M. [s]tudents[.]")). And as the Court mentioned *supra*, there are at least two other companies — Pieper (Ex. 38) and Kaplan (Ex. 20-21, 37) — that seem to offer bar review courses for foreign LL.M. graduates.

And other allegations in the First Amended Complaint's belie LBE's claim that the Law School Agreements allow Barbri "to maintain supracompetitive prices." (FAC ¶ 44). Indeed, it seems that Barbri made a practice of *discounting* its rates to attract foreign LL.M. students to sign up for its courses. (*Id.* at ¶¶ 56, 99, 161; *see also* Ex. 11 ("[I]n other schools where [LBE was] permitted to market [its] course, competitors were pressured to offer an additional $1,000 discount to compete with [LBE].")).[4]

---

[4]     In its opposition brief, LBE argues that Barbri "was able to effectively control and fix the prices charged to [f]oreign LL.M. [s]tudents, nearly $600.00 more than Barbri's product in the JD Market." (LBE Opp. 17). In support of this claim, LBE relies on a Barbri

### 4. LBE's Allegations About the New York Law Schools and the Non-New York Law Schools

Most of the First Amended Complaint's allegations, and nearly all of its exhibits, concern the New York Law Schools and the Non-New York Law Schools. The gist of those allegations is that all ten of these schools have impeded LBE's efforts to market its courses on their campuses. Below, the Court considers LBE's allegations about these schools, following the same order as the First Amended Complaint: Columbia, NYU, Fordham, St. John's, Cardozo, Harvard, Georgetown, Duke, USC, and Emory.

A global note before embarking down this road: LBE makes an identical allegation about all ten of these law schools: "More than one time, [school] and its representatives stated that it was constantly exchanging information about LBE's bar review program, business[,] and access to various other law schools, among others, with the other Defendants." (FAC ¶¶ 62, 79, 93, 111, 119, 125, 134, 143, 158, 174). The First Amended Complaint's 309 other paragraphs do not provide additional support, or context, for this claim. Nor do the First Amended Complaint's exhibits. Instead, the First Amended Complaint alleges that *some* representatives of *some* of the New York Law Schools and the Non-

_____

"Enrollment Application" that is attached as an exhibit to LBE's brief. (*Id.* (citing Dkt. #102-1)). The Court cannot consider this document — which was neither attached to, nor cited in, the First Amended Complaint — in adjudicating Defendants' motion to dismiss. *See, e.g., Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (limiting "universe of materials" a court can consider when deciding a Rule 12(b)(6) motion to "facts stated on the face of the complaint, ... documents appended to the complaint or incorporated in the complaint by reference, ... matters of which judicial notice may be taken," and documents that are "integral to the complaint" (internal quotation marks and citations omitted)). For the same reasons, the Court will not consider the Affidavit of Rebecca Patterson in Opposition to Motion to Dismiss. (Dkt. #102-2).

New York Law Schools communicated with each other about LBE. The Court will address those allegations below, and consider their import in the "Discussion" section of this Opinion.

### a. Columbia

Barbri enjoys "a long-standing relationship with Columbia." (FAC ¶ 62). Three Columbia faculty members teach Barbri bar review classes. (*Id.*). Barbri has made "numerous donations and gifts to Columbia," and Columbia has granted Barbri "exclusive and privileged access to Columbia." (*Id.*).[5]

LBE began marketing its course to Columbia's foreign LL.M. students in 2009. (FAC ¶ 63). "Within a few weeks," roughly 20 of those students signed up to take LBE's course, "putting LBE in immediate competition with Barbri in the LLM Market." (*Id.*). "In the spring of 2010, LBE conducted a few live, interactive lectures ... for New York law students," and reactions to those lectures "were mostly favorable and ... generally successful." (*Id.* at ¶ 64). But sometime thereafter, Barbri made "disparaging and untrue statements ... about LBE for the sole purpose of misinforming" foreign LL.M. students at Columbia "who were already enrolled with LBE to breach their enrollment agreement[s] with LBE to enroll with Barbri." (*Id.* at ¶¶ 64-65). To this end, Barbri advised

---

[5]     LBE also repeats this allegation — "In exchange for such gifts [or 'gifts and donations'], Barbri enjoyed and continues to enjoy exclusive and privileged access to [school]." — for all ten of the law school defendants. (FAC ¶¶ 62, 79, 93, 111, 119, 125, 134, 143, 158, 174). As the Court explained earlier, the First Amended Complaint belies LBE's repeated assertion that Barbri is the *exclusive* provider of bar review courses at these schools. (*See supra* at 13).

students who had already signed up for LBE's course "to meet with [Polo] to seek refunds that were not due or owing to these students." (*Id.* at ¶ 66).

LBE alleges that, because of Barbri's "disparaging and untrue statements," "Polo coerced [ ] Tosolini to give refunds to students." (FAC ¶ 67). In exchange, Columbia "allow[ed] LBE to continue marketing its product and conduct[ing] presentations on Columbia's campus." (*Id.*). As part of this agreement, LBE was "allowed to table" on Columbia's campus "once a week for the entire [Fall 2010] [S]emester." (*Id.* at ¶ 68). And that effort bore fruit: "During the first day of tabling" alone, "over [100] students stopp[ed] by the LBE table, leaving their contact information and expressing an overwhelming interest in LBE." (*Id.*).

But in September 2010, Columbia suspended LBE from marketing on its campus. (FAC ¶¶ 68-69). Tosolini and another LBE employee, Rebecca Patterson, met with Polo to find out why they had been banned from Columbia. (*Id.* at ¶ 69; *see* Ex. 5). Polo told them "that she would only recommend and endorse Barbri because Barbri was and is a powerful friend of Columbia, … the oldest bar review course[,] and [that Columbia] students are smart and do not need any other course." (FAC ¶ 69). Polo also questioned whether Tosolini, "as a foreign-educated student[,] [had] the necessary knowledge and expertise to" prepare students to take an American bar exam. (*Id.*).

Columbia students "became wary of" LBE after it was barred from marketing on campus. (FAC ¶ 68). But eight of the students who stopped by LBE's table in fall 2010 stuck with LBE's course — and all eight passed the

July 2011 administration of the New York bar.  (*Id.*).  Buoyed by these results, in August 2011, Tosolini wrote a letter to Michelle Greenberg-Kobrin, Columbia's Dean of Students, to see if LBE could return to Columbia's campus.  (*Id.* at ¶ 70; Ex. 5).  Greenberg-Kobrin asked for a list of all Columbia students who had signed up for LBE's course in the preceding two years — "including students who ha[d] enrolled but then dropped out" — and Tosolini complied.  (Ex. 5).  But "[d]espite the 100% pass rate provided to Columbia by LBE," Columbia opted to wait one year before making a decision on whether to allow LBE back on its campus.  (FAC ¶ 70; Ex. 6).

On September 28, 2012 — after LBE again unsuccessfully attempted to return to Columbia's campus — Tosolini wrote a letter to Dean David Schizer. (FAC ¶ 71; Ex. 9).  In it, Tosolini complained of the "active and ongoing case of discrimination against [him] and [LBE] by certain members of the [Columbia] administration."  (Ex. 9).  He also, perhaps unwittingly, undercut LBE's current arguments regarding the singularity of its competition.  In the First Amended Complaint, LBE alleges that Tosolini's letter took issue with "Polo's continued favoritism toward Barbri."  (FAC ¶ 71).  In fact, Tosolini wrote that "Dean Polo stated to [him] ... that she would recommend a major competitor over [LBE] to her students," but the letter does not identify that competitor by name.  (Ex. 9). And Tosolini added that he was "aware of ... favoritism that continuously takes place in favor of other major bar review *companies* at" Columbia.  (*Id.* (emphasis added)).  Tosolini wrote that students had told LBE "about the other bar review *companies* disparaging [LBE] to students, while they have display

17

tables on [Columbia's] campus." (*Id.* (emphasis added)). On October 5, 2012, Lynn Beller, an Assistant Dean at Columbia, wrote Tosolini an e-mail in which she explained that the decision to bar LBE from Columbia was made by a committee that included Polo. (Ex. 10). Beller added that this committee had decided to ban LBE from Columbia's campus for the upcoming year. (*Id.*).

Undeterred, in July 2013, LBE sent to Greenberg-Kobrin a petition requesting that LBE be allowed back on Columbia's campus. (FAC ¶ 73; Ex. 11). Over 50 foreign students who received LL.M. degrees from Columbia in 2013 signed the petition. (FAC ¶ 73; Ex. 11). In December of that year, a foreign student who received an LL.M. from Columbia in 2013, then passed the New York bar after taking LBE's course, e-mailed Polo to ask that LBE be let back on campus. (FAC ¶ 73; Ex. 12). Neither the petition, nor the e-mail, worked. (FAC ¶ 73).

Columbia continued to bar LBE from marketing on its campus through the 2014 academic year. (FAC ¶ 75). To be clear, LBE still marketed its course to Columbia students: For example, LBE held "an event off-campus" (presumably in 2014) for interested students. (*Id.*). But because LBE was not allowed on Columbia's campus, it had difficulty "effectively compet[ing] with Barbri." (*Id.*).

### b.    NYU

LBE does not explain when it began marketing its course to NYU students. But it claims that on an unspecified date, "[Erica] Fine advised NYU [f]oreign LL.M. [s]tudents to complain about LBE to their law school

administration in a blatant effort to undermine LBE[ ]." (FAC ¶ 81). As a result of Fine's subterfuge, LBE was "foreclosed from selling its course at NYU." (*Id.* at ¶ 83).

Instead, in October 2012, LBE hosted an off-campus recruiting event for NYU students. (FAC ¶ 83). The event was successful: Many of NYU's foreign LL.M. students signed up for LBE's course. (*Id.*). But the next day, "NYU's Office of Graduate Affairs sent an email/newsletter directly to NYU [f]oreign LL.M. [s]tudents" which stated, in relevant part:

> We urge you to be careful consumers and to exercise due diligence in selecting a commercial [b]ar review course. It is advisable to seek counsel from alumni who have taken [b]ar [r]eview preparation courses. In the past, students have had bad experiences with at least one company. In short, ask around! Do not simply rely on the representations of a course provider[ ] — it is advisable, before signing on to a course, at a minimum to speak to several NYU … alumni who actually took the class.

(Ex. 16). LBE alleges that, "[u]pon information and belief, NYU" discouraged its foreign LL.M. students from signing up for LBE, and advised those students "who were already enrolled with LBE to drop the course and enroll with Barbri." (FAC ¶ 84).

On January 11, 2013, LBE e-mailed NYU's Director of the Office of Graduate Affairs, Barbara Landress, to request that LBE "regain access to the NYU … campus and bi-weekly display tables." (FAC ¶ 85; Ex. 17). Landress replied about two weeks later, writing that LBE had yet to "establish[ ] enough of a track record for tabling at" NYU. (Ex. 18). When LBE asked what it could

do to "re-establish[ ] … tabling and presentation privileges … at NYU," Landress "refused to provide such information." (Ex. 19; *see also* FAC ¶ 85).

That summer, NYU "harassed [f]oreign LL.M. [s]tudents who [had] already enrolled with" LBE and encouraged them to drop the course. (FAC ¶ 86). NYU did not target students who registered for classes with bar review companies other than LBE. (*Id*.). Attached to the First Amended Complaint is a signed declaration from a 2013 NYU LL.M. graduate from Mexico who signed up with LBE in fall 2012. (Ex. 20, ¶¶ 1, 5). She claims that after enrolling with LBE, an NYU representative called her and "encouraged [her] to cancel [her LBE] enrollment." (*Id.* at ¶ 6). During this same conversation, this NYU representative mentioned that LBE "ha[d] ongoing litigation with students." (*Id.* at ¶ 7). Lourdes Marshall, an NYU employee, similarly told this LL.M. student that LBE had "had problems with some NYU students in the past, and that [LBE] had bad materials." (*Id.* at ¶ 9; *see* FAC ¶ 88).

Although "LBE has received tremendous praise and recommendation from its students who are NYU alumni," NYU has refused to let LBE on its campus. (FAC ¶ 90). "LBE's goodwill and business operations" have been "severely damaged" as a result. (*Id.* at ¶ 91).

### c. Fordham

LBE's relationship with Fordham began in 2009, when it hired Assistant Dean of International and Non-JD Programs Toni M. Jaeger-Fine to serve as an instructor for its bar review course. (FAC ¶ 94). Barbri, concerned that LBE might "mak[e] a dent in [its] monopoly at Fordham," tried to convince Fordham

to fire Jaeger-Fine. (*Id.* at ¶ 95). The effort failed, and LBE successfully marketed its course to Fordham students for years. (*Id.* at ¶¶ 95-96). Indeed, LBE was so successful that in 2011, Fordham offered Tosolini an adjunct professorship. (*Id.* at ¶ 96). Tosolini's class — Fundamental Principles of New York Law — mirrored "LBE's methodology, faculty[,] and materials," and "quickly became the most popular, non-mandatory course among [f]oreign LL.M. [s]tudents at Fordham." (*Id.*).

Things changed in 2015, when "there were substantial administrative changes at Fordham" and Matthew Diller became the school's Dean. (FAC ¶ 97). For the first time, LBE alleges, it was obstructed in its efforts to market its course at Fordham. (*Id.*). In February 2015, for example, Tosolini e-mailed Rebecca Gruia, Fordham's Manager of Program Operations, to ask about rates for booking classrooms that summer. (*Id.* at ¶ 98; Ex. 22). In previous summers, LBE paid Fordham $400 per day to rent a single classroom. (FAC ¶ 98). But Gruia informed Tosolini that, for summer 2015, LBE would have to pay $1,250 per day, and that this fee would cover "1 to 3 classrooms." (Ex. 23). LBE was thus forced "to seek alternative spaces for its summer lectures." (FAC ¶ 98). The First Amended Complaint does not suggest that Barbri was offered a different or discounted rate, but rather appears merely to allege that Barbri was able to afford Fordham's increased summer 2015 rate. (*Id.*).

Fordham also offered Barbri opportunities to market its courses to foreign LL.M. students before LBE could do so. In August 2015, Barbri hosted

two information sessions about the New York bar exam for Fordham students. (Ex. 25). LBE alleges that Fordham "sponsored" the sessions (FAC ¶ 99), although an e-mail from Fordham's Student Bar Association advertising the sessions makes no mention of the school's official involvement (*see* Ex. 25). Of note, that e-mail is titled "Barbri Information Sessions on the NEW BAR EXAM." (*Id.*). These sessions, LBE alleges, "were a blatant tactic by Fordham to bar LBE and promote Barbri." (FAC ¶ 99). Though billed as information sessions about the bar exam, these events were really "promotion[s]" for Barbri: At the sessions, Barbri "handed out" "enrollment forms" to attendees and offered them "special discounts." (*Id.*). Moreover, Fordham's "[f]oreign LL.M. [s]tudents were told" (LBE does not say by whom) that these sessions "were mandatory for LL.M. students." (*Id.*).

On September 3, 2015, Tosolini wrote an e-mail to Escalera and the Office of Law Student Affairs at Fordham in which he raised concerns about Barbri's information sessions. (FAC ¶ 100; Ex. 26). Tosolini lodged a similar complaint with Jaeger-Fine in a September 11, 2015 e-mail. (FAC ¶ 101; Ex. 27). In this latter e-mail, Tosolini wrote that "at least [two] students told [him] that they felt misle[d] as they were told that [Barbri] was the course for LLM students and believed Fordham endorsed it." (Ex. 27). Tosolini never heard back from Escalera or Fordham's Office of Law Student Affairs. (FAC ¶ 101).

On February 8, 2016 — one "day before the first tabling day scheduled at Fordham for the [S]pring [S]emester" — Tosolini learned from Jaeger-Fine that

Fordham had barred LBE from marketing on its campus. (FAC ¶ 102). In an e-mail, Jaeger-Fine wrote: "I am sorry to have to pass this along but there apparently have been many complaints about [LBE] in recent weeks and last semester as well … . [A]pparently there has been a decision to disallow you from tabling at Fordham." (Ex. 30 (alterations omitted)). Jaeger-Fine also told Tosolini that Fordham had decided "to discontinue [his] for-credit class." (Ex. 30). Jaeger-Fine explained that she had "gotten a lot of reports over the years that the course was too focused on [Tosolini's] commercial interests," and that Fordham was concerned that Tosolini had used the "class as a platform to distribute information about [LBE] and get students to sign up." (*Id.*). LBE deems these allegations about Tosolini using his Fordham class to promote LBE "false and unfounded." (FAC ¶ 102).

LBE tried to arrange a meeting with Fordham to discuss the school's "decision to disavow LBE." (FAC ¶ 103). For weeks, Fordham declined. (*Id.*). And as time wore on, rumors about LBE's "possible permanent removal" percolated on Fordham's campus, and foreign LL.M. students who had registered for LBE's course sought to cancel their enrollments. (*Id.*).

Tosolini finally met with Escalera on February 29, 2016. (FAC ¶ 104). Tosolini asked Escalera to describe the complaints she had received from Fordham students about LBE, but "Escalera could not provide any names of students or specific incidents of student complaints." (*Id.*). Instead, "[t]he only issue that Dean Escalera" brought up "was LBE's use of an affidavit," which LBE alleges it "was forced to use to stay competitive with Barbri." (*Id.*). The

affidavit is a form titled "Course Cancellation Request"; it appears to be an affidavit students must execute in order to cancel their enrollments with LBE. (Ex. 31). By signing the affidavit, a student agrees not to "sit[ ] for any bar exam for the next two years," and in exchange LBE "release[s] [that student] from any further financial obligation under the course purchase agreement." (*Id.*). "Barbri uses an identical affidavit for their enrolled students who do not want to continue with Barbri's course[.]" (FAC ¶ 104; *see* Ex. 32).

Tosolini's meeting with Escalera concluded "with the understanding that Fordham would evaluate student complaints received by Fordham that led to Fordham's decision to disallow LBE from Fordham's campus." (FAC ¶ 104). LBE alleges, "[u]pon information and belief," that nobody at Fordham had actually received any complaints about LBE. (*Id.*). "Within an hour after" the meeting ended, [Matthew] Diller sent a group e-mail to Fordham's LL.M. students that stated, in relevant part:

> In recent weeks, I have become aware of concerns raised by students with regard to the practices and policies of [LBE].
>
> The issues students have raised concern me greatly. Students must be treated fairly, and we have a responsibility to demand this of any company we permit on campus to solicit business from Fordham … students. …
>
> While we have already heard from several of you, I ask that any others who have had issues with [LBE] please contact … the Office of Student Affairs.

(FAC ¶ 105; Ex. 33). In what can fairly be described as an aggressive deduction, LBE contends that this e-mail "clearly shows that Fordham never

received any complaints against LBE" before Tosolini's meeting with Escalera. (FAC ¶ 105). A week later, Kandice Thorn, Fordham's Director of International and Non-JD Programs, "sent a follow-up e-mail" about Diller's request for student "complaints against LBE." (*Id.* at ¶ 106; Ex. 34).

These e-mails "ultimately harmed LBE." (FAC ¶ 107). In March 2016, "Escalera demanded [that] LBE ... refund two Fordham students." (*Id.*). LBE alleges that these two students' "concerns and desire for refunds were directly caused by Fordham's solicitation" of complaints about LBE, "since the students specifically asked LBE why LBE was 'suspended from campus.'" (*Id.*). Tosolini again asked Escalera why LBE was banned from Fordham's campus, and she responded that "the decision ... was taken in response to LBE's use of" the Course Cancellation Request affidavit. (*Id.*). When Tosolini retorted that Barbri had used an identical affidavit "since at least 2015," Escalera told him that Barbri's affidavit "'was not [Tosolini's] concern' and that it was a 'different project' for Fordham's deans to handle." (*Id.* (alterations omitted)). In an effort to return to Fordham's campus, LBE gave into Escalera's demand and refunded these two students. (*Id.* at ¶ 108). But it appears that Tosolini's gesture was futile: LBE alleges that it still cannot table or hold classes on Fordham's campus. (*Id.* at ¶ 109).

### d. St. John's

Barbri, it is alleged, has deep roots at St. John's. "Many St. John's faculty" members teach Barbri bar review courses. (FAC ¶ 111). And Fine, in

addition to being a St. John's alumna, is "an adjunct professor at" the school and "has had personal relationships with various Deans" there.  (*Id.*).

In 2012, a St. John's professor who had taken LBE's course — Luca Melchionna — advised St. John's foreign LL.M. students to enroll with LBE. (FAC ¶ 113).  Melchionna "continue[d] to advocate for LBE" even after receiving "heavy pressure to advocate for Barbri."  (*Id.*).  The First Amended Complaint does not explain who exerted this pressure.  (*Id.*).  But LBE claims that St. John's terminated Melchionna because "of his sponsorship and recommendation of LBE."  (*Id.*).  Since Melchionna left, "LBE has not been invited back to St. John's," although it is not clear from the First Amended Complaint that LBE ever tabled at St. John's in the first place.  (*Id.*).

Indeed, LBE alleges that in 2014 and 2015, it made multiple requests to table at St. John's — but St. John's never responded.  (FAC ¶¶ 114-15).  LBE alleges that "Fine's close ties with Barbri" and St. John's explain why LBE has been "completely shut out from St. John's campus."  (*Id.* at ¶ 116).  As things stand, LBE can only enroll "[f]oreign LL.M. [s]tudents who were referred to LBE by St. John's alumni and/or ... those [f]oreign LL.M. [s]tudents who will take [LBE's course] once they fail the NY Bar Exam after studying with Barbri."  (*Id.*).

### e.  Cardozo

LBE alleges that Cardozo has "foreclos[ed] on LBE's ability to promote and sell its course," without specifying when Cardozo did so.  (FAC ¶ 120).  In December 2011, Tosolini e-mailed Amy Sugin, Cardozo's Assistant Dean for

Graduate and International Programs, about "certain concerns that some of [Cardozo's] students had with [LBE the preceding] summer." (*Id.*; Ex. 35). Tosolini sought to allay those concerns, writing that Cardozo's "students received the best possible assistance." (Ex. 35). Sugin had heard otherwise. She responded to Tosolini the next day, writing: "I'm sorry but our students were disappointed with your course, and had concerns about the materials and about the integrity of your system, and I am afraid that we cannot invite you back to Cardozo at this time." (Ex. 36). Tosolini replied, promising to provide Sugin "testimonials from [Cardozo] students that loved [LBE's] program." (Ex. 37). And Tosolini added that although LBE is "not a multinational company like Kaplan or Barbri … [its] overall product is second to none." (*Id.*). Sugin "refused to discuss the situation further." (FAC ¶ 120).

In 2013, a Cardozo LL.M. student wrote to Tosolini to ask about LBE. (FAC ¶ 121; Ex. 38). Her classmates had spoken to Sugin, who told them "that there had been complaints from past Cardozo LL.M. students who ha[d] taken [LBE's] bar preparation course, did not pass the bar exam[,] and did not receive a full refund." (Ex. 38). After hearing these stories, some of these classmates "opted to go to Pieper and Barbri." (*Id.*). Sugin's statements, LBE claims, were false: "LBE had not received complaints," and had fully refunded the lone Cardozo student who asked for a refund. (FAC ¶ 121). Worse still, LBE alleges that "Sugin's false accusations regarding LBE resulted in many Cardozo [f]oreign LL.M. [s]tudents enrolling with Barbri." (*Id.* at ¶ 122).

### f.     Harvard

In addition to having close relationships with administrators at St.

John's, Fine knows many "Deans, faculty members[,] and administrators at

Harvard, including Ellen Cosgrove, the Dean of Students." (FAC ¶ 126).  At a

time unspecified in the First Amended Complaint, Fine made "negative

comments" (presumably about LBE) "to the various Deans at Harvard." (*Id.* at

¶ 127).  Consequently, "LBE was barred from on-campus marketing at

Harvard" without being given an "explanation or reason." (*Id.*).

The First Amended Complaint's exhibits suggest that at one point in

time, LBE *was* allowed to market on Harvard's campus.  It appears that

Tosolini met with Cosgrove in fall 2010.  (*See* Ex. 39).  On October 4, 2010,

Tosolini sent Cosgrove an e-mail to follow up on that meeting, and to see if LBE

could "reschedule [a] presentation of [its] program for Harvard students." (*Id.*).

Cosgrove responded that day:

> I have discussed this with a number of people inside
> and outside Harvard … and have determined it is best
> to hold off on any future tabling events and speaking
> engagements until we see what the results were for the
> first exam.
>
> I continue to be concerned that the concerns are
> broader than the one professor you mentioned.  I have
> also heard multiple concerns about the late arrival of
> materials and the incompleteness of the materials.
>
> On a personal note, I was also concerned about the
> litigious posture you mentioned against the NYU
> students during our meeting.
>
> I hope you can appreciate that at this time, you have no
> track record and the complaints are significant enough

> that it would be inappropriate for us to continue to allow
> access to our tables and classrooms.[6]

(*Id.*).   In January 2011, Tosolini e-mailed Cosgrove again, writing that LBE had

achieved "an extremely high pass rate of 76.5%" (for students who took the

New York bar, the Court assumes).  (Ex. 40).  Tosolini asked that LBE be let

back on Harvard's campus — a request he repeated "regularly" thereafter, to no

avail.  (*Id.*; FAC ¶ 129).

LBE alleges that "Fine's personal relationship[s] with the Deans and

faculty at Harvard has provided Barbri unlimited access directly [to] the school

and Harvard students."  (FAC ¶ 131).  The result is that LBE is "foreclosed from

marketing and selling its products and services to [f]oreign LL.M. [s]tudents at

Harvard."  (*Id.*).

### g.    Georgetown

LBE's marketing efforts at Georgetown got off to a promising start.  In fall

2015, LBE tabled and held presentations on Georgetown's campus.  (FAC

¶ 135).  LBE also "garner[ed] … positive testimonials from previous Georgetown

[f]oreign LL.M. [s]tudents who studied with LBE and successfully passed the"

New York bar.  (*Id.*).  As a result, LBE "enroll[ed] the largest number of

Georgetown [f]oreign LL.M. [s]tudents in the history of LBE."  (*Id.*).

---

6        The First Amended Complaint recounts Cosgrove's e-mail as follows:  "Cosgrove …
revoked LBE's permission to table at Harvard because she wanted to see the results of
LBE's pass rate for the July 2010 bar examination[.]"  (FAC ¶ 128).  The First Amended
Complaint does not address Cosgrove's concerns about LBE's "incomplete[ ]" and "late"
materials, and LBE's "litigious posture … against … NYU students."  (Ex. 39).

But it appears that LBE hit a snag sometime in 2015 or 2016. On February 25, 2016, Caryn Voland, Georgetown's Assistant Dean of Graduate Programs, e-mailed Tosolini. (Ex. 42; FAC ¶ 136). Copied on Voland's e-mail was Mitchell Bailin, Georgetown's Dean of Students. (Ex. 42; FAC ¶ 136). It appears that Voland was writing to follow up on a phone call with Tosolini concerning "LL.M. students' confusion with the terms of the enrollment agreement with [LBE], and their ability to discontinue their enrollment in the [LBE] course." (Ex. 42; *see also* Ex. 46). The remainder of Voland's e-mail set terms for LBE to provide refunds to these students — including LBE's promise to "not require these students to sign the release agreement that prohibits them from taking the bar for two years or discussing the release with others." (Ex. 42). Voland added that she and Bailin were "concerned about all of the bar review companies' use of this type of binding language with students who may not be clear on what they are signing, and [that] Bailin w[ould] be looking at this issue across the board." (*Id.*).

Tosolini replied to Voland and Bailin later that day. (Ex. 41). He "confirm[ed] … the terms in" Voland's e-mail. (*Id.*). And he added: "I have reached out to Barbri and offered to reduce both of our fees in half and let the student pick one of the 2 courses. … Barbri did not accept my offer instead they started an aggressive targeting o[f] students that paid enrollment fees to both companies[.]" (Ex. 41). The First Amended Complaint does not explain why Barbri was involved with LBE's decision to refund certain Georgetown students.

It seems that there was a misunderstanding between LBE and Georgetown about these refunds.  Tosolini was under the impression that Georgetown wanted LBE to provide refunds only to "Chinese speaking students."  (Ex. 43; *see* FAC ¶ 137).  Voland responded that Georgetown "did not agree to limit the terms of the refund opportunity to only Chinese students."  (Ex. 44).  Tosolini pushed back, writing to Voland that LBE would make a "good faith effort" (presumably to pay all LL.M. students who demanded a refund), and requesting in exchange that Georgetown "waive the fee for renting a room for [the upcoming] summer."  (Ex. 45).  Voland demurred, writing that Georgetown had conditioned its agreement to let LBE market on its campus on LBE's promise to provide refunds.  (Ex. 46).  Voland added: "Rather than adding new terms at this point, we would appreciate your closing the loop on the students who contacted you within the specified timeframe, so that we can put this year's experience behind us."  (*Id.*).  LBE alleges that, "[u]pon information and belief, Georgetown has" never asked Barbri to refund students "who may have misunderstood Barbri's Terms and Conditions, which are identical to LBE's Terms and Conditions."  (FAC ¶ 139).

The First Amended Complaint does not disclose whether LBE provided refunds to any Georgetown LL.M. students.  But it does allege that "LBE is currently and continues to be unfairly barred from Georgetown," and "cannot rent any classrooms or conduct any presentations to sell and market its products" there.  (FAC ¶ 140).

### h. Duke

Beginning in 2012, LBE tabled and held presentations at Duke. (FAC ¶ 144). LBE's marketing succeeded: That fall, LBE "enroll[ed] the largest number of Duke [f]oreign LL.M. [s]tudents in the history of LBE." (*Id.*). And LBE alleges that it "helped Duke [f]oreign LL.M. [s]tudents successfully pass the NY Bar Exam." (*Id.* at ¶ 145).

But in 2013, Duke denied LBE access to its campus "without any explanation." (FAC ¶ 146). As a result, "LBE was forced to rent a room in another building off-campus at a substantial cost," leading Duke's foreign LL.M. students to suspect "that LBE did not want to pay Duke and/or LBE was too cheap to pay for a room at Duke." (*Id.* at ¶ 147). In contrast, Duke gave "Barbri access to its campus and use of its classrooms free of charge." (*Id.*). LBE alleges that Barbri had "exclusive on-campus promoting privileges" at Duke. (*Id.*).

In 2014, LBE asked Duke for permission to table on its campus. (FAC ¶ 148). Duke responded that it did not have enough space to accommodate LBE. (*Id.*). LBE renewed its request in 2015, when it asked Oleg Kobelev, Duke's Assistant Dean of International Studies, for permission to table that fall. (*Id.* at ¶ 149; Ex. 47). "Kobelev did not respond," but Duke's Associate Dean of Admissions and Student Affairs William Hoye did, explaining that Duke lacked the space to give LBE a table on its campus. (FAC ¶¶ 149-50; Ex. 48).

Tosolini e-mailed Hoye on September 13, 2015, asking again if LBE could market its classes at Duke. (Ex. 49). Tosolini wrote that LBE was "already the number one course provider in many schools from the East to the West Coast," and that many Duke students had asked LBE to visit their campus. (*Id.*). Hoye did not respond at first. (FAC ¶ 151). But after Tosolini e-mailed Hoye again the following week (Ex. 50), Hoye wrote back, explaining that Duke was "not in the position to approve additional bar preparation companies at th[at] time" (Ex. 51). Tosolini asked Hoye to explain why Duke had banned LBE from conducting promotional activities on campus (Ex. 52), but Hoye did not respond (FAC ¶ 152).

LBE alleges that "[u]pon information and belief, [f]oreign LL.M. [s]tudents at Duke are still requesting LBE to table" there." (FAC ¶ 154). LBE remains barred from marketing on Duke's campus, while "Barbri has h[eld] multiple events regarding its products and services at Duke." (*Id.* at ¶¶ 153, 155, 156).

i.     **USC**

In fall 2015, LBE marketed its course at USC, and "enroll[ed] the largest number of USC [f]oreign LL.M. [s]tudents in the history of LBE." (FAC ¶ 159). But in spite of this success, LBE claims that Barbri had many unfair advantages over LBE. For one, it is alleged that USC Professor John Heilman — who is "a long standing Barbri professor" — gave LL.M. students "Barbri enrollment forms ... during his regular for-credit classes." (*Id.* at ¶ 160). And Barbri also marketed its course to LL.M. students "several weeks prior to USC's Fall Bar Week, which is the only opportunity that bar exam

preparation companies have access to USC." (*Id.* at ¶ 161). By LBE's account, "Barbri presented its products and services to [f]oreign LL.M. [s]tudents during one of [USC's] first LL.M. classes during the [F]all 2015 [S]emester." (*Id.*). The result, LBE alleges, was that "many students" signed up for Barbri's course "without knowing of Barbri's competitors and/or with the belief that Barbri is the only company that offers bar examination preparation courses." (*Id.*).

LBE further alleges that many USC foreign LL.M. students who had registered — and put down a deposit — for Barbri's course decided to switch to LBE. (FAC ¶ 162). But these students learned that Barbri still planned "to charge them the full amount of the bar preparation course." (*Id.*). In October 2015, Tosolini e-mailed Kyle Jones, USC's Dean of Students, about Barbri's early access to USC's students and Barbri's intention "to charge [students] the full amount even if they d[id] not take part in [Barbri's] main course." (*Id.* at ¶ 163; Ex. 53). Jones did not respond. (FAC ¶ 163).

Sometime thereafter — "and without any reason and contrary to LBE's prior accommodations" — USC did not invite LBE to attend its "Spring Bar Week" event in 2016. (FAC ¶ 164).[7] On February 12, 2016, Tosolini e-mailed Anne Marlenga, USC's Associate Dean for Graduate and International Programs. (Ex. 54; *see* Ex. 55). Tosolini asked Marlenga "to confirm the dates" for USC's Spring Bar Week, because USC had not yet provided those dates to LBE. (Ex. 54). Marlenga responded on February 16, apparently after speaking

---

[7]     The existence of Spring Bar Week at USC refutes LBE's allegation that *Fall* Bar Week is USC's "only opportunity that bar exam preparation companies have access to USC." (FAC ¶ 161).

with Tosolini on the phone. (Ex. 55). Marlenga wrote that she was "look[ing] forward to hearing from [Tosolini] about [LBE's] participation" in Spring Bar Week. (*Id.*). The First Amended Complaint confirms that Deborah Call, USC's Associate Dean for Graduate and International Programs, "invited LBE to attend" the event, although it adds that "at that point, most of Spring Bar Week [had] already started, which made it very difficult for LBE to attend on very short notice and effectively market its products." (FAC ¶ 166).

Marlenga ended her e-mail to Tosolini on a different note:

> Lastly, for our current LLMs who have complained about their [LBE] experience, and as you have said that you would be willing to work with the LLM students who have complained on a one-on-one basis, may I provide your email address to each of them individually?
>
> Thank you for your willingness to address our students' concerns.

(Ex. 55).

LBE ultimately attended USC's Spring Bar Week. (Ex. 56). At that event, Call told an LBE representative that USC "ha[d] a number of LLM students who [were] very dissatisfied with [LBE]." (*Id.*). Call added that she had encouraged these students to speak with LBE's representative "so that [the representative] could notate their names and contact information." (*Id.*). LBE's representative "seemed surprised." (*Id.*). And as Call recounted to Tosolini in a February 22, 2016 e-mail, this representative met with some of USC's students but "provided no assurance that their problems would be addressed nor that their registrations would be canceled." (*Id.*).

Tosolini responded to Call, explaining that LBE's "marketing people" (including, the Court assumes, LBE's representative at Spring Bar Week) "do not get involved with cancellation[s] or refunds." (Ex. 57). Tosolini added that LBE "ha[d] over 500 enrolled students," and that "only a small number of students ha[d] issues." (*Id.*). And Tosolini wrote that LBE's "cancellation policy is the same as those of [its] competitors." (*Id.*).

Call's February 23, 2016 reply to Tosolini's e-mail told a different story. Call wrote, in relevant part:

> When we spoke last week about [LBE's] tabling during our Bar Week, and when I told you that we have many students who feel that [LBE's] business practices are abhorrent, and that they have been misled by your reps, you said "I understand that there are a very large number of complaints by USC students[.]"
>
> Further, you said, "I understand that students may be confused" acknowledging that the information your reps have provided our students lacks consistency with your policies and practices.
>
>                     ***
>
> Unfortunately, we are not able to work with [LBE] from this point forward given our students' deep level of dissatisfaction with your company and your company's failure to address their serious concerns.

(Ex. 58). LBE ultimately agreed to refund four USC students on the condition that they sign "an affidavit stating that the[y] … w[ould] not take a bar examination within the next two years." (FAC ¶ 169). Call told Tosolini that the students should receive refunds without being "required to sign any affidavit that prohibits [them] from taking the bar exam in the future." (Ex. 60). In a move that went "against the general practice in the bar

36

examination review industry as set forth by Barbri," LBE consented, and "waived the affidavit" requirement.  (FAC ¶ 170).  LBE is still not allowed to rent classrooms or market its courses at USC.  (*Id.* at ¶ 171).

### j.    Emory

The genesis of LBE's marketing efforts at Emory is unclear.  But it is clear that Emory's administration interceded when LBE refused to provide refunds to certain Emory students.

In January 2016, Tosolini reached an agreement with Jessica Dworkin, Emory's Assistant Dean of Graduate programs, pursuant to which "students 'who ha[d] not paid for [LBE's] course w[ould] be released from their payment obligations and students [who] ha[d] been charged w[ould] not receive a refund.'"  (FAC ¶ 175 (quoting Ex. 61)).  Two months later, Robert B. Ahdieh, a "Vice Dean and Professor at Emory … contacted [ ] Tosolini to demand that LBE refund all Emory students immediately."  (*Id.* at ¶ 176).  Ahdieh told Tosolini that Dworkin did not have the authority to enter into an agreement with LBE about these refunds.  (*Id.*).  And Ahdieh further "threatened to communicate with other law schools and 'bring an action against LBE.'"  (*Id.*).  Ahdieh, LBE notes, "is … a distinguished faculty member at Barbri."  (*Id.*).

LBE's dispute with Emory is set forth in a series of April 2016 e-mails between Tosolini and Ahdieh.  On April 1, 2016, Tosolini wrote to Ahdieh, memorializing the terms of the agreement LBE had reached with Dworkin. (Ex. 61).  Tosolini added:  "I received your voice message containing a clear threat and defamatory statements.  I would like to note that you have a real

conflict of interest since you are employed by Barbri, one of our direct competitors." (*Id.*). The First Amended Complaint does not specify the "threat and defamatory statements" that Ahdieh allegedly made. Tosolini concluded by writing: "Finally, I am copying my lawyer to this email as he is assessing the actual and future damage that you are causing (and threatening to cause) [LBE] by actively reaching out to other law schools." (*Id.*).

Ahdieh responded to Tosolini that same day. (Ex. 62). He reiterated that Dworkin "did not have authority to reach any … agreement" regarding LBE's refunds. (*Id.*). And Ahdieh added that any agreement Dworkin had reached "predated [Emory's] receipt of documentation from multiple schools, and multiple students, of your employee's misrepresentation." (*Id.*). The First Amended Complaint does not identify the employee in question; nor does it specify the misrepresentation she made. Ahdieh then advised Tosolini "to proceed as you did at Georgetown," or else LBE would "not be able to return to Emory in the future." (*Id.*). Ahdieh added that in the event Emory barred LBE from its campus, the school would "need to share with those with whom we have been in conversation why that decision was made, including in light of the factual record of audio recordings, written messages, and the like that the students have compiled." (*Id.*).

LBE has chosen to rely on communications of this type as the principal evidence of collusion among Defendants. Specifically, LBE alleges that "Ahdieh's mention of LBE's conduct at Georgetown clearly shows that there is some degree of communication and influence between law schools regarding

the various vendors and companies allowed to market and sell products on law school campuses." (FAC ¶ 177). In so doing, however, LBE focuses on those portions of the e-mails referencing communications with other schools, while studiously avoiding any discussion of the student and administrator complaints discussed therein. In the e-mail in question, for instance, Ahdieh concluded as follows:

> [M]y apologies that this issue has reached this stage. But I have to confess that, from my conversation with my counterparts at other schools, I did not imagine that — in the face of the obvious and acknowledged provision of misinformation by your employee — you would insist on requiring litigation in order for students to receive relief.

(Ex. 62). Barbri, LBE alleges, "has identical Terms and Conditions as LBE," and it has engaged in "identical conduct." (FAC ¶ 178). But Emory has "not tak[en] any adverse actions against Barbri." (*Id.*). And by LBE's account, "Ahdieh intentionally allowed Emory to breach its agreement with [ ] Tosolini in clear favoritism for Barbri." (*Id.*). As things stand, LBE is "foreclosed from tabling, advertising, renting classrooms, and selling its product to" Emory's foreign LL.M. students. (*Id.* at ¶ 180).

## B. Procedural Background

LBE filed its initial Complaint on May 20, 2016. (Dkt. #1). On September 6, 2016, Defendants filed three pre-motion letters that mirror the briefs they filed in support of their omnibus motion to dismiss. (Dkt. #69-71). The Court held a conference to discuss these letters on October 26, 2016, and thereafter gave LBE the opportunity to amend its Complaint. (Dkt. #82).

LBE filed its First Amended Complaint on November 14, 2016. (Dkt. #85). It asserts thirteen causes of action:

i.  <u>First Cause of Action</u>:  Conspiracy to restrain trade in violation of 15 U.S.C. § 1 (against all Defendants).

ii.  <u>Second Cause of Action</u>:  Monopolization in violation of 15 U.S.C. § 2 (against Barbri).

iii.  <u>Third Cause of Action</u>:  Attempted monopolization in violation of 15 U.S.C. § 2 (against Barbri).

iv.  <u>Fourth Cause of Action</u>:  Misrepresentation and fraud (against Barbri).

v.  <u>Fifth Cause of Action</u>:  Tortious interference with prospective economic advantage (against all Defendants).

vi.  <u>Sixth Cause of Action</u>:  Tortious interference with contractual relations (against all Defendants).

vii.  <u>Seventh Cause of Action</u>:  Violation of Section 349 of the New York General Business Law (against all Defendants).

viii.  <u>Eighth Cause of Action</u>:  Violation of Section 340(1) of the New York General Business Law (against all Defendants).

ix.  <u>Ninth Cause of Action</u>:  Racketeering in violation of RICO, 18 U.S.C. § 1962(c) (against all Defendants).

x.    Tenth Cause of Action:   Misappropriation of ideas (against Barbri).

xi.    Eleventh Cause of Action:   Copyright infringement (against Barbri).

xii.    Twelfth Cause of Action:   Trade libel/trade slander/injurious falsehoods/defamation (against all Defendants).

xiii.    Thirteenth Cause of Action:  Breach of contract/breach of implied covenant of good faith and fair dealing (against all Defendants).

Defendants filed their motion to dismiss the First Amended Complaint, and their three supporting briefs, on December 16, 2016.  (Dkt. #91-101).  LBE opposed that motion on February 1, 2017 (Dkt. #102), and briefing concluded when Defendants filed three separate reply briefs on February 15, 2017 (Dkt. #103-05).

## DISCUSSION

The animating force behind this lawsuit is LBE's belief that Defendants have conspired to make Barbri the country's leading — and only — bar review company.  But shorn of its internal contradictions and conclusory assertions, the First Amended Complaint does not plausibly support that belief.

Instead, the First Amended Complaint depicts a commercial dispute between two bar review providers:  Barbri and LBE.  And the First Amended Complaint explains why LBE has lost ground in that dispute.  Between 2010

and 2016, foreign LL.M. students from coast to coast complained about the quality of LBE's courses and the company's business practices. When those complaints reached the administrations of the New York Law Schools and the Non-New York Law Schools, academic administrators intervened. LBE, in turn, saw its tabling privileges vanish — not because of any collusion between Barbri and the ten law schools named as defendants in this case, but because of the independent (and, it appears, justified) actions of the New York Law Schools and the Non-New York Law Schools.

In short, LBE has not alleged a single cognizable federal cause of action: Its antitrust, civil RICO, and copyright claims all fail. And the Court declines to exercise supplemental jurisdiction over LBE's state-law causes of actions. The Court thus grants Defendants' motion to dismiss in its entirety.[8]

---

[8] As the Court noted *supra*, the Non-New York Defendants argue that the Court lacks personal jurisdiction over them. (Dkt. #100). The Court agrees. The Court has considered with care the Non-New York Law Schools' personal jurisdiction arguments, and agrees that there is no basis to assert general, specific, or statutory jurisdiction over them.

But instead of dismissing the First Amended Complaint as to the Non-New York Law Schools under Rule 12(b)(2), the Court will proceed directly to the Rule 12(b)(6) arguments that *all* Defendants have made. "Although [courts] traditionally treat personal jurisdiction as a threshold question to be addressed prior to consideration of the merits of a claim, ... that practice is prudential and does not reflect a restriction on the power of the courts to address legal issues." *ONY, Inc.* v. *Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 498 n.6 (2d Cir. 2013). And "[i]n cases involving 'multiple defendants — over some of whom the court indisputably has personal jurisdiction — in which all defendants collectively challenge the legal sufficiency of the plaintiff's cause[s] of action,'" courts can "proceed[ ] directly to the merits on a motion to dismiss." *Id.* (quoting *Chevron Corp.* v. *Naranjo*, 667 F.3d 232, 246 n.17 (2d Cir. 2012)); *see Sullivan* v. *Barclays PLC*, No. 13 Civ. 2811 (PKC), 2017 WL 685570, at *11 (S.D.N.Y. Feb. 21, 2017) (adopting this approach where some defendants did not dispute personal jurisdiction, which made it "necessary to rule on [ ] defendants' Rule 12(b)(6) arguments regardless of the [c]ourt's personal jurisdiction over the remaining defendants").

Such is the case here. The Court plainly has personal jurisdiction over, for example, the New York Law Schools. Thus, even if the Court were to hold that it lacks personal jurisdiction over the Non-New York Law Schools, it would have to consider their merits arguments about the First Amended Complaint, which arguments are identical to those

## A.       Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).  "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Allco Fin. Ltd.* v. *Klee*, 861 F.3d 82, 94-95 (2d Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678).  In determining whether a plaintiff has made this showing, "the only facts to be considered are those alleged in the complaint, and the court must accept them, drawing all reasonable inferences in the plaintiff's favor." *Doe* v. *Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016); *see generally Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (noting that, in determining the adequacy of a claim under Rule 12(b)(6), a court is generally limited to "facts stated on the face of the complaint," "documents appended to the complaint or incorporated in the complaint by reference," and "matters of which judicial notice may be taken").

"[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.  And once a court has

---

of the New York Law Schools.  Instead of adopting that piecemeal approach, the Court will dismiss the First Amended Complaint as to all Defendants under Rule 12(b)(6).

excised legal conclusions from a complaint, the remaining "well-pleaded facts" must "permit the court to infer more than the mere possibility of misconduct." *Id.* at 679. Put another way: "While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [a plaintiff's] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570).

**B.      The Court Grants Defendants' Rule 12(b)(6) Motion to Dismiss**

Five of the First Amended Complaint's thirteen causes of action — the First (15 U.S.C. § 1), Second (15 U.S.C. § 2), Third (also 15 U.S.C. § 2), Ninth (18 U.S.C. § 1962), and Eleventh (17 U.S.C. § 101) Causes of Action — arise under federal law. The Court will address these five claims first, analyzing why all five are meritless. The Court will then explain why it is declining to exercise supplemental jurisdiction over the First Amended Complaint's eight state-law causes of action. And finally, the Court will address why it is dismissing LBE's First, Second, Third, and Ninth Causes of Action with prejudice, and the First Amended Complaint's remaining claims without prejudice.

**1.      The First Amended Complaint Fails to State a Claim for Relief Under Any Federal Statute**

**a.      LBE Does Not Plausibly Allege That Defendants Conspired to Restrain Trade in Violation of 15 U.S.C. § 1**

**i.      Applicable Law**

Section 1 of the Sherman Act, 15 U.S.C. § 1, provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign

nations, is declared to be illegal."  15 U.S.C. § 1.  "Since all contracts

necessarily restrain trade to some extent, this provision cannot be read

literally:  [O]nly 'unreasonable' restraints of trade are unlawful."  *In re*

*Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419, 438 (S.D.N.Y.

2015) (quoting *Bus. Elecs. Corp.* v. *Sharp Elecs. Corp.*, 485 U.S. 717, 723

(1988)).  And "[t]o run afoul of § 1, the unreasonable restraint must result from

an agreement between two or more entities."  *Id.*

Accordingly, to state a Section 1 claim, a plaintiff must make two

showings:  "[i] a combination or some form of concerted action between at least

two legally distinct economic entities that [ii] unreasonably restrains trade."

*United States* v. *Am. Express Co.*, 838 F.3d 179, 193 (2d Cir. 2016) (internal

quotation mark and citation omitted).  The Court considers each of these

elements in turn.

Element One — A Combination or Some Form of Concerted Action:  "The

crucial question in a Section 1 case is … whether the challenged conduct stems

from independent decision or from an agreement, tacit or express."  *Mayor &*

*City Council of Baltimore, Md.* v. *Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir.

2013) (internal quotation marks omitted) (quoting *Starr* v. *Sony BMG Music*

*Entm't,* 592 F.3d 314, 321 (2d Cir. 2010)).  "Agreements that fall within the

scope of Section 1 are characterized as either 'horizontal' or 'vertical.'"  *In re*

*Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 376 (S.D.N.Y. 2016).  "A horizontal

agreement is an 'agreement between competitors at the same level of the

market structure,' while a vertical agreement is a 'combination[ ] of persons at

45

different levels of the market structure.'" *Id.* (quoting *United States* v. *Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972)). Further, "courts have long recognized the existence of 'hub-and-spoke' conspiracies in which an entity at one level of the market structure, the 'hub,' coordinates an agreement among competitors at a different level, the 'spokes.' *United States* v. *Apple, Inc.*, 791 F.3d 290, 314 (2d Cir. 2015) (citation omitted). "These arrangements consist of *both* vertical agreements between the hub and each spoke and a horizontal agreement among the spokes to adhere to the [hub's] terms, often because the spokes would not have gone along with [the vertical agreements] except on the understanding that the other [spokes] were agreeing to the same thing." *Id.* (internal quotation marks and citation omitted).

No matter the type of agreement alleged, "[a] plaintiff's job at the pleading stage, in order to overcome a motion to dismiss, is to allege enough facts to support the inference that a conspiracy actually existed." *Citigroup*, 709 F.3d at 136; *accord Twombly*, 550 U.S. at 556 ("[S]tating [a Section 1] claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made."). This bar is not high: "To survive dismissal, 'the plaintiff need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action, as would be required at later litigation stages such as a defense motion for summary judgment, or a trial.'" *Gelboim* v. *Bank of Am. Corp.*, 823 F.3d 759, 782 (2d Cir. 2016) (quoting *Anderson News, L.L.C.* v. *Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012)), *cert. denied*, 137 S. Ct. 814 (2017). "Instead, a well-

pleaded complaint may proceed even if … actual proof of those facts is improbable, and … a recovery is very remote and unlikely as long as the complaint presents *a* plausible interpretation of wrongdoing." *In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 558 (S.D.N.Y. 2016) (emphasis in original) (internal quotation marks and citations omitted).

"As the Second Circuit has recognized, there are two ways, at the pleading stage, for a plaintiff 'to allege enough facts to support the inference that a conspiracy actually existed' so as to overcome a motion to dismiss." *In re Interest Rate Swaps Antitrust Litig.*, — F. Supp. 3d —, No. 16 MDL 2704 (PAE), 2017 WL 3209233, at *17 (S.D.N.Y. July 28, 2017) (quoting *Citigroup*, 709 F.3d at 136). "First, a plaintiff may, of course, assert direct evidence that the defendants entered into an agreement in violation of the antitrust laws." *Citigroup*, 709 F.3d at 136. "Such evidence would consist, for example, of a recorded phone call in which two competitors agreed to fix prices at a certain level." *Id.* "Direct evidence, however, is not required." *Interest Rate Swaps*, 2017 WL 3209233, at *18. And a "[c]ourt cannot take [a plaintiff's] failure to present direct evidence as a sign that no conspiracy existed." *London Silver Fixing*, 213 F. Supp. 3d at 558.

Thus, "as an alternative to direct evidence, to prove a [Section 1] conspiracy a plaintiff may rely on indirect or circumstantial evidence, that is, 'inferences that may fairly be drawn from the behavior of the alleged conspirators.'" *Interest Rate Swaps*, 2017 WL 3209233, at *18 (quoting *Anderson News*, 680 F.3d at 183). But "'alleging parallel conduct alone is

insufficient, even at the pleading stage,' to survive a motion to dismiss." *Id.* (quoting *Citigroup*, 709 F.3d at 136). "Rather, to plausibly allege a § 1 violation, the parallel conduct must be 'placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). "Examples of a parallel conduct allegation that would suffice under this standard include 'parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties.'" *Starr*, 592 F.3d at 322 (quoting *Twombly*, 550 U.S. at 556 n.4). "A plaintiff may also state a Section 1 claim if he alleges behavior 'that would plausibly contravene each defendant's self-interest in the absence of similar behavior by rivals.'" *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 682 (S.D.N.Y. 2012) (quoting *Starr*, 592 F.3d at 327).

"Post-*Twombly* courts have analyzed § 1 claims based on parallel conduct by horizontal competitors by inquiring whether 'plus factors' and/or other circumstantial evidence are present that, along with the parallel conduct, make it plausible to infer an agreement among competitors." *Interest Rate Swaps*, 2017 WL 3209233, at *19. "These plus factors include: [i] 'a common motive to conspire'; [ii] 'evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators'; and [iii] 'evidence of a high level of interfirm communications.'" *Gelboim*, 823 F.3d at 781 (internal quotation marks omitted) (quoting *Citigroup*, 709 F.3d at 136).

"[T]his list" of plus factors "is 'neither exhaustive nor exclusive, but rather illustrative of the type of circumstances which, when combined with parallel behavior, might permit a jury to infer the existence of an agreement.'" *In re Propranolol Antitrust Litig.*, — F. Supp. 3d —, No. 16 Civ. 9901 (JSR), 2017 WL 1287515, at *4 (S.D.N.Y. Apr. 6, 2017) (quoting *Gelboim*, 823 F.3d at 781).

"[T]he presence of plus factors certainly does not compel or 'necessarily lead to an inference of conspiracy.'" *Anderson News, L.L.C.* v. *Am. Media, Inc.*, 123 F. Supp. 3d 478, 499 (S.D.N.Y. 2015) (quoting *Apex Oil Co.* v. *DiMauro*, 822 F.2d 246, 254 (2d Cir. 1987)). And sometimes, a plaintiff's allegations of parallel conduct, combined with plus factors, will not support a Section 1 claim. "An inference of conspiracy will not arise when the conspirators' parallel conduct 'made perfect business sense,' … 'there are obvious alternative explanations for the facts alleged,' … or the alleged facts 'suggest competition at least as plausibly as [they] suggest anticompetitive conspiracy[.]'" *Interest Rate Swaps*, 2017 WL 3209233, at *18 (quoting *Citigroup*, 709 F.3d at 138; *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 322-23 (3d Cir. 2010); *Elevator Antitrust Litig.*, 502 F.3d at 51). Nonetheless, "the requirement of '*plausible* grounds to infer an agreement *does not impose a probability requirement at the pleading stage*; it simply calls for enough facts to raise *a reasonable expectation that discovery* will reveal evidence of illegal agreement[.]'" *Id.* (internal quotation marks omitted) (emphases in original) (quoting *Anderson News*, 680 F.3d at 184).

Element Two — An Unreasonable Restraint of Trade: "Section 1 does not disallow any and all agreements; it disallows only those 'in restraint of trade or commerce among the several States.'" *Elec. Books*, 859 F. Supp. 3d at 682 (quoting 15 U.S.C. § 1). Moreover, Section 1 "outlaws only *unreasonable* restraints." *Id.* (emphasis in original) (quoting *Leegin Creative Leather Prods., Inc.* v. *PSKS, Inc.*, 551 U.S. 877, 885 (2007)).

"To determine whether a practice unreasonably restrains trade in violation of the Sherman Act, courts apply one of two rules designed to provide guidance in forming judgments about the competitive significance of challenged restraints." *Am. Express Co.*, 838 F.3d at 193. "A plaintiff alleging a § 1 violation may allege either [i] a *per se* unlawful agreement or [ii] one that is illegal under the 'rule of reason.'" *Interest Rate Swaps*, 2017 WL 3209233, at *22. "*Per se* liability is limited to 'agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality[.]'" *Id.* (quoting *Nat'l Soc'y of Prof'l Eng'rs* v. *United States*, 435 U.S. 679, 692 (1978)). But "[m]ost antitrust claims are evaluated under the rule of reason," which "requires a court to weigh all of the circumstances surrounding the challenged conduct to determine whether the alleged restraint is unreasonable, taking into account the nature of the specific business, the industry, the restraint's history, and whether the defendant has market power." *In re Aluminum Warehousing Antitrust Litig.*, No. 13 MDL 2481 (KBF), 2014 WL 4277510, at *25 (S.D.N.Y. Aug. 29, 2014).

### ii.    Analysis

To review, a cognizable Section 1 claim has two elements:  "[i] a combination or some form of concerted action between at least two legally distinct economic entities that [ii] unreasonably restrains trade."  *Am. Express Co.*, 838 F.3d at 193 (internal quotation marks and citation omitted).  LBE has established neither element.  Nothing in the First Amended Complaint suggests that Defendants entered into a conspiracy.  And the First Amended Complaint does not allege plausibly that *any* of the Defendants sought to unreasonably restrain trade.  LBE's Section 1 claim fails.

LBE Has Not Plausibly Alleged That Defendants Entered Into Any Form of Agreement:  LBE brings its Section 1 claim against all Defendants in this action.  (FAC ¶¶ 193-201).  But the First Amended Complaint does not present direct evidence to support LBE's claim that Barbri, the New York Law Schools, and the Non-New York Law Schools entered into an agreement (let alone an agreement to restrain trade).  Nor does the First Amended Complaint plead indirect evidence to support the existence of an agreement between these entities.  On this first element, LBE's Section 1 claim fails.

To begin, the First Amended Complaint presents no "direct evidence that [Defendants] entered into an agreement in violation of the antitrust laws."  *Citigroup*, 709 F.3d at 136.  LBE does not argue otherwise in its opposition brief.  Instead, LBE attempts to rely on indirect evidence of Defendants' conspiracy, claiming that in the First Amended Complaint, Defendants'

"conspiracy agreement" is "evidenced by parallel conduct and contributing 'plus factors.'" (LBE Opp. 14).

The Court disagrees. The First Amended Complaint provides no indirect evidence to support LBE's claim that Defendants entered into an agreement within the meaning of Section 1. LBE argues that the New York Law Schools and the Non-New York Law Schools engaged in parallel conduct when they "forb[ade] [LBE] from any on-campus tabling, marketing[,] and promotion privileges"; LBE deems these decisions "almost simultaneous." (LBE Opp. 15). But calling this conduct "parallel" is a stretch: The First Amended Complaint makes plain that these schools banned LBE from marketing on their campuses at different times over the span of several years. Columbia, for example, first "disallow[ed] LBE from" its campus in "September of 2010" (FAC ¶ 69); Fordham did the same, but not until February 2016 (*id.* at ¶ 102). Parallel conduct is insufficient, on its own, to state a plausible Section 1 claim. *See Interest Rate Swaps*, 2017 WL 3209233, at *18 (quoting *Citigroup*, 709 F.3d at 136). Here, LBE has not established even this basic building block of an antitrust conspiracy.

LBE's attempt to establish "plus factors" is similarly unavailing. LBE argues that the First Amended Complaint pleads three such factors: "(i) common motive to conspire; (ii) actions contrary to each defendant's self-interest; and (iii) regular communication between defendants." (LBE Opp. 17). Initially, the Court notes that in its brief, LBE largely supports these plus factors with allegations that do not appear in the First Amended Complaint.

(*See id.* at 18 (arguing that Barbri gives "prepaid credit cards/gift cards to numerous departments at the Defendant Law Schools"); *id.* at 19 (claiming that Polo urged NYU, Cardozo, and Harvard to ban LBE from their campuses); *id.* (ruminating that the New York Law Schools and the Non-New York Law Schools "had the regular opportunity to discuss the on-going nature of their scheme" because "academic scholars customarily speak over the phone, via email, and meet at seminars"). The Court will not consider these new allegations here, as "[i]t is axiomatic that [a] [c]omplaint cannot be amended by the briefs in opposition to a motion to dismiss." *Komlossy* v. *Faruqi & Faruqi, LLP*, No. 15 Civ. 9316 (KPF), 2017 WL 722033, at *6 (S.D.N.Y. Feb. 23, 2017) (quoting *Jordan* v. *Chase Manhattan Bank*, 91 F. Supp. 3d 491, 500 (S.D.N.Y. 2015)).

But the biggest flaw in LBE's account of these "plus factors" — and, more broadly, in LBE's Section 1 claim — is that "there are obvious alternative explanations for the" New York Law Schools' and Non-New York Law Schools' conduct. *Interest Rate Swaps*, 2017 WL 3209233, at *18 (internal quotation mark and citation omitted). LBE posits that these law schools "provide preferential treatment to Barbri over its competitors to ensure" that the schools continue receiving "donations and sizable employment agreements" from Barbri. (LBE Opp. 18). The First Amended Complaint gives no sense of these donations' size. Nor does it attempt to explain why the *administrators* of the New York Law Schools and the Non-New York Law Schools would be invested

in ensuring that *professors* at these schools can continue teaching Barbri courses on the side.

Even more importantly, the First Amended Complaint does not provide any support for LBE's claim that the New York Law Schools and the Non-New York Law Schools favor Barbri over Barbri's *competitors*. Instead, the First Amended Complaint establishes only that these law schools prefer Barbri over one of its competitors: LBE. And the First Amended Complaint — and moreso, its exhibits — makes plain why this is so: Administrators at these schools were concerned about the quality of LBE's bar review course and the company's business practices.

Consider the concerns that administrators at law schools across the country conveyed to LBE. There were complaints about the quality of LBE's course materials. (Ex. 36, 39). There were concerns about LBE's refusal to provide refunds to students. (Ex. 42-46). There were complaints about LBE's business tactics, including its decision to pursue litigation against students. (Ex. 39, 58). And there were complaints that LBE's marketing representatives made misrepresentations to law students who were considering signing up for LBE's courses. (Ex. 58, 62).

In light of these complaints, it is unsurprising that — at different times over the span of several years — many of the New York Law Schools and the Non-New York Law Schools barred LBE from marketing its courses on their campuses. Their reactions were "independent responses to common stimuli," *Starr*, 592 F.3d at 322 (quoting *Twombly*, 550 U.S. at 556 n.4), not a

54

coordinated effort to stifle competition.  And this alternative explanation for these law schools' conduct defeats any "inference of conspiracy" that LBE attempts to raise.  *Interest Rate Swaps*, 2017 WL 3209233, at *18.  Even viewed in the light most favorable to LBE, the First Amended Complaint's allegations fall far short of establishing that Defendants entered into a conspiracy.

   LBE Has Not Plausibly Alleged That Defendants Unreasonably Restrained Trade:  LBE's failure to plead an agreement between and among Defendants is fatal to its Section 1 claim.  In turn, the Court need not consider whether LBE has established the second element of this claim: that Defendants unreasonably restrained trade.  *See Anderson News*, 123 F. Supp. 3d at 496 ("Only after an agreement is established will a court consider whether the agreement constituted an unreasonable restraint of trade." (quoting *AD/SAT* v. *Associated Press*, 181 F.3d 216, 232 (2d Cir. 1999))).  Nonetheless, the Court will explain why LBE has also not made this showing, because this pleading deficiency highlights a fundamental flaw in all of LBE's antitrust claims.

   Section 1 forbids unreasonable restraints on trade.  And that restriction furthers the overarching goal of the Sherman Act: "to protect[ ] competition as a whole in [a given] relevant market."  *Am. Express Co.*, 838 F.3d at 193 (internal quotation mark omitted) (quoting *Top Mkts., Inc.* v. *Quality Mkts., Inc.*, 142 F.3d 90, 96 (2d Cir. 1998)).  But the Sherman Act does *not* "aim[ ] to protect … individual competitors within that market."  *Id.* (internal quotation marks omitted) (quoting *Top Mkts*, 142 F.3d at 96).  Put another way:

"Disputes between business competitors … are not the proper subjects of antitrust actions."  *Id.*

The First Amended Complaint alleges clearly that LBE and Barbri are in a dispute.  But it gives no indication that Defendants have done anything to harm "competition as a whole" within the LLM Market.  Part of this is because the LLM Market is not a cognizable market under the Sherman Act, an issue the Court will explain in the next section of this Opinion.  But another reason why LBE has failed to allege injury to *competition* is the fact that the First Amended Complaint provides no information about other companies that compete with Barbri and LBE.

Plainly, LBE is aware that such competitors exist.  (*See* FAC ¶ 27 (alleging that "LBE has enjoyed significantly high bar passage rates compared to those of its competitors"); *id.* at ¶ 42 ("[T]here are a very limited number of bar preparation providers in the JD Market and even [fewer] in the LLM Market."); Ex. 11 (Tosolini writing about "competitors" offering discounts to students)).  And the First Amended Complaint's exhibits mention two such competitors by name:  Kaplan (Ex. 20-21, 37) and Pieper (Ex. 38).  But the First Amended Complaint does not contain a single allegation about these competitors, let alone how competition among them has suffered because of Defendants' actions.

Again, the First Amended Complaint does not plausibly allege that Defendants entered into a conspiracy of any stripe.  But even if the Court were to accept LBE's allegation that Defendants entered into a conspiracy, that

conspiracy's object — favoring Barbri over LBE — would not be cognizable under the Sherman Act.  The First Amended Complaint, at bottom, depicts a business dispute between two competing bar review companies.  It does not state a claim under Section 1 of the Sherman Act.

### b.    LBE Does Not Plausibly Allege That Barbri Monopolized the LLM Market in Violation of 15 U.S.C. § 2

#### i.    Applicable Law

Section 2 of the Sherman Act forbids monopolization.  15 U.S.C. § 2.  "To state a[ ] claim under Section 2, a plaintiff must allege plausible facts that" establish two elements.  *Zinc Antitrust Litig.*, 155 F. Supp. 3d at 377.  First, a plaintiff must establish "that a defendant possesses market power (sometimes referred to as 'monopoly power') in a relevant market, and willfully acquired or maintained such power as 'distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'"  *Id.* (quoting *United States* v. *Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)).  And second, a plaintiff must plausibly allege that the defendant engaged in "anticompetitive conduct."  *New York ex rel. Schneiderman* v. *Actavis PLC*, 787 F.3d 638, 651 (2d Cir. 2015).  The Court considers both elements in turn.

Element One — Market Power:  Under Section 2, "[a] claim of monopoly power may be alleged by pleading [i] power to control prices or exclude competition, or [ii] possession of a predominant share of the relevant market."  *Merced Irrigation Dist.* v. *Barclays Bank PLC*, 165 F. Supp. 3d 122, 140 (S.D.N.Y.), *reconsideration denied*, 178 F. Supp. 3d 181 (S.D.N.Y. 2016).

Because the First Amended Complaint bases its Section 2 claim on Barbri's alleged market share (*see* FAC ¶¶ 205, 207), the Court will focus on this second method of establishing market power. "To allege [market] power by this means, a plaintiff must satisfactorily allege both [i] a plausible definition of a relevant market and [ii] excess market share in that market." *Shak* v. *JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 482 (S.D.N.Y. 2016).

The Court begins by considering the metes and bounds of a relevant market. For purposes of Section 2, "the relevant market is the 'area of effective competition' within which the defendant operates." *Concord Assocs., L.P.* v. *Entm't Properties Tr.*, 817 F.3d 46, 52 (2d Cir. 2016) (quoting *AD/SAT*, 181 F.3d at 227). Such "a market has two components: [i] a product market and [ii] a geographic market." *Id.*

"A relevant product market consists of 'products that have reasonable interchangeability for the purposes for which they are produced — price, use and qualities considered.'" *Zinc Antitrust Litig.*, 155 F. Supp. 3d at 378 (quoting *United States* v. *E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956)). "Products are considered reasonably interchangeable if consumers treat them as acceptable substitutes." *Id.* Thus, for purposes of Section 2, "[t]he relevant market must be defined 'as all products reasonably interchangeable by consumers for the same purposes,' because the ability of consumers to switch to a substitute restrains a firm's ability to raise prices above the competitive level.'" *Shak*, 156 F. Supp. 3d at 482 (quoting *City of N.Y.* v. *Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011)). And "[w]here the plaintiff fails to define its

proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in [the] plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *Id.* at 482-83 (quoting *Chapman* v. *N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008)).

A "geographic market encompasses the geographic area in which purchasers of the product can practicably turn for alternative sources of the product." *Zinc Antitrust Litig*, 155 F. Supp. 3d at 378. "Factors relevant to [the] geographic scope of a market 'may include barriers to transactions between buyers and sellers of different locations, such as transportation costs to a particular location, as well as the relative preferences of consumers with respect to travel and price.'" *Id.* (quoting *Heerwagen* v. *Clear Channel Commc'ns,* 435 F.3d 219, 228 (2d Cir. 2006), *overruled on other grounds as recognized by Concord Assocs.*, 817 F.3d at 53).

As for excess market share, "one firm's large percentage share of a defined relevant market" can suffice to establish this element of a Section 2 claim. *Aluminum Warehousing*, 95 F. Supp. 3d at 454. "For instance, 'a market share of over 70 percent is usually strong evidence of monopoly power.'" *Id.* (quoting *Top Mkts.*, 142 F.3d at 99).

"Although market definition is a deeply fact-intensive inquiry not ordinarily subject to dismissal at the pleadings stage, ... there is no absolute

rule against dismissal where the plaintiff has failed to articulate a plausible explanation as to why a market should be limited in a particular way[.]" *Concord Assocs.*, 817 F.3d at 53 (internal quotation marks and citations omitted). In turn, a district court adjudicating a motion to dismiss a Section 2 claim should "assess whether the … complaint asserts sufficient facts to allege plausibly the existence of both a product and geographic market." *Id.* "Cases are subject to dismissal when [a] plaintiff fails to allege a plausible explanation as to why a market should be limited in a particular way." *Zinc Antitrust Litig.*, 155 F. Supp. 3d at 378.

Element Two — Anticompetitive Conduct: "The Second Circuit has defined anticompetitive conduct as 'conduct without a legitimate business purpose that make[s] sense only because it eliminates competition.'" *Merced*, 165 F. Supp. 3d at 142 (quoting *In re Adderall XR Antitrust Litig.,* 754 F.3d 128, 133 (2d Cir. 2014)).

## ii.    Analysis

LBE's Section 2 monopolization claim fails because the First Amended Complaint does not plausibly allege that Barbri has market power. What LBE believes to be the relevant market — the LLM Market — is not cognizable under Section 2. And in any event, the First Amended Complaint gives no indication that Barbri holds an excess share of the LLM Market.

The First Amended Complaint defines the LLM Market as follows. The LLM Market comprises "the U.S. market for bar examination review courses for [f]oreign LL.M. [s]tudents." (FAC ¶ 29). LBE alleges that "the relevant

60

geographic market" for the LLM Market "is the United States." (*Id.* at ¶ 38). By LBE's account, the LLM Market is distinct from the JD Market ("the U.S. market for bar examination review courses for J.D. graduates"). (*Id.* at ¶ 27). And because "significantly" fewer LL.M. students "sit for a bar examination," "[t]he LLM Market is far more limited than the JD Market." (*Id.* at ¶ 31).

This is an inadequate market definition. LBE's claimed distinction between the LLM Market and the JD Market "is an ipse dixit." *Shak*, 156 F. Supp. 3d at 483. This is in large part because LBE has not defined the LLM Market "with reference to the rule of reasonable interchangeability and cross-elasticity of demand," a deficiency that alone merits dismissal of LBE's Section 2 claim. *Chapman*, 546 F.3d at 238 (citation omitted).

Although LBE alleges that the LLM Market is distinct from the JD Market, it acknowledges that LL.M. and J.D. graduates take the same bar exam — these students "are in direct competition." (FAC ¶ 34). LBE also claims that in 2009, it became "the first company to offer" a bar review course catered specifically to foreign LL.M. graduates. (*Id.* at ¶ 37). Indeed, by LBE's account, before 2012, "Barbri only sold one type of bar review course to both the JD Market and the LLM Market." (*Id.* at ¶ 46; *see id.* at ¶ 45).

How, then, did foreign LL.M. graduates study for the bar before LBE was founded in 2009? The most logical reading of the First Amended Complaint is that they took the *same bar review classes* as their J.D.-holding peers. But the First Amended Complaint does not address this obvious overlap between the LLM Market and the JD Market. And as a result, the First Amended Complaint

does not explain why the JD Market does not offer "reasonably interchangeable" substitutes for the courses available in the LLM Market. *Shak*, 156 F. Supp. 3d at 482 (quoting *Grp. Health*, 649 F.3d at 155). LBE's failure to address these alternative products renders its definition of the LLM Market implausible. *See Bayer Schering Pharma AG* v. *Sandoz, Inc.*, 813 F. Supp. 2d 569, 577-78 (S.D.N.Y. 2011).

And even if LBE had plausibly defined the LLM Market, the First Amended Complaint does not allege that Barbri holds an excess share of it. The First Amended Complaint "assume[s]" that Barbri has an "over 80%" share" of "the bar review marketplace." (FAC ¶ 43; *see also id.* at ¶ 205 ("Upon information and belief, Barbri maintains an 80%-90% share of the LLM Market and the JD Market.")). This is confusing, given LBE's insistence that the JD Market and LLM Market are distinct, and that only the latter is relevant to LBE's Section 2 claim. (*Id.* at ¶¶ 29-30). In any event, the First Amended Complaint provides no indication of Barbri's share of the LLM Market.

Moreover, some of the First Amended Complaint's allegations *undercut* an inference that Barbri has an excess share of the LLM Market. "It is inherent in the concept of a claim brought under Section 2 that the monopolist has the power over price and competition in the market it purportedly monopolizes." *Zinc Antitrust Litig.*, 155 F. Supp. 3d at 379. Throughout the First Amended Complaint, LBE alleges that Barbri charges "supracompetitive prices" for its "bar review courses." (FAC ¶¶ 44, 198). But the First Amended Complaint also alleges that Barbri offered discounts to students at many law schools. (*Id.* at

¶¶ 56, 99, 161).  The question, then, is why Barbri — an alleged

monopolist — would discount its courses in order to compete in the LLM

Market.  LBE supplies no answer, weakening its claim that Barbri holds an

excess share of the LLM Market.

In sum, LBE has not plausibly alleged that Barbri possesses market

power in the LLM Market.  Its Section 2 monopolization claim thus fails.

### c.    LBE Does Not Plausibly Allege That Barbri Attempted Monopolization in Violation of 15 U.S.C. § 2

#### i.    Applicable Law

"Section Two of the Sherman Act ... [also] forbids attempted

monopolization." *A.V.E.L.A., Inc.* v. *Estate of Marilyn Monroe, LLC*, 241 F. Supp.

3d 461, 481 (S.D.N.Y. 2017).  "To make out a Section Two claim, a plaintiff

must prove three things: '[i] that the defendant has engaged in predatory or

anticompetitive conduct with [ii] a specific intent to monopolize and [iii] a

dangerous probability of achieving monopoly power.'"  *Id.* (quoting *Sandoz*, 813

F. Supp. 2d at 578).  And "[i]n order to determine whether there is a dangerous

probability of monopolization, courts have found it necessary to consider the

relevant market and the defendant's ability to lessen or destroy competition in

that market." *Sandoz*, 813 F. Supp. 2d at 578 (quoting *Spectrum Sports, Inc.* v.

*McQuillan*, 506 U.S. 447, 456 (1993)).

#### ii.    Analysis

LBE's "attempted monopolization claim mirrors [its] actual

monopolization claim," *Zinc Antitrust Litig.*, 155 F. Supp. 3d at 382, and both

fail for similar reasons. To begin, LBE has not established a cognizable market. "'A valid claim for … attempted monopolization must define the relevant product market' in which trade was monopolized." *Boneta* v. *Rolex Watch USA, Inc.*, 232 F. Supp. 3d 354, 360 (S.D.N.Y. 2017) (quoting *Shaw* v. *Rolex Watch, U.S.A., Inc.*, 673 F. Supp. 674, 678 (S.D.N.Y. 1987)). But as the Court just explained, the LLM Market, as defined in the First Amended Complaint, is not cognizable under Section 2.

LBE's failure to define a valid market prevents it from demonstrating that Barbri has a dangerous probability of achieving a monopoly. True, an attempted monopolization claim requires "[a] lesser degree of market power … than that necessary to establish a completed monopolization claim." *Bayer Schering*, 813 F. Supp. 2d at 580 (quoting *Tops Mkts.*, 142 F.3d at 100). But a court cannot determine whether a defendant holds *any* degree of market power before "determin[ing] what market that defendant has attempted to monopolize." *A.V.E.L.A.*, 241 F. Supp. 3d at 481; *see Concord Assocs.*, 817 F.3d at 53 ("[W]ithout a definition of [a relevant] market there is no way to measure the defendant's ability to lessen or destroy competition." (quoting *Xerox Corp.* v. *Media Scis. Int'l, Inc.*, 511 F. Supp. 2d 372, 383 (S.D.N.Y. 2007))). Here again, LBE cannot state a claim under Section 2 without defining a plausible market. Its attempted monopolization claim, like its completed monopolization claim, fails accordingly.

### d. LBE Does Not Plausibly Allege That Defendants Have Committed a Civil RICO Violation

#### i. Applicable Law

18 U.S.C. § 1964(c) provides a civil remedy to "[a]ny person injured in his business or property by" a RICO violation. "To sustain a private cause of action under RICO, a plaintiff must allege: '[i] the defendant's violation of 18 U.S.C. § 1962, [ii] an injury to the plaintiff's business or property, and [iii] causation of the injury by the defendant's violation." *Campeggi* v. *Arche Inc.*, No. 15 Civ. 1097 (PGG), 2016 WL 4939539, at *12 (S.D.N.Y. Sept. 14, 2016) (quoting *Lerner* v. *Fleet Bank, N.A.*, 459 F.3d 273, 283 (2d Cir. 2006)). "Turning to the first requirement, to establish a defendant's violation of 18 U.S.C. § 1962, a plaintiff must allege 'the existence of seven constituent elements: [i] that the defendant [ii] through the commission of two or more acts [iii] constituting a pattern [iv] of racketeering activity [v] directly or indirectly invests in, or maintains an interest in, or participates in [vi] an enterprise [vii] the activities of which affect interstate or foreign commerce.'" *Tardibuono-Quigley* v. *HSBC Mortg. Corp. (USA)*, No. 15 Civ. 6940 (KMK), 2017 WL 1216925, at *5 (S.D.N.Y. Mar. 30, 2017) (internal quotation marks omitted) (quoting *Moss* v. *Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir. 1983)). Below, the Court considers two (really, three) of these elements in greater detail: what constitutes (i) a "pattern of racketeering activity" and (ii) a RICO "enterprise."

Pattern of Racketeering Activity: "'[R]acketeering activity,' as defined in RICO, may consist of any of a number of criminal offenses, ... including mail

fraud in violation of 18 U.S.C. § 1341, and wire fraud in violation of 18 U.S.C. § 1343." *Crawford* v. *Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 487 (2d Cir. 2014) (citing 18 U.S.C. § 1961(1)). "A 'pattern of racketeering activity' consists of, *inter alia,* 'at least two acts of racketeering activity[.]'" *Id.* (quoting 18 U.S.C. § 1961(5)). "To survive a motion to dismiss, this pattern must be adequately alleged in the complaint." *BWP Media USA Inc.* v. *Hollywood Fan Sites, LLC*, 69 F. Supp. 3d 342, 361 (S.D.N.Y. 2014) (quoting *Spool* v. *World Child Int'l Adoption Agency,* 520 F.3d 178, 183 (2d Cir. 2008)).

Further, "a civil RICO plaintiff also 'must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity.'" *Crawford*, 758 F.3d at 487 (quoting *H.J. Inc.* v. *Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)). "The requisite continuity may be found in 'either an open-ended pattern of racketeering activity (*i.e.,* past criminal conduct coupled with a threat of future criminal conduct) or a closed-ended pattern of racketeering activity (*i.e.,* past criminal conduct extending over a substantial period of time).'" *Id.* (internal quotation marks omitted) (quoting *GICC Capital Corp.* v. *Tech. Fin. Grp., Inc.*, 67 F.3d 463, 466 (2d Cir. 1995)).

RICO Enterprise:  18 U.S.C. § 1961(4) defines "enterprise," for purposes of RICO, as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." "The existence of an enterprise at all times remains a separate element which must be proved by" a civil RICO plaintiff. *New York* v. *United Parcel Serv., Inc.*, No. 15 Civ. 1136 (KBF), 2016 WL 4203547, at *3

(S.D.N.Y. Aug. 9, 2016) (internal quotation mark omitted) (quoting *United States* v. *Turkette*, 452 U.S. 576, 583 (1981)); *see also id.* ("[T]he enterprise 'must be separate from the pattern of racketeering activity and distinct from the person conducting the affairs of the enterprise.'" (quoting *First Capital Asset Mgmt., Inc.* v. *Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir. 2004)).

Section 1961(4) includes in the definition of an enterprise "*any ...* group of individuals associated in fact." *Boyle* v. *United States*, 556 U.S. 938, 944 (2009) (quoting 18 U.S.C. § 1961(4)). "An 'association-in-fact' for RICO purposes 'is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.'" *Tardibuono-Quigley*, 2017 WL 1216925, at *6 (quoting *City of N.Y.* v. *Chavez*, 944 F. Supp. 2d 260, 269 (S.D.N.Y. 2013)). And "'[i]t is apparent' from RICO's text 'that an association-in-fact enterprise must have at least three structural features: [i] a purpose, [ii] relationships among those associated with the enterprise, and [iii] longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* (quoting *Boyle*, 556 U.S. at 946). Further, a civil RICO "complaint must set out facts tending to show that each individual defendant 'participated in the operation or management of the enterprise itself.'" *Elsevier Inc.* v. *W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 307 (S.D.N.Y. 2010) (quoting *Reves* v. *Ernst & Young*, 507 U.S. 170, 183 (1993)); *see id.* at 307-08 ("For purposes of civil RICO, it is not enough to allege that a defendant provided services that were helpful to an enterprise, without alleging facts that, if proved, would demonstrate some degree of control over the enterprise.").

"In determining whether [a plaintiff has] alleged the existence of an association-in-fact RICO enterprise, courts analyze the 'hierarchy, organization, and activities of the alleged association to determine whether its members functioned as a unit.'" *BWP Media*, 69 F. Supp. 2d at 360 (quoting *Cont'l Petroleum Corp.* v. *Corp. Funding Partners, LLC*, No. 11 Civ. 7801 (PAE), 2012 WL 1231775, at *5 (S.D.N.Y. Apr. 12, 2012)); *cf. Kriss* v. *Bayrock Grp. LLC*, No. 10 Civ. 3959 (LGS), 2016 WL 7046816, at *16 (S.D.N.Y. Dec. 2, 2016) ("An association-in-fact enterprise 'need not have a hierarchical structure, a chain of command, or other business-like attributes,' but it 'must have an ascertainable structure beyond that inherent in the pattern of racketeering activity in which it engages.'" (quoting *United States* v. *Applins*, 637 F.3d 59, 73 (2d Cir. 2011)), *appeal dismissed* (Feb. 6, 2017), *on reconsideration in part*, 2017 WL 1901966 (S.D.N.Y. May 8, 2017).  At base, "an association-in-fact enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct.'" *Tardibuono-Quigley*, 2017 WL 1216925, at *6 (quoting *Boyle*, 556 U.S. at 946).

### ii.  Analysis

The First Amended Complaint does not state a cognizable civil RICO claim.  LBE alleges that "[b]etween the summer of 2009 through April 2016," Barbri, the New York Law Schools, and the Non-New York Law Schools "formed an association-in-fact for the purpose of defrauding LBE."  (FAC ¶ 284).  That enterprise's "common purpose," LBE claims, "was to use artifice, deceit, misinformation, and dishonest means to wrest away from LBE its customers in

68

the LLM Market." (*Id.* at ¶ 286). And Defendants allegedly accomplished this purpose by committing various predicate acts of mail and wire fraud. (*Id.* at ¶ 287).[9]

These allegations raise more questions than they answer. To start: What fraudulent communications did Defendants transmit via mail and wire in furtherance of their "enterprise-in fact"? Who made the statements? And when were the statements made? "[W]here ... the predicate acts on which a RICO claim is based sound in fraud, those acts must be pleaded in conformity with Rule 9(b)'s heightened pleading standard." *BWP Media*, 69 F. Supp. 3d at 362 (quoting *Cont'l Petroleum*, 2012 WL 1231775, at *4). "In order to comply with Rule 9(b), a complaint alleging fraud 'must: [i] specify the statements that the plaintiff contends were fraudulent, [ii] identify the speaker, [iii] state where and when the statements were made, and [iv] explain why the statements were fraudulent.'" *Id.* (quoting *Lerner*, 459 F.3d at 290). "And '[w]hen ... a complaint contains allegations of fraud against multiple defendants, the plaintiff must plead facts that describe each defendant's involvement in the fraud.'" *Id.* (quoting *Watkins* v. *Smith,* No. 12 Civ. 4635 (DLC), 2013 WL 655085, at *9 (S.D.N.Y. Feb. 22, 2013)). The First Amended Complaint fails on all of these fronts.

---

[9]     In its opposition brief, LBE alleges that Defendants' pattern of racketeering activity included "commercial bribery" in violation of New York Law. (LBE Opp. 33-34). Like many of the claims LBE makes in its brief, this allegation does not appear in the First Amended Complaint. The Court will thus not consider it here. (*See supra* note 4).

"Given the routine use of mail and wire communications in business operations, … 'RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it.'" *Crawford*, 758 F.3d at 489 (quoting *Efron* v. *Embassy Suites (Puerto Rico), Inc.,* 223 F.3d 12, 20 (1st Cir. 2000)). Just so here. LBE's allegations of fraud do not satisfy Rule 12(b)(6), much less Rule 9(b). The First Amended Complaint thus fails to allege plausibly that Defendants engaged in a pattern of racketeering activity.

LBE's allegations that Defendants formed an enterprise-in-fact are equally unavailing. The First Amended Complaint gives no indication that Defendants "functioned as a unit." *BWP Media*, 69 F. Supp. 2d at 360 (internal quotation mark and citation omitted). Instead, LBE rests on its conclusory assertion that Barbri and the law school defendants "formed an association-in fact" that constituted "an 'enterprise'" under 18 U.S.C. § 1961(4). (FAC ¶ 284). But even if LBE had established the existence of an association-in-fact enterprise, the First Amended Complaint does not allege "that each individual defendant participated in the operation or management of the enterprise itself." *Elsevier*, 692 F. Supp. 2d at 307 (internal quotation marks and citation omitted). Accordingly, LBE also falls short of plausibly alleging the existence of a RICO enterprise-in-fact.

For these reasons, LBE has not stated a cognizable civil RICO claim.

### e. LBE Does Not Allege Plausibly That Barbri Committed Copyright Infringement

#### i. Applicable Law

"To withstand a motion to dismiss, a complaint based on copyright infringement must allege: [i] which original works are the subject of the copyright claim; [ii] that the plaintiff owns the copyrights in those works; [iii] that the copyrights have been registered in accordance with [the Copyright Act]; and [iv] 'by what acts during what time' the defendant infringed the copyright." *Gym Door Repairs, Inc.* v. *Young Equip. Sales, Inc.*, 206 F. Supp. 3d 869, 893 (S.D.N.Y. 2016) (quoting *Carell* v. *Shubert Org., Inc.*, 104 F. Supp. 2d 236, 250 (S.D.N.Y. 2000)), *reconsideration denied*, No. 15 Civ. 4244 (JGK), 2016 WL 6652733 (S.D.N.Y. Nov. 10, 2016). "The third prong, demonstrating a valid copyright registration, captures the statutory requirement of Section 411(a) of the Copyright Act, which provides in relevant part that 'no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title.'" *Gattoni* v. *Tibi, LLC*, — F. Supp. 3d —, No. 16 Civ. 7527 (RWS), 2017 WL 2313882, at *2 (S.D.N.Y. May 25, 2017) (quoting 17 U.S.C. § 411(a)).

"The Second Circuit has not addressed" "whether a work qualifies as registered under the [Copyright Act] when an application for copyright is pending." *Gattoni*, 2017 WL 2313882, at *3. But nearly every court in the Southern District has answered this question "no." *See Zuma Press, Inc.* v.

*Getty Images (US), Inc.*, No. 16 Civ. 6110 (AKH), 2017 WL 2829517, at *4

(S.D.N.Y. June 29, 2017) (collecting cases).  The Second Circuit has explained

"that a plaintiff plainly fails to satisfy the precondition requirements of [S]ection

411(a) by neglecting to *apply* for registration of the relevant work prior to filing

suit for copyright infringement."  *Sullivan* v. *Duncan*, No. 13 Civ. 1640 (SAS),

2015 WL 4393316, at *4 (S.D.N.Y. July 17, 2015) (citing *Psihoyos* v. *John Wiley

& Sons, Inc.*, 748 F.3d 120, 125-26 (2d Cir. 2014)).

### ii.     Analysis

LBE's final federal claim fails for a simple reason:  The First Amended

Complaint does not allege that LBE holds, or has even applied for, a copyright.

LBE tries to escape this conclusion by arguing that "[r]egistration is not a

prerequisite to copyright protection under the Copyright Act."  (LBE Opp. 38).

This argument is inapposite:  Registration is plainly a prerequisite for "*suing* for

copyright infringement" under the Copyright Act.  *PaySys Int'l, Inc.* v. *Atos Se*,

226 F. Supp. 3d 206, 214-15 (S.D.N.Y. 2016) (emphasis added) (internal

quotation mark omitted) (quoting *Reed Elsevier, Inc.* v. *Muchnick*, 559 U.S. 154,

157 (2010)).  And because LBE did "not even file[ ] [an] *application*[ ] for

registration ... prior to instituting" this lawsuit, it cannot bring an infringement

claim under the Copyright Act.  *Psihoyos*, 748 F.3d at 125.  Accordingly, the

Court must dismiss LBE's copyright infringement claim against Barbri.

### 2.     The Court Declines to Exercise Supplemental Jurisdiction over Plaintiff's State-Law Causes of Action

So far, the Court has dismissed LBE's five federal claims.  LBE's eight

remaining claims (its Fourth, Fifth, Sixth, Seventh, Eighth, Tenth, Twelfth, and

Thirteenth Causes of Action) all arise under state law.  And for the reasons that follow, the Court will decline to exercise supplemental jurisdiction over them.

### i.      Applicable Law

28 U.S.C. § 1367(c)(3) grants a district court discretion to "decline to exercise supplemental jurisdiction over" pendent state-law claims "if … the district court has dismissed all claims over which it has original jurisdiction." "Once a district court's discretion is triggered under § 1367(c)(3), it balances the traditional 'values of [i] judicial economy, [ii] convenience, [iii] fairness, and [iv] comity,' … in deciding whether to exercise jurisdiction." *Kolari* v. *N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ.* v. *Cohill*, 484 U.S. 343, 350 (1988)); *accord United Mine Workers of Am.* v. *Gibbs*, 383 U.S. 715, 726-27 (1966); *cf. Benjamin* v. *N.Y.C. Dep't of Health*, 144 F. App'x 140, 142 (2d Cir. 2005) (summary order) ("In assessing whether § 1367(c)(3) discretion has been appropriately exercised, this Court looks mainly to whether a District Court reached unsettled issues of state law and to whether disposition was supported by *significant* considerations of judicial economy." (emphasis added)).  Those factors generally militate in favor of dismissing state-law claims:  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine … will point toward declining to exercise jurisdiction over the remaining state-law claims." *Cohill*, 484 U.S. at 350 n.7; *see also Motorola Credit Corp.* v. *Uzan*, 388 F.3d 39, 56 (2d Cir. 2004) ("[O]ur Court has held, as a general proposition, that 'if [all] federal claims are

dismissed *before trial* ..., the state claims should be dismissed as well.'"
(emphasis in original) (quoting *Castellano* v. *Bd. of Trustees,* 937 F.2d 752, 758
(2d Cir. 1991)).

### ii. Analysis

All four *Gibbs* factors counsel in favor of declining supplemental
jurisdiction over LBE's state-law claims. First, judicial economy tilts in favor of
declining supplemental jurisdiction, because this case has not yet moved past
the pleadings stage. *See Chenensky* v. *N.Y. Life Ins. Co.*, 942 F. Supp. 2d 388,
392 (S.D.N.Y. 2013). Second, the Court finds nothing inconvenient about
having the parties litigate LBE's state claims in state court. Third, the Court
does not believe that declining supplemental jurisdiction will prejudice the
parties. And finally, comity counsels in favor of having LBE pursue its state-
law claims in state court, where those claims "will be afforded a 'surer-footed
reading of applicable law.'" *Kolari*, 455 F.3d at 123-24 (quoting *Gibbs*, 383 U.S.
at 726).

In sum, "this is the 'usual case'" in which a federal court should decline
supplemental jurisdiction over state claims. *Kolari*, 455 F.3d at 123. The
Court will therefore dismiss LBE's Fourth, Fifth, Sixth, Seventh, Eighth, Tenth,
Twelfth, and Thirteenth Causes of Action without prejudice to LBE's ability to
refile them in state court.

**3. The Court Dismisses Plaintiff's First, Second, Third, and Ninth Causes of Action With Prejudice, and Its Remaining Causes of Action Without Prejudice**

For clarity's sake, the Court will conclude by explaining which claims it is dismissing with, and without, prejudice:

LBE's First, Second, Third, and Ninth Causes of Action: The Court held *supra* that none of these federal causes of action states a claim for relief. LBE has not requested an opportunity to replead them (or any other of its claims, for that matter). Accordingly, the Court dismisses these four claims **with prejudice**. *See Gallop* v. *Cheney*, 642 F.3d 364, 369-70 (2d Cir. 2011).

LBE's Fourth, Fifth, Sixth, Seventh, Eighth, Tenth, Eleventh, Twelfth, and Thirteenth Causes of Action: The claims that remain are LBE's state-law causes of action and its copyright claim. The Court dismisses these claims **without prejudice**.

This outcome is straightforward for all of LBE's state-law claims: The Court has declined supplemental jurisdiction over these claims to allow LBE to refile them in state court. But the Court's reason for denying without prejudice LBE's copyright claim (which arises under federal law) requires more explanation. The Court dismissed this claim because LBE does not hold (and indeed, has not even applied for) a copyright. (*See supra* at 71-72). The Copyright Act commands that result: 17 U.S.C. § 411(a) states that "no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made." And "[c]ourts within this Circuit have consistently held that failing to

meet a statutory precondition to suit precludes adjudication on the merits and warrants dismissal without prejudice." *Senisi* v. *John Wiley & Sons, Inc.,* No. 13 Civ. 3314 (LTS), 2016 WL 1045560, at *3 (S.D.N.Y. Mar. 15, 2016); *see Duncan,* 2015 WL 4393316, at *7 (dismissing plaintiff's copyright claim without prejudice where plaintiff's copyright application was pending); *cf. Palmer/Kane LLC* v. *Rosen Book Works LLC*, 204 F. Supp. 3d 565, 574 (S.D.N.Y. 2016) (dismissing without prejudice infringement claims based on unregistered works, because issue of dismissal with prejudice *vel non* "ha[d] not been adequately briefed"). The Court will follow suit here, and dismiss Plaintiff's copyright claim without prejudice.

## CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss LBE's First Amended Complaint is GRANTED. LBE's First, Second, Third, and Ninth Causes of Action are DISMISSED WITH PREJUDICE. LBE's Fourth, Fifth, Sixth, Seventh, Eighth, Tenth, Eleventh, Twelfth, and Thirteenth Causes of Action are DISMISSED WITHOUT PREJUDICE.

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:  September 25, 2017
        New York, New York

_____
        KATHERINE POLK FAILLA
        United States District Judge